## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

Jane Doe,

             Plaintiff,

v.

Loyola University Maryland,

             Defendant.

---

**Jury Trial Demand**

**VERIFIED COMPLAINT**

**Case No.:**

---

Plaintiff Jane Doe[1] ("Plaintiff") as and for her Complaint against Loyola University Maryland respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1. Jane Doe seeks damages and injunctive relief from the unlawful actions taken and procedures employed by Defendant and its agents that resulted in the wrongful suspension of Plaintiff, then a first-year student. The suspension was the result of a rigged and unfair disciplinary process put in place to rush to a pre-determined result and to minimize legal risk, with deliberate disregard for the consequences to Plaintiff, in violation of both state and federal law.

### THE PARTIES

2. Plaintiff Jane Doe resides in the State of Virginia. Jane Doe was a full-time student at Loyola University Maryland in Spring 2019.

---

[1] Plaintiff has filed a Motion to proceed pseudonymously.

3. Defendant Loyola University Maryland is a private, liberal arts college and a domestic non-profit corporation incorporated in Maryland, with its principal place of business located at 4501 N. Charles Street, Baltimore, MD 21210.

## JURISDICTION AND VENUE

4. This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because: Plaintiff states claims arising under the Constitution and laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

5. Plaintiff also invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6. This Court has personal jurisdiction over Defendant on the grounds that it is conducting business within the State of Maryland.

7. Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Defendant is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

### A.    Loyola University Maryland

8. Defendant is a private university with a student population of approximately 4,000 undergraduate students.

9. During the 2018-2019 academic year, the United States Department of Education ("ED") distributed billions of dollars to public and private colleges and universities for students attending their schools. Upon information and belief, Loyola University Maryland was a recipient of such federal funding.

**B.    Growing National and Federal Pressure to Hold Accused Students Responsible for Sexual Assault**

10. This case arises amidst a growing national controversy stemming from the Department of Education's Office of Civil Rights ("OCR") threats to withhold federal education dollars in order to compel colleges and universities to address so-called "sexual violence" on campuses.

11. OCR's threatened withholding of federal funds puts great pressure on Defendant and other universities to treat students accused of sexual misconduct with a presumption of guilt and to simply punish the student in order to avoid jeopardizing the flow of taxpayer dollars, under the guise of making campuses safe.

12. As detailed below, for years, Defendant and other universities were under federal scrutiny from the ED for alleged indifference to sexual violence on campus in violation of Title IX, and for violations of the Clery Act, which requires colleges to keep and disclose information about crime on and near their respective campuses. Title IX compliance is monitored in part by the ED which can impose civil penalties and can suspend institutions from participating in federal student aid programs.

13. Upon information and belief, Defendant's violations of Plaintiff's rights occurred in part because of threats by the federal government that universities could lose federal funding or

face other adverse consequences for not finding students like Plaintiff responsible for sexual assault. Evidence of this pressure includes but is not limited to, the White House's April 2014 report entitled "Not Alone", which encouraged schools to combat sexual assault on campuses and warnings that if colleges do not adhere to Title IX they "risk[] losing federal funds" and/or face potential lawsuits filed by the Department of Justice."[2]

C.    **Federal Statutory and Regulatory Requirements Concerning Allegations of Sexual Assault.**

14. The issue of sexual assaults on college and university campuses is primarily addressed by an act of Congress known as Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688. Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations.[3] A school specifically agrees, as a condition for receiving federal funds, to operate all of its programs and activities in accordance with Title IX and the Department of Education's Title IX regulations. This agreement is known as an "assurance of compliance."[4] In this respect, Title IX is no different from other federal legislation that conditions the entitlement to federal funds on adherence to a federal regulatory scheme.

15. Defendant, as a recipient of federal funds, is bound by Title IX and its regulations, and, upon information and belief, has executed an assurance of compliance.

---

[2] *See https://www.notalone.gov/assets/report.pdf.*
[3] 20 U.S.C. §§ 1681(a), 1687.
[4] 34 C.F.R. § 106.4(a)-(c).

16. Since regulations were first promulgated under Title IX in 1972[5], there has been a requirement that a school "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or its regulations.[6] Both the Department of Education and the Department of Justice have set forth this requirement by way of regulation.[7] It has also long been recognized by "[t]he Supreme Court, Congress, and Federal executive departments and agencies . . . that sexual harassment of students can constitute discrimination prohibited by Title IX."[8] "Sexual Harassment" is broadly defined as "unwelcome conduct of a sexual nature" that includes sexual intercourse, sexual assault, and rape. Student-on-student sexual harassment is prohibited by Title IX, as are other forms of sexual harassment.[9]

17. The Office for Civil Rights ("OCR") of the Department of Education investigates and administratively enforces Title IX as it relates to sexual harassment. In 2001, OCR promulgated regulations pursuant to notice-and-comment rulemaking[10] in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance").[11] OCR issued these regulations to "continue[ ] to provide the principles that a school should use to recognize and

---

[5] U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001) at 36 n.98 (notice of publication at 66 Fed. Reg. 5512 (January 19, 2001)) ("2001 Guidance"), available at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

[6] 34 C.F.R. § 106.8(b)

[7] 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice).

[8] 2001 Guidance at 2 & n.3.

[9] *Id.* at 2-3 & nn.2, 3, 6, 8, 20.

[10] *Id.* at ii.

[11] *See* note 3 *supra.*

effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance."[12]

18. Title IX's regulations, including the 2001 Guidance, have the force and effect of law, for they affect individual rights and obligations, and were the product of notice-and-comment rulemaking.

19. In the 2001 Guidance, OCR recognized that "procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience."[13] Nevertheless, OCR has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable" requirement of the regulations.

20. First, in a section entitled "Due Process Rights of the Accused," OCR states that the procedures must not only "ensure the Title IX rights of the complainant," but must do so while "according due process to both parties involved."[14] This Title IX "due process" requirement applies to both state and private colleges and universities.[15]

21. The "prompt and equitable" procedures that a school is required to implement to "accord due process to both parties involved" must include, at a minimum: "Notice . . . of the procedure, including where complaints may be filed"; "Application of the procedure to complaints alleging [sexual] harassment . . ."; "Adequate, reliable, and impartial investigation of

---

[12] 2001 Guidance at i.

[13] 2001 Guidance at 20.

[14] Id. at 22.

[15] Id. at 2, 22.

complaints, including the opportunity to present witnesses and other evidence"; "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and "Notice to the parties of the outcome of the complaint . . . ."[16]

22. A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment," which includes "alleged sexual assaults."[17]

**D.     2011 Dear Colleague Letter clarifies certain elements of basic fairness to be provided to the accused.**

23. In April 2011, OCR issued a "significant guidance document" commonly referred to as the "Dear Colleague Letter."[18]

24. The Letter reaffirmed the vitality of the 2001 Guidance while putting pressure on schools to find students accused of sexual assault responsible. As set forth in the Letter, OCR states that compliance with Title IX requires the following:

  a. A school's "Title IX coordinator [the official charged with compliance] should review the [school's] disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX."[19]

  b. "Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police

---

[16] Id. at 20.

[17] Id. at 21.

[18] "Dear Colleague" Letter from Russlynn Ali, Assistant Secretary for Civil Rights, U.S. Department of Education (Apr. 4, 2011), available at http://www2.ed.gov/about/offices/list/ocr/letters/colleagues-201104.pdf.

[19] *Id.* at 8.

department has completed its gathering of evidence . . . , the school must promptly

resume and complete its fact-finding for the Title IX investigation."[20]

c.   The complainant and the accused student "must have an equal opportunity to present

relevant witnesses and other evidence."[21]

d.   The complainant and the accused student "must be afforded similar and timely access

to any information that will be used at the hearing. For example, a school should not

conduct a pre-hearing meeting during which only the [complainant] is present and

given an opportunity to present his or her side of the story, unless a similar meeting

takes place with the [accused student]."[22]

e.   "Schools must maintain documentation of all proceedings, which may include written

findings of fact, transcripts, or audio recordings."[23]

f.   "[S]chools [should] provide an appeals process."[24]

g.   "In sexual violence cases, the fact-finder and decision-maker also should have

adequate training or knowledge regarding sexual violence."[25]

h.   "If an investigation or hearing involves forensic evidence, that evidence should be

reviewed by a trained forensic examiner."[26]

E.   **2011 Dear Colleague Letter and April 29, 2014 guidance question and answers
rescinded, more specific requirements related to burden of proof placed on school
and requirements to consider exculpatory evidence implemented.**

---

[20] *Id.* at 10 (emphasis added) (footnote omitted).

[21] *Id.* at 8.

[22] *Id.* (emphasis added).

[23] *Id.* at 12 (emphasis added).

[24] *Id.*

[25] *Id.* (emphasis added).

[26] *Id.* (emphasis added).

25. In September 2017, in response to concerns that prior guidelines had created a system that had gone too far and was treating the accused unfairly, the OCR issued a "significant guidance document" entitled "Q&A on Campus Sexual Misconduct." That Q&A rescinded the Dear Colleague letter and the Questions and Answers on Title IX Sexual Violence dated April 29, 2014, noting that the withdrawn documents "ignored notice and comment requirements, created a system that lacked basic elements of due process and failed to ensure fundamental fairness.[27]"

26. The 2017 Q&A, while reaffirming the vitality of the 2001 and 2006 Guidance Documents, made notable changes from the guidance provided in the Dear Colleague Letter and the 2014 Q&A Guidance, including:

  a. Requiring that the trained investigator "analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and **exculpatory evidence**—and take into account the unique and complex circumstances of each case. (emphasis added)

  b. Removing the requirement that findings of fact and conclusions must be reached by applying a preponderance of the evidence standard and allowing institutions to decide whether to apply the more likely than not preponderance standard or the highly probable clear and convincing evidence standard[28];

---

[27] https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf

[28] Id. at Question 8

   c. Making it clear that the burden is on the institution, and not on either party, to gather

      sufficient evidence to reach a fair and impartial determination as to whether sexual

      misconduct has occurred[29]; and

   d. Removing the 60-day deadline for adjudication of claims in favor of a prompt

      resolution of claims that afforded both parties fairness.

**F.**    **Defendant's Policy Prohibiting Discrimination, Harassment and Related Misconduct.**

27. Defendant's "Sexual and Gender Based Misconduct" policy sets forth the definitions

applicable to allegations of sexual misconduct, as set forth below: (See Exhibit 1 – Loyola

University 2018-19 Community Standards).

### 21.SexualandGenderBasedMisconduct

For purposes of this section, "consent" is defined as an affirmative indication by words and/or actions of a voluntary agreement to engage in the particular sexual act or conduct in question. Consent for one sexual act or conduct does not constitute consent to all sexual acts or conduct. Consent can be withdrawn at any time, and once withdrawal of consent has been expressed, sexual activity must cease. Consent cannot be obtained through the use of force, threat, intimidation, or coercion. Consent cannot be given by someone who is not able to effectively communicate or to understand the nature of the conduct being engaged in as a result of incapacitation due to consuming drugs or alcohol or for any other reason (including but not limited to being unconscious, asleep, or otherwise unaware that sexual activity is occurring). Incapacitation may also exist because of a physical, mental or developmental disability. Silence or absence of resistance on the part of an individual does not constitute their consent.

Sexual and gender based misconduct includes gender based harassment that does not involve conduct of a sexual nature.

a. Sexual Harassment

Sexual harassment is defined as unwelcome sexual advances, requests, and other verbal or physical conduct of a sexual nature when submission to or rejection of such conduct is

---

[29] Id. at question 6

a condition or basis for employment or educational decisions affecting the individual, or which is sufficiently severe, pervasive, and objectively offensive as to have the purpose or effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile, or offensive educational or work environment.

b. Sexual Verbal Abuse

Sexual verbal abuse is using language that is sexual in nature and unwanted on the part of another person. Examples include but are not limited to phone calls or use of written and/or verbal communication that are intimidating, threatening, or obscene in nature.

c. Sexual Assault

Sexual assault includes any sexual act or sexual contact without consent, including intercourse; oral sex; unwanted touching of an intimate body part of another person, such as sexual organs, buttocks, or breasts; or an attempt of any of the above. Rape is a type of sexual assault. This description of prohibited sexual acts and conduct is not intended to be inclusive of all conduct that could fall within this category. It is the intent of this policy to provide notice that any unconsented sexual conduct, whether by a stranger or an acquaintance of the victim, is prohibited.

d. Domestic Violence

Domestic violence includes felony or misdemeanor crimes of violence committed by a current or former spouse of the victim by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of Maryland, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic violence laws of Maryland.

e. Dating Violence

Dating violence encompasses a broad range of behaviors, including sexual assault, physical abuse, and other forms of violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the complainant and where the existence of such a relationship is determined based on the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

f. Stalking

Stalking means engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others, or suffer

substantial emotional distress.

g. Sexual Exploitation

Sexual exploitation means taking non-consensual or abusive sexual advantage of another person for one's own advantage or benefit or for the advantage or benefit of anyone other than the person being exploited. Examples include but are not limited to non-consensual photography, video, or audio recording sexual images or activity, distributing images of sexual activity without consent, allowing others to observe a consensual sexual act without the prior knowledge or consent of all involved parties, and voyeurism.

28. The "Procedures for Adjudicating Charges of Sexual Misconduct" provide as follows:

The University's procedures provide for prompt, fair, equitable, and impartial investigation and resolution of all reports of sexual misconduct. Investigations and hearings will be conducted by officials who have received annual training on the issues related to domestic violence, dating violence, sexual assault, and stalking and on how to conduct an investigation and hearing process that protects the safety of participants and promotes accountability. Actions by the police or criminal courts do not in any way preclude the University from pursuing charges through the University's student conduct system. Similarly, pursuit of charges through the student conduct system does not preclude the pursuit of criminal charges. In cases where law enforcement directs the University to suspend its investigative efforts, the University will cooperate with all investigative efforts and will promptly resume its own investigation or adjudication of the case when permitted to do so. Reports of sexual assault, dating violence, domestic violence, and stalking will not be resolved through mediation.

All participants will be treated with dignity, respect, and sensitivity. The complainant and respondent will be notified of the date, time and location of each hearing, meeting, or interview that the student is required or permitted to attend and shall have the right to be accompanied by an advisor of choice. The time frame for conducting the investigation is usually 60 University business days. The time frames for the hearing panel proceedings and any appeal(s) are set forth below. Each of these deadlines may be extended for good cause. The University will notify the parties when a delay is anticipated.

The Title IX Deputy for Students will provide the respondent with timely written notice of the reported violation, including the date, time and location of the alleged violation, the type of sexual misconduct alleged, the conduct allegedly constituting the violation, and the range of potential sanctions associated with the alleged violation. The Title IX Deputy for Students (or their designee) will designate an investigator and coordinate the logistics of the investigation process. The

complainant and respondent shall have the right to submit to the investigator evidence, witness lists, and suggested questions for witnesses. At the conclusion of the investigation, the investigator shall prepare a written report summarizing and analyzing the evidence. The complainant and respondent will receive the investigative report and may submit a written response to the Title IX Deputy for Students (or their designee) within five University business days. The Title IX Deputy for Students (or their designee) will provide the written response to the Office of Student Conduct to be included in the materials reviewed by the hearing panel. Each party's written response, if any, will be shared with the other party. Based on the investigation and the parties' responses, if any, the Office of Student Conduct may schedule a sexual misconduct hearing panel, usually within 15 University business (sic) following receipt of the investigative report and parties' responses from the Title IX Deputy for Students (or their designee). .

All hearings, also known as proceedings, involving sexual misconduct will be conducted in accordance with the normal rules and procedures of the student conduct process with special sensitivity to the nature of the charges and the best interests of all parties involved. All participants are expected to maintain confidentiality regarding the proceedings, except that the complainant and the respondent may not be required to maintain confidentiality as to the outcome of the proceedings and any directives regarding confidentiality shall not impede the parties' ability to obtain and present evidence or otherwise support or defend their interests. In recognition of the unique nature of sexual misconduct cases, the procedures specified in this section supersede any conflicting provisions of the University student conduct process.

i. The sexual misconduct hearing panel will be comprised of one faculty member, one administrator, and the Director of Student Conduct (or their designee). All panel members will receive special training on sexual misconduct cases. Both the complainant and the respondent will receive the list of potential hearing panel and appeal panel members and will have one University business day to request removal of any member who they believe could not be objective toward them based on previous interactions. A request for removal must state with specificity the grounds for removal. The Dean of Students (or their designee) shall review the merits of a request for removal, including discussing with the challenged panel member(s) whether the member(s) could serve objectively (sic)  The Dean of Students (or their designee) shall make the final decision regarding removal.

ii. If, in the judgment of the Director of Student Conduct (or their designee), the timing of the proceedings precludes the participation of a faculty member, the Director of Student Conduct (or their designee) and a University administrator will serve as hearing officers for the case.

iii. The respondent and complainant may each have an advisor present throughout the entire process, including the hearing. The advisor is not allowed to address the investigators, address the hearing panel, or question witnesses. The advisor cannot serve as a witness. Both the complainant and the respondent can have an advisor of choice, which can include parents, attorneys, or others who are not fulltime members of the University community. Disruptive advisors will be removed from the process, and the process will continue. Students are required to notify the Office of Student Conduct one University business day in advance of the hearing date if a student plans to bring an advisor. Advisors can request an outline of their role and expectations for their participation in the student conduct process.

iv. Under Title IX, both the respondent and complainant have a right to similar and timely access to information that will be used at the hearing. The hearing materials, or instructions for how to view certain materials, normally will be distributed to the parties and the members of the hearing panel five University business days prior to the hearing.

v. The respondent and the complainant each have the right to bring fact witnesses to the hearing to testify on their behalf. There is no limitation placed on the number of fact witnesses; however, students are required to notify the hearing officer of the names of witnesses attending the hearing at least one University business day in advance of the hearing. In the event that a fact witness cannot attend a hearing, the fact witness may email or personally deliver a signed written statement directly to the hearing officer in advance of the scheduled hearing. Students also may submit up to two character witness statements in writing to the Office of Student Conduct at least one University business day prior to the hearing.

vi. The hearing will begin with the panel chair going over the student rights and responsibilities for the respondent, and then reading the charges. The respondent will have the opportunity to present a brief statement to the panel and respond to questions from the panel. The complainant will then have an opportunity to present a brief statement to the panel and respond to questions from the panel. Either party may choose to present their testimony outside of the presence of the other party, but the non-testifying party will be able to listen to the testimony remotely. The parties have the right to listen to all testimony given during the hearing, if they so choose. The panel will then call witnesses and has the ability to recall the parties and any witness for clarification. The complainant has the right to provide a written impact statement that describes how the incident has affected them. The impact statement is reviewed by the hearing panel only if a determination of responsibility is made and before a sanction is determined. If an impact statement was submitted and reviewed by the hearing panel, a copy will be provided to the respondent with the decision letter.

vii. Statements or questions regarding the past sexual history of the respondent or complainant generally may not be presented as evidence during the hearing except as they relate to the past sexual history of the respondent with the complainant, to prove the source of an injury, to prove prior sexual misconduct, to support a claim that a party has an ulterior motive, or to impeach a party's credibility after that party has put their own sexual conduct at issue. Evidence regarding a student's medical history, including mental health counseling, treatment or diagnosis, may not be presented without that student's consent.

viii. The panel will make findings of fact and determinations using a preponderance of evidence standard. If the panel determines that the respondent is responsible for a violation of this policy, the panel will decide the appropriate sanctions in accordance with the Student Code of Conduct. Drug or alcohol use by the respondent is not a defense to a charge of sexual misconduct and will not be considered a mitigating factor in assessing an appropriate sanction. Violations of the sexual misconduct policy are serious and the range of sanctions includes the following: written reprimand, fine, restitution, educational project, alcohol and drug screening/education/treatment, civility hours, parental notification, restricted access or privileges, senior week restrictions, loss of room selection privileges, relocation to another residence, restricted contact, social restrictions, residence hall probation, disciplinary probation, deferred suspension from the residence halls, deferred suspension from the University, suspension from the residence halls, suspension from the University, expulsion, student development assessment and evaluation, periodic drug testing, postponement of activity participation and conferring of honors and degrees, mentoring with an administrator, Jesuit reflection, and continuation/modification or (sic) interim measures.

ix. The respondent and the complainant will be informed concurrently in writing of the outcome of the hearing, also known as the result, normally within ten (10) University business days. Both parties will receive written notice of any sanctions imposed on the respondent, except that in cases of non-violent sexual harassment the complainant will only receive notice of any sanctions that relate directly to the complainant. The result must also include the rationale for the result and the sanctions.

x. The complainant and the respondent each have the right to appeal the hearing panel's decision and/or the sanction to the University Board on Discipline. In cases where appeals are submitted by both parties, both appeals will be considered together by the same board. If only one party appeals, the other party has the right to attend the hearing and participate. Unless indicated otherwise in the original decision letter, the type written appeal should be submitted via email or in person to the Dean of Students in Jenkins Hall 105. The appeal must be submitted within

five University business days of receipt of the decision letter of the hearing panel. If a party does not appeal the hearing panel's decision within this time period, they have waived a right to appeal. An appeal must be based upon one or more of the following grounds:

- The party alleges that their rights to a fair hearing were violated.
- The party alleges that new evidence that was not available for the original hearing might impact the decision of responsibility or determination of sanction.
- The party alleges that the sanctions imposed are grossly disproportionate to the findings of responsibility.

The burden is on the student to provide support in the appeal letter for the asserted grounds. The Dean of Students (or their designee) shall determine whether the student has provided sufficient support for each asserted ground. failure to follow the guidelines or to provide sufficient support for the asserted grounds will result in the Dean of Students (or their designee) determining that only certain asserted grounds should be submitted for review by the University Board on Discipline or that the appeal should be dismissed without further proceedings. When an appeal letter is accepted, the other party will be given a copy of the appeal letter and the opportunity to submit a written response within five University business days.

No panel members who were involved in the original hearing will serve on the University Board on Discipline for the appeal. For appeals in sexual misconduct cases, the Board is comprised of at least one faculty member and up to two University administrators. The University reserves the right to have a modified board hear the appeal when circumstances warrant it.

The University Board on Discipline that hears the appeal can take the following actions: affirm the original decision of the hearing panel, affirm the original decision of responsibility for some or all of the charges and change the sanction (sanction may be reduced or increased), reverse the original decision of responsibility for some or all of the charges, or remand the matter to the original hearing panel for further consideration. Upon remand, if the original hearing panel affirms its prior decisions regarding responsibility and sanctions, the University Board on Discipline shall continue its review and render a decision on the original appeal(s). If the original hearing panel reverses or modifies its original decisions regarding responsibility and/or sanctions, each party shall have a right to appeal to the University Board on Discipline.

xi. Except in cases involving the discovery of new evidence, the Board will review the hearing record, the appeal letter and response, and the decision and rationale of the hearing panel. The Board may meet with the student who is making the appeal and the original hearing officer. The other party may attend such meeting(s), but is

not required to do so. In cases where the appeal is based in whole or in part on a claim of newly discovered evidence, the Board will first determine if the offered evidence was not known at the time of the hearing and if it might impact the decision of responsibility or determination of sanction. If the Board determines that the evidence was not known at the time of the hearing and that it might impact the decision of responsibility or determination of sanction, the Board will remand the case to the original hearing panel for review and the panel will issue a new decision letter taking into account the newly discovered evidence.

xii. The Board's decision will be communicated concurrently in writing to both the respondent and the complainant, normally within five University business days of the appeal hearing. The decision of the University Board on Discipline is final, and no further appeal is permitted by either party.

Retaliation

Any retaliation, reprisal, or intimidation directed toward a complainant or anyone else as a result of reporting or participating in an investigation or adjudication of alleged sexual misconduct is strictly prohibited. Any incidents of retaliation should be reported immediately to Student Conduct and are considered a serious violation.

28. The "Procedures for Adjudicating Charges of Sexual Misconduct" also provide as

follows as it relates to the possession of weapons on campus:

**Weapons and Ammunition**

Unauthorized use, possession, or storage of any weapon or ammunition on University premises or at University sponsored activities is strictly prohibited. This includes, but is not limited to firearms, BB guns, air rifles, slingshots, paintball guns, swords, knives, tasers of any kind, ammunition, etc. Standard sanction: expulsion.

**G.    The Night of January 20 and morning of January 21, 2019**

29. At approximately 10:00 p.m., on January 20, 2019, Plaintiff, John Doe and approximately

eight (8) others were visiting, playing cards and drinking alcohol in Plaintiff's dorm room in

Flannery O'Connor dorm over the course of the evening.

30. During this time, John Doe consumed alcohol from a bottle in his backpack.

31. Plaintiff also consumed alcohol, in the form of two Smirnoff Ice bottles and two (2) shots of vodka.

32. Eventually, the party broke up, and Plaintiff ended up alone in her room with John Doe, with both parties sitting the floor.

33. After the room cleared out, Plaintiff and John Doe talked about and showed each other their tattoos.

34. After several minutes of talking, Plaintiff asked John Doe if she could kiss him.

35. John Doe said "yes".

36. Plaintiff and John Doe then kissed for several minutes.

37. John Doe went to the bathroom and then removed his shirt.

38. When John returned to Plaintiff's room, he began kissing Jane Doe again.

39. While Plaintiff and John Doe were kissing on her bed, there was a knock at Plaintiff's door.

40. Answering the door, Plaintiff found Kayla Ingram and Dominic Nesmith were there and wanted to give Plaintiff and update on a friend who had made a suicidal statement earlier in the evening and to get Dominic's slippers.

41. Both witnesses stated John Doe was on Plaintiff's bed with his shirt off at the time.

42. After the visitors left, John Doe removed his pants and asked Plaintiff if they could "fuck"

43. Plaintiff told John Doe that they had to wait for a few minutes because Plaintiff's roommate had texted and said she needed something from the room.

44. While Plaintiff and John Doe waited for Plaintiff's roommate to get back, and then leave again, they talked and Plaintiff asked John Doe if he was sure he wanted to have sex.

45. Jane Doe removed her clothes, leaving just under garments on.

46. After Plaintiff's roommate left, John Doe again asked Plaintiff if they could "fuck".

47. Plaintiff asked if he still watned to have sex, John Doe pointed at his erect penis inside his boxers and said suggestively, "what do you think?"

48. John Doe took off his own boxers and laid on his back on Plaintiff's bed. Jane Doe removed the rest of her undergarments at this point.

49. John Doe then leaned forward and grabbed the Plaintiff by the hips and moved her into a straddling position on top of him.

50. While Plaintiff was straddling John Doe, he grabbed her hips very roughly.  He then after rutting against her, pushed her below him and then stuck his fingers roughly into Plaintiff's vagina. He had given no earlier indication or asked to do this action. He at this point had assumed the dominant positon on top of her and she could not see his hand or where it was going.

51. This was painful for Plaintiff and caused her to bleed from her vagina, with blood getting on her sheets.  The plaintiff remained still, hoping that this would cause the act to end quicker and for the pain to be over. After several minutes, John Doe removed his fingers. At this point the Plaintiff did not give her full consent for any next actions, but did not say anything as she was scared because he had pinned her down forcefully and she was much smaller than he and was worried he could hurt her.

52. John Doe reached for his backpack on the ground by the foot of the bed to retrieve his Wallet with the condom inside it. (Trojan extra thin grey condom). The Plaintiff stayed still, in pain, John Doe placed his condom on his own erect penis.

53. John Doe then assumed the dominant position putting his entire weight on top of her and then asked Plaintiff is he could choke her.

54. Plaintiff said she was not sure, and John Doe ignored this and then put his hands around Plaintiff's neck and squeezed hard choking her.

55. As John Doe was starting to grab Plaintiff's neck, he also inserted his penis into Plaintiff's vagina and started to thrust.

56. Plaintiff pushed at John Doe's hands and after unwanted thrusts of his penis into her vagina, and then she pushed his hands off of her neck resulting in redness and bruising.

57. After Plaintiff removed John Doe's hands from her throat, John Doe placed his hands on either side of Plaintiff's head and pushed his forearms and elbows onto Plaintiff's shoulders and clavicle, causing pain in both of her shoulders and in her chest.

58. While John Doe was on top of Plaintiff, he had her pinned down and said "take it like a little slut" several times.

59. John Doe then asked Plaintiff to scratch his back, which she did, lightly.

60. John Doe then asked Plaintiff to scratch harder, scared she complied.  Plaintiff was afraid of his actions.

61. He proceeded to call the plaintiff a little slut.

62. John Doe then ejaculated into the condom, pulled his penis from Plaintiff's vagina, and sat up on the bed.

63. After that, John Doe removed the condom from his penis, threw it onto the floor, and started to get dressed.  The plaintiff, very quietly asked if John Doe ejaculated and he responded with yes.  And that is all that he said to her.

64. Plaintiff tried to talk with John Doe, but he did not respond to her, and then used his phone to call Zoe Haas, to ask her to come get him so he could get into Hammerman.

65. John Doe then called Chuck Ogala, and told Chuck that he was still in Plaintiff's room, and was coming to Hammerman.

66. Around that same time, John Doe also texted Eddie Leimbach, and then Zoe Haas.

67. When Zoe and Chuck arrived at Plaintiff's dorm room together, John Doe packed up his backpack left with him.

## H.   John Doe Leaves Plaintiff's Room

68. After leaving Plaintiff's room, John Doe allegedly broke down in the hallway, stating that had been raped.

69. However, after several moments John Doe was able to walk and went to Hammerman.

70. Once at Hammerman, John Doe conversed with multiple people, including calling his ex-girlfriend, who later observed the scratches on John Doe's back.

71. John Doe and several witnesses describe the scratches as "severe", however, photographs taken on January 21, 2019, do not support that contention.

## I.   Plaintiff's actions following the assault

72. Plaintiff stayed in her room that night, and awoke to find a used rubber on the floor along with a hunting knife left in the open position

73. On January 23, Plaintiff returned to her family home in Virginia, and on January 24, 2019, Plaintiff presented at the doctor's office for evaluation and treatment of the injuries she suffered during the sexual encounter with John Doe.

74. There, a doctor performed a full examination on Plaintiff, which included taking photographs of the visible bruising and swelling on Plaintiff's shoulders, hips, and neck.

75. Plaintiff also had her roommate take photographs of the bruises on her neck, shoulders, and hips. (See Exhibit 2– Photos of Injuries).

76. An examination of Plaintiff's vagina showed a 1-cm first-degree vaginal tear at the introitus on the superior aspect. The Plaintiff had abnormal uterine and vaginal bleeding, laceration of the vagina, pain in shoulder, hips, and back, and was a victim of sexual abuse (See Exhibit 3 - Physical Examination of 24 January 2019).

77. X-rays were ordered, and Plaintiff was referred for physical therapy for the pain in her neck, shoulder, and hips from the sexual encounter with John Doe.

78. Plaintiff underwent physical therapy for the pain in her neck, shoulder, and hips Physical Therapy Records – starting 12 February and continuing through the present day. (See Exhibit 4 – Physical Therapy Records).

79. Plaintiff was placed on additional anxiety medications by the school psychologist during the investigation process, and began to have flare ups of Panic Disorder that was previously in remission.

80. Plaintiff was diagnosed with PTSD and is currently in counseling as of December 2019. (See Exhibit 5 - Letter from LCSW – 16 November 2019).

**J.     Plaintiff is Informed of Allegations**

81. On January 23, 2019, Plaintiff was verbally informed of the charges against her initiated by John Doe, and also received an email from Title IX Deputy Coordinator for Students stating that Loyola had issued a mutual no contact order between Plaintiff and John Doe.  (See

Exhibit 6- Sexual Misconduct Incident Report Loyola University Maryland – 22 January 2019).

82. In addition to the No Contact requirement, the letter also forbade Plaintiff from discussing the events with "any student at Loyola University unless this matter has been referred for an official university action." (Emphasis in original).

83. This was in contradiction of the spirit of the university guidelines, which stated: "any directives regarding confidentiality shall not impede the parties' ability to obtain and present evidence or otherwise support or defend their interests" and undermined Plaintiff's ability to defend herself.

84. However, even with the No Contact order, John Doe was seen around and near the plaintiff's dorm, even though he was a day student

85. The Plaintiff obtained legal counsel and submitted her claim of sexual assault against John Doe. (See Exhibit 7 - February 8, 2019).

## K.     Plaintiff Meets with Defendant's Investigator

86. From the beginning of this case, there was obvious gender bias against the Plaintiff. John Doe was reported to be pansexual. The administration took overt actions to protect John Doe from the charges against him, possibly because he launched the initial sexual assault claim against the Plaintiff and they rushed to judgement before the Hearing, or they didn't want to deter other students from reporting sexual assault by punishing someone who made a claim of sexual assault, or because of his sexual orientation.

87. Title IX Coordinator, Kurita Kitsura, coordinated a single investigation, conducted by a single person, Stephanie P. Karn, rather than separate investigations to independently and objectively address each incident complaint.

88. It is unclear why Kitsura picked a single investigator to investigate both complaints, or what Kitsura told the investigator in advance of accomplishing the investigation, but this approach introduced significant bias into the investigative process that violated the Plaintiff's right to a fair and impartial hearing.

89. The investigator either purposefully or negligently did not completely or objectively investigate the Plaintiff complaints against John Doe. The investigative report findings and conclusions did not include significant facts or analysis that would have supported the Plaintiff's statements, either as a respondent or a claimant.

90. Even though the Plaintiff was allowed to respond to the report, it is evident that the Hearing Panel either did not read her rebuttal or did not believe her over the investigator.

91. Stephanie P. Karn's role as a litigator is to protect universities from lawsuits.

92. Additionally, Karn is known to have represented at least one accuser, in a case that resulted in litigation and denial of the school's motion to dismiss before settlement. See https://deadspin.com/liberty-university-settles-claim-that-it-expelled-footb-1825023756

93. None of the interviews conducted by the investigator, Stephanie Karn, were recorded, so there is no way to determine whether the questions were unbiased, of if any questions were asked of witnesses that could have supported that the Plaintiff's claim that she had been assaulted by John Doe. In particular, in the recorded testimony during the Hearing, one of the two witnesses, Brandan Walsh, communicated that his statements to the investigator that

supported the Plaintiff as the victim appeared to have been minimized.  (Exhibit 8 – May 13, 2019 Recorded Hearing Testimony).

94. The Plaintiff also made several corrections to the statement as captured by the investigator (See Exhibit 9 - Response to Investigative Report 12 April 2019).

95. Neither Plaintiff nor her advisor were permitted to interview any of the witnesses or attend the witness interviews, leaving solely the summary of interview which were not recorded or transcribed for use in the proceedings. This violated the Plaintiff's right to due process and timely review of the information during the investigative process, and later to a fair and impartial hearing, especially given that David Tiscione reported to the Appeals Board that the Panel placed so much emphasis on witness statements from the report (and not the Plaintiff's statements or physical evidence as captured in the report). (See Exhibit 10 - David Tiscione's Statement at Appeals Hearing).

96. These initial actions by the defendant to have a single attorney conduct a single investigation, to focus on statements of witnesses that not present during the assault on whether John Doe was inebriated to consent to sex, not to analyze relevant physical evidence, not to analyze injuries to the Plaintiff, was negligent or intentional. If this report was reviewed by the Title IX attorney prior to finalizing the report, it represents a coordinated effort not to fully investigate the Plaintiff claims that John Doe sexually assaulted her, or to prove that John Doe could not consent to sex in his assault claim.

97. There were indications in the investigative report that John Doe was discussing the case with at least one of the witnesses, Zoe Haas, as there was no way she should have known about the knife, yet she made it a point to try to explain away the knife in her statement to the

investigator. Plaintiff reported this to the Dean of Students during the Appeal Process, and was assured that the school would investigate, but there was no additional review of the investigative process to find out if Zoe Haas had influenced any of the other witnesses, or follow-on effort to review all of the witness statements in the investigative report. The investigative report was used as a primary document to find the Plaintiff responsible (according to statements he made in the Appeal Hearing). (See Exhibit 11 – Dean's Response to Plaintiff's Appeal).

98. During the investigative phase, prior to the original hearing, the Plaintiff was offered counseling by the Title IX attorney, and assured that her privacy would be protected, but when the Plaintiff later sought help from the school Psychiatrist, Dina Sokal, for anxiety and fear, the school psychiatrist stated to the Plaintiff that it was her understanding that the Plaintiff was responsible for the assault, and not John Doe. The Plaintiff also reported this fact to the Dean of Students during the Appeal process. The Dean of Students did not investigate this or try to determine if anyone from the Dean's Office, Student Conduct Office, or other school official had talked with the Psychiatrist about this case, even though it clearly violated the Plaintiff's right to privacy and may indicate additional violations of her rights by one or more of the parties in an attempt to influence the investigation, hearings, decisions, and sanctions in this case. (See Exhibit 12- Appeal Response from Dean of Students).

99. None of the care providers for Jane Doe were contacted or interviewed by the investigator, and none of the medical reports were analyzed in the findings and conclusions. The failure of the investigator to consult with licensed doctors and other care providers that supported the

Plaintiff's claims, or analyze the medical reports and physical evidence, violated the
Plaintiff's right to a complete and fair investigation and the 2017 Guidance that required that
the investigator consider both inculpatory and exculpatory evidence.

100.   There were several issues in the formatting and content of the actual report that reflected
favorably on John Doe made the Plaintiff look guilty:

  a.  The investigative report was organized by the order of complaints, starting with John
      Doe, effectively putting the Plaintiff in a respondent, or counter-stance position
      throughout the entire report. This sequence of claim and counter-claim was also later
      followed throughout the Hearing and Appeals Hearings. This made the Plaintiff look
      guilty.

  b.  The primary focus and content of the report, using only one set of witness interviews
      (conducted by a single investigator), was to identify the inebriated state of John Doe,
      and corroborate statements from witnesses that were not present during the actual
      assault. In addition, texts, and videos were collected to demonstrate that: the Plaintiff
      knew that John Doe was inebriated, insinuate that the Plaintiff tried to isolate John
      Doe, and to show that he was too drunk to consent to sex. (See Exhibit 13 –
      Investigation Report).

  c.  The investigation report findings did not analyze or describe multiple items of
      physical evidence that demonstrated that John Doe was able to communicate and
      initiated sex with the Plaintiff, including: undressing himself, retrieving his condom
      from his wallet and putting on his own condom, telling the Plaintiff that he wanted to
      fuck her, initiating sex with the Plaintiff, choking the Plaintiff from a superior

position, calling the Plaintiff lewd names, removing own condom, unlocking his

phone and texting and facetiming with friends immediately after having sex, and

leaving an open knife in the Plaintiff's room.  (See Exhibit 13 - Investigative Report).

d. Discrepancies with John Doe's account of what happened in the room alone with the

Plaintiff were never analyzed in any way by the investigator to see if John Doe's

description of events was physically plausible, or whether there was any possibility

that he could in fact have perpetrated an assault on the Plaintiff and then cried rape

afterwards. Instead, the report emphasized how the Plaintiff consented to sex (which

initially was true, but changed as the sex turned into a forcible assault). (See Exhibit

13 - Investigative Report).

e. The investigator never analyzed the physical aspects of the Plaintiff's claim that she

was assaulted by John Doe during sex or, as a respondent, items that could prove that

John Doe was capable of consent, including how as a male has to be sober enough to

ejaculate, that John Doe removed his own clothes and put on his own condom, John

Doe forcefully digitally penetrated the Plaintiff in a superior position, dressed himself,

and then texted his friends to come and get him. Instead, the majority of the

investigation focused primarily on John Doe's claim that he was unable to consent,

with a heavy focus on corroborative witness statements to show that John Doe was

too drunk to consent and make it appear as if the Plaintiff was trying to isolate him so

that she could take advantage of him sexually.

f. The investigative report analysis conclusions did not provide any determinations at all

from the physical evidence (what happened with the condom, texting, walking around

the Plaintiff's room and Hammerman, undressing himself and putting on a condom, ejaculating, etc.) that could either prove John Doe was capable of consent, or that could show in any way that John Doe sexually assaulted the Plaintiff.

g. The investigation report findings and conclusions did not address the medical report that described the Plaintiff's injuries, or the medical assessment that the Plaintiff was the victim of sexual assault. (See Exhibits 3, 4 ,5 - Medical Records and See Exhibit 13 - Investigative Report).

h. One of the witnesses, Brandon Walsh, interviewed by the investigator, reported at the hearing that the investigator had asked him who he really thought was the victim, and he responded that it was the Plaintiff, but this information was never captured in the statement recorded by the investigator. He further reported that the report appeared to minimize his comments according to his testimony later in the hearing. (See Exhibit 14 - Brandon Walsh Statement).

i. The Plaintiff had to make several corrections to the investigators account of her own statements.  (See Exhibit 15 – Comments/Corrections/Clarifications to Plaintiff's Recorded Interview Statement).

j. The report findings and conclusions made the Plaintiff look guilty and made John Doe look innocent. If this work was reviewed by the Title IX attorney before it was distributed to the students, this demonstrates a group effort to make the Plaintiff look guilty and to discount her claim against John Doe. As later attested by David Tiscione during the Appeal hearing, the Original Hearing Panel largely used this report to make a pre-determination about whether John Doe was incapacitated and whether the

Plaintiff 'isolated' John Doe in order to engage in sexual relations with him. (See Exhibit 10 - Appeal Board Statement by David Tiscione).

k. At no time in the investigative report, was there ever any consideration or analysis by the investigator or Hearing Panel that the 'rape' claim could be false or fabricated, or that in fact John Doe committed a forcible sexual assault against the Plaintiff.

l. If there had been separate investigations based on the Plaintiff's complaint, the Plaintiff's complaint would likely have been more impartially and fully investigated.

m. Because all of the witnesses were interviewed by the single investigator, and the interviews were not recorded, and because the witnesses were not present for either hearing, there was only the investigator's authoritative account of what they said. Although the Plaintiff contested items in the report, David Tiscione later stated at the Appeal Hearing that the Original Hearing Panel made their decision based upon corroborating witness reports documented in the report that John Doe was inebriated. David Tiscione specifically called out the Plaintiff's roommate's comment that John Doe was unintelligible, but the Hearing Panel never inquired about this during the hearing. This indicates that the Hearing Panel either did not consider Plaintiff's statement in her response to the investigative report that she heard John Doe's response clearly from her position sitting directly beside him on the bed, or they ignored the Plaintiff's statements and believed the witness statement in the report. (See Exhibit 10 - Appeals Board Testimony by David Tiscione and Exhibit 15 – Comments/Corrections/Clarifications to Plaintiff's Recorded Interview Statement).

101.   If the Title IX coordinator reviewed the investigative report and did not highlight these

discrepancies, then the question needs to be asked, what guidance and oversight was

provided to the investigator and the investigative process in this case? On April 18, 2019,

Plaintiff received an email from Director of Student Conduct David Tiscione informing her

that he had received the Investigative Report and was scheduling an administrative hearing

regarding both sets of allegations to take place on April 29, 2019 at 3:00 p.m.  (See Exhibit

17 - April 18, 2019 Letter).

102.   Also attached to that email were approximately 145 pages of documents, which Plaintiff

was asked to review in preparation for that hearing.

**L.     Knife Ignored**

103.   When initially discussed with Kurita Katsura, Title IX Coordinator, the Plaintiff was

advised that weapons on campus were prohibited, especially knives, and indicated that the

sanction is automatic expulsion, per the Loyola University Community Standards. (See

Exhibit 1- Loyola University 2018-19 Community Standards).

104.   The day before the Hearing, David Tiscione summarily emailed the Plaintiff and stated

that they were removing the Knife charge from the Plaintiff's Sexual Misconduct Incident.

105.   This action demonstrates a concerted bias to protect John Doe from review of the knife as

part of the sexual assault incident, which would have resulted in expulsion, and to prevent

the school having to report a weapon was involved in this incident.

106.   By an email, dated May 11, 2019, Plaintiff inquired of David Tiscione why allegations of

John Doe's possession of a knife had been removed from the charges.  (See Exhibit 17 –

May 10, 2019 Email).

107.   In response, David Tiscione stated that since the knife was not alleged to have been used as part of the sexual assault, it was not germane to the incident and would not be considered a violation of Loyola policy.  (See Exhibit 17 – May 10, 2019 Email).

108.   The Plaintiff responded to David Tiscione that an open hunting knife was left in her room during a sexual assault, and caused her significant fear, and was in violation of Community Standards (See Exhibit 17 - May 11, 2019 Email).

109.   Plaintiff was never provided any explanation for why Defendant, which insisted on conducting the investigation into Plaintiff and John Doe as one investigation, was so eager to remove consideration of the weapon's violation from the investigation.

110.   The issue of the opened knife was never addressed again, and John Doe was not held accountable for this violation, by either the Original Hearing Panel, the Dean of Students, or the Appeals Panel, despite it being left by a student who asserts he was so blackout drunk he was unable to control his own actions. This violated the Plaintiff's rights to a fair and impartial hearing, and was an overt action on the part of David Tiscione to protect John Doe from consequences of an action that could not be refuted.

**M.    The May 13, 2019 Hearing**

111.   The hearing occurred on May 13, 2019, with Plaintiff's attorney present.  (See Exhibit 8 – May 13, 2019 Hearing Transcript).

112.   Plaintiff, John Doe, Brendan Walsh and Katie McDonnell provided statements.

113.   During her testimony, Plaintiff described her interactions with John Doe, who she described as an active and alert participant, who was very aggressive in the sexual encounter.

114.   In his testimony, John Doe claimed to recall events up until he was in Plaintiff's bed, at
which point he recalled not wanting to have sexual contact with Plaintiff, but being unable to
move, and then nothing until he left Plaintiff's room with Zoe and Chuck.

115.   Brendon Walsh testified that he was with Plaintiff after the sexual encounter, and
Plaintiff appeared upset, though Brendan was uncertain if it was because of a fellow student
who had tried to harm himself or because of the sexual contact with John Doe, which
Brendan learned about at a later time.

116.   David Tiscione claimed to have training and experience, but this was only his second
case as a Panel Lead. (See Exhibit 10 - Appeals Board Testimony by David Tiscione).

117.   The gender bias was perpetuated by David Tiscione, the Director of Student Conduct,
who selected the members of the Hearing Panel and led the Hearing Panel. David Tiscione
treated the Plaintiff unfairly, and tried to protect John Doe from being found responsible for
the Plaintiff's claims against him.

118.   David Tiscione's bias against the Plaintiff is evident throughout this process, as described
below:

   a.  David Tiscione removed Plaintiff's weapons charge against John Doe the day prior to
       the hearing, in violation of the processes documented in the Community Standards
       Handbook. This violated the Plaintiff's due process in the sexual assault claim against
       John Doe. Removal of any examination of the open knife that was left in Plaintiff's
       room was particularly dubious given Defendant's approach of consolidating all issues
       into one grand adjudication.  Removing consideration of the knife shows that
       consolidation was done when it helped John, but not when it might benefit Plaintiff.

b. David Tiscione set the agenda of the Hearing Panel to cover John Doe's complaint first. Because the agenda started with John Doe's complaint, the Plaintiff was immediately established as a Respondent, and almost all of the Hearing Panel questioning was based upon the investigative report and John Doe's complaint, trying to prove he was too drunk to consent to sex. As a result, the Hearing Panel did not address the Plaintiff's complaint that John Doe had assaulted her until after they were finished focusing on John Doe as an alleged victim. The Plaintiff's case did not receive the same scrutiny as John Doe's complaint.

c. During the original hearing David Tiscione demonstrated obvious bias in favor of John Doe throughout the line of questioning. He peppered the Plaintiff with repeated and specific personal questions about whether she wanted sex as the act was occurring to try to show that she consented to the sexual acts which she claimed were rape. In contrast, he asked very few questions of John Doe about what happened in the room alone with the Plaintiff once John Doe stated that he could not remember anything. The questions to John Doe were focused on 'brown out' and 'black out.' This approach treated the Plaintiff as a respondent and made John Doe look like a victim.

d. David Tiscione filtered many of the cross examination questions the Plaintiff had prepared for the Hearing Panel. Several questions were not asked, and others were changed by David Tiscione when the questions were asked. (See Exhibit 22 – Hearing Questions for John Doe, by Plaintiff). David Tiscione stated later in the Appeal Hearing that the Hearing Panel did not need to ask these questions because John Doe had already said he could not remember, or they would be considered as antagonizing

John Doe. The Appeal Hearing subsequently determined that the Original Hearing Panel had adequately considered all of the questions in subsequent Appeal, and did not reevaluate the hearing or sanctions against the Plaintiff or John Doe. The Appeal Hearing Panel Members were never instructed to reevaluate this case or any of the evidence.

e. The Plaintiff was not allowed to be physically present in the room or cross examine John Doe, the investigator, or witnesses during the original hearing or Appeal Hearing.

f. The Original hearing panel did not analyze physical evidence or the Plaintiff's statements of the Plaintiff's injuries and physical evidence in her complaint against John Doe.  Mr. Tiscione asked several leading and inappropriate questions after the Plaintiff stated that the digital penetration performed by John Doe was not asked for, and was unwelcome. This presumption that, because the Plaintiff never said 'No', she consented to the forced pinning down and finger penetration by John Doe accompanied by lewd language and choking violated her right to due process and an impartial and unbiased hearing. (See Exhibit 10 – David Tiscione Appeals Statement).

g. Mr. Tiscione stated during the Appeal Hearing that corroborative statements by students close to the time of the incident, especially Jane's roommate, Caitlyn Biltz, were used to determine that John Doe could not consent to sex, rather than examining the physical position of Caitlyn in the room, and the Plaintiff's statement in the investigative report response that she heard John Doe's responses clearly sitting beside him in the bed. Mr. Tiscione never asked the Plaintiff about this during the

original hearing, and it would appear that either the Hearing Panel, led by Mr.

Tiscione, did not review the Plaintiff's statement or summarily discounted it in their

determination that John Doe could not consent. (See Exhibit 9 - Plaintiff Response to

Investigative Report).

h.  Mr. Tiscione stated in the Appeal Hearing discussion of sanctions that the Hearing

Panel determined John Doe did not intend to harm the Plaintiff. In other words, the

only thing the original Hearing Panel determined John Doe did to harm the Plaintiff

was to choke her and call her lewd names. The Hearing Panel determined that John

Doe did not violently or forcefully injure Jane Doe, digitally penetrate her to the point

of bleeding from her vagina, or leave an open hunting knife in her room as any type of

warning or half-acted upon action on the part of John Doe. There was no mention in

the sanctions of the physical injuries caused to the Plaintiff by John Doe, including

the vaginal tears, hurt shoulder, back, and hips that required months of physical

therapy. No mention of the diagnosis of PTSD. None of these were considered

aggravating factors in this incident by the members of the Hearing Panel.

i.  Mr. Tiscione described at the Appeal Hearing that witness statements in the

investigative report as showing that the Plaintiff tried to 'isolate' John Doe, but he did

not appear to take into account that the dorm room's doors lock for school and student

safety when closed. He either did not review or did not believe the Plaintiff's

contention that she did want to be alone with John Doe in order for both of them to

have consensual sex, which she stated very clearly in her response to the investigative

report and during the Original Hearing.

119.    On May 29, 2019, Plaintiff received a letter from Defendant informing her that she had

been found responsible for Sexual and Gender Based Misconduct: Sexual Assault and not

responsible for Physical Conflict.  (See Exhibit 19 - May 29, 2019 Letter).

120.    The letter also informed Plaintiff that she would be suspended from Loyola from May 29,

2019 through January 12, 2020, have deferred suspension from January 12, 2020 until

January 12, 2021, continue to have no contact with John Doe, and be required to complete

Substance Education prior to December 6, 2019.

121.    The letter also informed Plaintiff that both she had John Doe had the ability to appeal the

decision, by filing a typewritten appeal within five business days.

122.    On June 4, 2019, Plaintiff submitted an appeal decision and sanctions imposed. (See

Exhibit 20 – June 4, 2019 Appeal Letter).

123.    In her appeal, Plaintiff argued that her rights to a fair investigation and hearing were

violated, that the findings were inconsistent with the facts presented, and that the sanctions

imposed were grossly disproportionate to the findings of responsibility.

124.    John Doe also appealed the sanction imposed on Plaintiff, arguing that the sanctions

imposed were insufficient and that Plaintiff should be suspended until after John Doe

graduated.  (See Exhibit 21 – John Doe's June 1, 2019 Appeal Letter).

125.    John Doe also appealed the conclusion that he was responsible for sexual verbal abuse

and sexual assault, asserting that any harm he caused to Plaintiff could only have occurred in

self-defense, despite still maintaining that he had no recollection of the events.

126.    After submitting her appeal, Plaintiff received a letter from Dr. Christina Spearman,

stating that Dr. Spearman had reviewed Plaintiff's appeal request, and would only allow her

appeal to proceed on the allegations that her rights to a fair hearing were violated when the

questions she submitted here screened and reduced, and on the grounds that the sanctions

imposed were grossly disproportionate to the finds of responsibility. All of the other

complaints of Jane Doe were denied. It is unclear whether legal counsel or Title IX

coordinator reviewed or helped write this response. (See Exhibit 22 – Letter from Dr.

Spearman to Plaintiff).

127.   By a letter dated June 20, 2019, Plaintiff requested that Dr. Spearman reconsider and

allow her to appeal on all grounds raised.  (See Exhibit 23 – June 20, 2019 Letter from

Plaintiff to Dr. Spearman).

128.   By an email dated June 24, 2019, Dr. Spearman refused to reconsider her decision.  (See

Exhibit 23 – June 27, 2019 email from Dr. Spearman to Plaintiff).

129.   The appeal hearing for both appeals took place on June 28, 2019.

**N.   Problems with the Appeal Process**:

130.   The Plaintiff's appeal was largely denied by Christina Spearman, Dean of Students. She

specifically stated that disagreement with the investigative report was not grounds for an

appeal, and that there was no evidence that anyone had not followed a fair and impartial

process to address this case. This essentially put the nail in the Plaintiff's coffin, as the

Appeals Board never revisited the findings or sanctions as a result.

131.   The Appeals Panel focused solely on whether the Plaintiff's questions were considered

by the Original Hearing Panel, but they did not allow the questions to be asked of John Doe,

or reconsider any of the findings and sanctions of the original Hearing Panel. They did not

change the sanctions, of course, because they never reassessed the case. It has to be asked why?

132.    David Tiscione admitted during the hearing that, in the original hearing, the Hearing Panel gave a lot of weight to the witness statements and the investigative report, but neither most of the witnesses nor the investigator were present at the Hearing for the Plaintiff to cross-examine. It is unclear what weight the Panel gave to the investigator Findings and Conclusions verses the Plaintiff's response to the witness statements, but might explain why the Hearing Questions, largely asked by Mr. Tiscione, were focused on aspects of witness statements that would show John Doe was unable to consent.

133.    Because cases were bundled together, and both the Plaintiff and John Doe received the same punishment. They were both found responsible for assaulting each other.

134.    As Dave Tiscione described the sanctions process, it was very clear that he did not consider John Doe a threat to the Plaintiff. Conversely, the Plaintiff was suspended for a period of time because Mr. Tiscione further noted the need for additional protective factors that would prevent her from harming John Doe upon her return to campus in the sanctions process. He said this even though John Doe had visited her dorm after the incident occurred and she had to request an order from the Title IX coordinator to keep him out of her dorm.

135.    In addition, during the Appeals Hearing, new information was introduced to show that John Doe was willing to lie to his parents about this case, and that he had serious, ongoing problems with alcohol consumption that were not identified in the original hearing.  Despite this new information, the Appeals panel did not reconsider this case, or any of the evidence or ask John Doe the questions that were filtered from the first hearing.

136.    The Hearing Panel and Appeal board both ignored or discounted obvious physical

evidence in this case while accepting the allegations of John Doe, even though he claimed no

memory of the event.  This was also the case even though John Doe indicated during the

Appeals Board that he has and would lie to persons about this case, and that he has a severe

alcohol problem. All of the proceedings and decisions in these cases were accomplished in

close consult with the Title IX attorney. Individually and in total, these actions violated the

Plaintiff's right to due process and an impartial and unbiased Hearing and Appeals hearing.

137.    The Appeals Panel focus was very narrow, and only appeared to be overseeing that the

original Hearing Panel's determination followed the process. The Appeals Panel did not

reexamine this case for its validity or accuracy. None of the Plaintiff's assertions that the

investigation and Original Hearing were acted upon. Nothing was changed in the outcome or

the punishment. The Appeals Hearing was a farce to account for the behavior of Mr.

Tiscione and not to review this case or the sanctions in any meaningful way.

138.    In a letter, dated July 12, 2019, Michal Puma, informed Plaintiff that the Appeal Board

had denied both Plaintiff's appeal and John Doe's appeal, concluding that both parties

received a fair hearing and sanctions proportionate to the offenses found.

139.    This letter informed Plaintiff that the decision against her was final and that she had no

further remedy.

## COUNT I
### Declaratory Judgment – Title IX

140.    Plaintiff repeats and realleges paragraphs 1 throug 139 as if fully set forth herein.

141.   Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, and the

regulations promulgated thereunder require a school receiving federal funds to "adopt and

publish grievance procedures providing for the prompt and equitable resolution of student . .

. complaints alleging any form of sexual harassment, including sexual assault.[30]  These

procedures must "accord[ ] due process to both parties involved . . . ."[31]

142.   Upon information and belief, Defendant receives federal funds and must comply with

Title IX.

143.   The "prompt and equitable" procedures that a school must implement to "accord due

process to both parties involved" must include, at a minimum: (a) "[n]otice . . . of the

procedure, including how complaints may be filed"; (b) "[a]dequate, reliable, and impartial

investigation of complaints"; (c) "the opportunity to present witnesses and other evidence";

and (d) "[d]esignated and reasonably prompt timeframes for the major stages of the

complaint process." A school must also ensure that all employees involved in the conduct of

the procedures have "adequate training as to what conduct constitutes sexual harassment,"

which includes "alleged sexual assaults."[32]

144.   As written, the Defendant's student disciplinary process in effect in the 2018-2019 school

year violated Title IX and the regulations thereunder, which have the force of law, including

the requirements that: the procedures comport with due process, be "prompt and equitable,"

---

[30]      34 C.F.R. § 106.8(b)

[31]      2001 Guidance at 20.

[32] 2001 Guidance at 21.

uphold the preponderance of the evidence standard, and Defendant deliver to Plaintiff written notice of the outcome of the investigation and the rationale therefor.

145.    Those violations include, but are not limited to, the following: (a) the lack of a meaningful hearing process wherein Plaintiff had an opportunity to present evidence and subject the evidence against her to any adversarial testing, (b) failure to provide Plaintiff with written notice of the determination and the rationale therefore, (c) the lack of a meaningful right to appeal, (d) excluding exculpatory evidence for Plaintiff from the hearing in the form of the knife and (e) presuming Plaintiff's guilt by maintaining a policy that required no corroboration of the allegation against Plaintiff even where the complaining witness claimed no recollection of the events.

146.    As implemented, Defendant's student disciplinary process in effect during the 2018-2019 school year, violated Title IX and the regulations thereunder, which have the force of law, including the requirements that the procedures comport with due process, be "prompt and equitable," uphold the preponderance of the evidence standard, and Defendant deliver to Plaintiff written notice of the outcome of the investigation and the rationale therefore. Those violations, which are described above, include, but are not limited to, the following: (a) the lack of a meaningful hearing process wherein Plaintiff had an opportunity to present evidence and subject the evidence against her to any adversarial testing, (b) failure to provide Plaintiff with written notice of the determination and the rationale therefor, (c) the lack of a meaningful right to appeal, (d) and presuming Plaintiff's guilt by maintaining a policy that explicitly states that corroboration of the allegations against Plaintiff is unnecessary.

147.   As applied to Plaintiff, Defendant's student disciplinary process in effect during the 2018-2019 school year violated Title IX and the regulations thereunder, which have the force of law, including the requirements that the procedures comport with due process and be "prompt and equitable." Those violations which are described above, include, but are not limited to, the following: (a) the failure to perform a threshold evaluation of the charge; (b) the failure to conduct a "thorough, reliable and impartial" investigation with a trained investigator; (c) the failure to set an appropriate, fair hearing date that would have allowed Plaintiff to rely on exculpatory evidence; (d) the failure to provide fair and meaningful notice of the charges; (e) the refusal to contact witnesses identified by Plaintiff; (f) the failure to provide an unbiased disciplinary process and tribunal; (g) the failure to ensure that Plaintiff be presumed innocent and that Defendant had the burden of proof; (h) the failure to ensure that there be sufficient evidence to support the Investigator's conclusion; (i) otherwise acting to achieve a predetermined result, *i.e.*, a finding that Plaintiff committed sexual assault or some related offense.

148.   Pursuant to the provisions of 28 U.S.C. §§ 2201, 2202, and 1651, Plaintiff is entitled to (a) a declaratory judgment that Defendant's 2018-2019 student disciplinary process, as written, violated Title IX (including its due process requirements); (b) a declaratory judgment that the Defendant's student disciplinary process as implemented, violated Title IX (including its due process requirements); (c) a declaratory judgment that Defendant's student disciplinary process as applied to Plaintiff, violated Title IX (including its due process requirements); and (d) further necessary or proper relief.

## COUNT II
### Violation of Title IX – Erroneous Outcome from a Flawed Proceeding

149.   Plaintiff repeats and realleges paragraphs 1 through 148 as if fully set forth herein.

150.   Title IX prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations.

151.   Upon information and belief, Defendant receives federal funds and must comply with Title IX.

152.   A victim of discrimination based on his or her gender has, under Title IX, a private right of action against the offending school for monetary damages and equitable relief.

153.   As set forth above, Defendant engaged in a series of rushed actions that ultimately resulted in the erroneous finding that Plaintiff committed sexual assault. This represents disparate treatment of Plaintiff by Defendant on the basis of her sex.

154.   As fully set forth above, there were significant evidentiary weaknesses underlying Defendant's finding, including:

   a.   The absence of any evidence John Doe objected to the sexual contact,

   b.   The fact that John Doe got up and went into the bathroom on his own and used his phone, (unlocking and texting clearly) by himself.

   c.   The fact that John Doe undressed himself down to his underwear and got into Plaintiff's bed of his own accord.

   d.   The fact that John Doe asked Plaintiff if they could "fuck" several times.

   e.   The fact that when Plaintiff asked if John Doe was sure he wanted to have sex, and he pointed to his erection and said, "What do you think?"

f.  The fact that John Doe remained in Plaintiff's room and on her bed even as multiple people stopped by.

g.  The fact that John Doe removed his own underwear, got off the bed and went to his wallet, pulled out his own condom, and put it on himself.

h.  The fact that John Doe was an active participant in the sex, getting on top of Plaintiff and asked her if he could choke her.

i.  The fact that John Doe choked Plaintiff during sex.

j.  The fact that John Doe Jack physically penetrated Plaintiff digitally with excessive force, squeezed her harshly, asked Plaintiff to scratch him, called the Plaintiff obscene names, and ejaculated.

k.  The fact that John Doe removed the condom on his own and threw it on the floor.

l.  The fact that John Doe got himself dressed without any assistance.

m. The fact that John Doe facetimed and texted several people immediately after sex.

n.  The fact that John Doe packed up his own backpack, took out his knife, opened his knife and left it on the floor, and carried his own backpack as he left the room.

o.  The fact that John Doe spent the remainder of the night immediately after having sex walking around, cognitive and able to ambulate, talking coherently to everyone about what his version of what happened.

155.  These errors occurred as a result of the school's bias against accused students, which resulted in the:

a.  Failure to establish separate investigations and adjudications

b.  Failure to fully interview all witnesses, ask appropriate relevant questions, and present all relevant evidence and witness statements in the investigator's report,

c.  Potential bias and interest in finding the Plaintiff responsible to show compliance with Title IX,

d.  No opportunity for the Plaintiff to question John Doe or other witnesses regarding the allegations,

e.  No opportunity to view all the evidence, particularly exculpatory evidence,

f.  No opportunity to review the evidence obtained during the investigative interviews which were not recorded and were proven to be incomplete, biased, and not truthful as summarized in the investigative report.

g.  Unnecessary haste in reaching a conclusion despite the federal government removing the 60-day timeline for completing investigations,

h.  Failure of investigation to take into consideration John Doe's state of mind in making the allegations and whether they were instigated by his regret and/or friends' retaliatory urging to report or in order to avoid consequences of underaged drinking.

i.  Failure to respond to the Plaintiff's concerns about the fact that someone had told the psychiatrist, Dina Sokal, she was the responsible party before the hearing.

j.  Failure to investigate collaboration of witnesses during the investigative process

k.  Failure to consider the Plaintiff's account of the sexual encounter or consider multiple items of physical evidence after determining that John Doe was not able to consent to sex.

l.   Failure to review the Plaintiff's appeal and reexamine whether the Plaintiff had been given adequate due process during the investigative and hearing process.

m.   Failure to reconsider this case and culpability of the Plaintiff during the Appeals process

156.   In addition to the lack of evidence against Plaintiff, there were, as set forth above, numerous procedural flaws that affected the proof, including the lack of an appropriate investigation by a properly trained and unbiased investigator; the refusal to provide Plaintiff with a hearing wherein she could actually contest the allegations against her, the prohibition on Plaintiff being allowed to conduct her own investigation or contact any potential witness, the presumption of guilt applied to Plaintiff from the outset, and the impermissible shifting of the burden of proof to Plaintiff.

157.   The erroneous outcome of the hearing and purported appeal can only be explained by bias against the accused in cases involving allegations of sexual assault. This bias is reflected in the patterns of decision making by Defendant throughout the entire process and by the biased training agents of which Defendant received.

## COUNT III
### Negligence

158.   Plaintiff repeats and realleges paragraphs 1 through 157 as if fully set forth herein.

159.   Having put in place a student disciplinary process, including the Student Sexual Misconduct Resolution Process, Defendant owed a duty of care to Plaintiff and others to conduct that process in a non-negligent manner and with due care to avoid arbitrarily dismissing students.

160.   The conduct of Defendant and its agents fell below the applicable standard of care and amounted to breaches of the duty of due care and incompetence. This conduct included, but was not limited to, implementing its Policy in a manner that is biased against the accused, failing to proceed with a presumption of innocence, and failing to implement the policy in a manner that would result in a fair process, tilted to favor a particular outcome by not having a fair and neutral fact finder and panel member.

161.   These breaches of the duty of due care caused Plaintiff, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; loss of trust; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT IV
### Breach of Contract

162.   Plaintiff repeats and realleges paragraphs 1 throug 161 as if fully set forth herein.

163.   At all times relevant hereto, a contractual relationship existed between Plaintiff and Defendant.  Loyola's Community Standards handbook, which includes its sexual misconduct policies and promises governing situations such as this one, the terms of which were unilaterally promulgated by Defendant, comprise a contract.

164.   Pursuant thereto, Defendant was required to act in accordance with its own procedures and honor those principals in its investigations of complaints and in the process of adjudicating complaints of sexual misconduct, and in resolving appeals brought to challenge disciplinary decisions.

165. The promises set forth in Defendant's Community Standards are and were supported by valid consideration.

166. Plaintiff fully complied with all of her contractual obligations to Defendant, including payment of tuition and compliance with enrollment procedures.

167. Based on the above facts and circumstances, Defendant breached its contractual obligations to Plaintiff as the accused, by, among other things:

    a. Discriminating against Plaintiff on the basis of her gender,

    b. Failing to provide adequate policies and procedures for investigation and adjudication of complaints of alleged sexual misconduct,

    c. Operating from a presumption that Plaintiff committed sexual assault,

    d. Conducting a cursory, superficial, biased, and fundamentally unfair investigation, hearing and appeal process,

    e. Preventing Plaintiff from contacting witnesses,

    f. Failing to allow Plaintiff to present a complete defense,

    g. Rendering an adverse decision against Plaintiff without sufficient evidence to support it,

    h. Failing to impose a proportionate and reasonable sanction,

    i. Issuing an arbitrary and capricious determination,

    j. Misapplying Defendant's own consent standard as elaborated in its Community Standards, and

    k. Failing to provide Plaintiff with an impartial process.

168.   As a direct, proximate, and foreseeable consequence of those breaches, Plaintiff sustained

significant damages, including, without limitation, loss of educational opportunities,

economic injuries, and other direct and consequential damages.

## COUNT V
### Breach of Covenant of Good Faith and Fair Dealing

169.   Plaintiff repeats and realleges paragraphs 1 throug 168 as if fully set forth herein.

170.   The contract between Defendant and Plaintiff imposed upon Defendant a duty of good

faith and fair dealing including, a duty to conduct a diligent, unbiased, and meaningful

investigation, adjudication, and appellate review.

171.   Defendant breached and violated the covenant of good faith and fair dealing implied in its

agreement with Plaintiff by failing to conduct a diligent, unbiased, and meaningful

investigation, adjudication, and appellate review.

172.   As a direct, proximate, and foreseeable consequence of those breaches, Plaintiff sustained

significant damages, including, without limitation, loss of educational opportunities,

economic injuries, and other direct and consequential damages.

## RELIEF REQUESTED

WHEREFORE, plaintiff prays for judgment against defendant, jointly and severally, and

asks this Court to:

1. issue a judgment that (a) declares the Defendant's student disciplinary process,

including the Student Sexual Misconduct Resolution Process, as written, as implemented, and

as applied to Plaintiff, to be in violation of Title IX, including its due process requirements; (b)

requires Defendant to expunge the entire disciplinary proceeding from its records; (c) declares

Defendant's conduct to be wrongful, willful, intentional, and reckless; (d) prohibits Defendant from referencing Plaintiff's disciplinary proceeding in the event of any third-party inquiry; and (e) declares that upon any third-party inquiry, Plaintiff may reply in the negative as to any question as to whether he has been accused of sexual misconduct or as to any similar question.

2. award plaintiff compensatory damages in an amount to be determined at trial, but not less than $75,000.00 for mental anguish, loss of trust, severe emotional distress, serious mental injury, injury to reputation, past and future economic loss, deprivations of due process, loss of educational opportunities, loss of future career prospects, and other injuries proximately caused by the wrongful conduct of defendant;

3. award plaintiff her attorney's fees, disbursements, and costs pursuant to the provisions of 42 U.S.C. § 1988(b) (relating to Title IX); or pursuant to any other statute or common law doctrine providing for the award of attorney's fees, disbursements, and/or costs;

4. award prejudgment interest; and grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims so triable.

Dated: 5/7/20

_____
Jane Doe

Dated: 5/14/2020

**LAW OFFICE OF RICHARD P. ARNOLD**

_____
Richard P. Arnold, Bar No.: 25147
Attorney for Plaintiff
39 West Lexington Streeet
Baltimore, MD 21201
Telephone: (301) 613-5550
richardparnold@hotmail.com