SIN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JANE DOE** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case No.: 1-20-CV-01227-ELH** |
| **LOYOLA UNIVERSITY MARYLAND,** | * | |
| **Defendant.** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**</u>

#711295

# TABLE OF CONTENTS

Page

Background ..........................................................................................................................2

Argument ...........................................................................................................................16

I.       Standard Of Review...............................................................................................16

II.      Plaintiff's Complaint Should Be Dismissed. ........................................................17

      **A.**    Plaintiff's Title IX Claim (Count II) Fails As A Matter Of Law...........................17

            1.    Plaintiff Cannot Plausibly Allege A Flawed Process Or An Erroneous Outcome. ....................................................................... 18

                  a.    The Process Plaintiff Received Was Not Procedurally Flawed................................................................................... 18

                  b.    There Were Ample Facts Supporting The Finding That It Was More Likely Than Not That John Doe Was Incapacitated By Alcohol. ............................................... 20

            2.    Plaintiff Cannot Show Unfair Treatment "On The Basis Of Sex."..............23

      **B.**    Plaintiff's Breach Of Contract Claim (Count IV) Fails As A Matter Of Law. ...................................................................................................................27

      **C.**    Plaintiff's Negligence Claim (Count III) Fails As A Matter Of Law. ...................32

      **D.**    Plaintiff's Breach Of Covenant Of Good Faith And Fair Dealing (Count V) Fails As A Matter of Law. ................................................................................33

      **E.**    Plaintiff's Claim For Declaratory Judgment–Title IX (Count I) Fails As A Matter Of Law...................................................................................................33

Conclusion ........................................................................................................................34

Defendant Loyola University Maryland ("Loyola" or the "University") respectfully submits this Memorandum in support of its Motion to Dismiss, and states:

In this Title IX lawsuit, Plaintiff alleges that the University's determination that Plaintiff violated its sexual misconduct policy because she engaged in sexual activity with a fellow student who was too intoxicated to be able to provide the requisite consent was erroneous and based on discrimination against her because she is a woman.  Immediately after the sexual encounter, Plaintiff's fellow student filed a complaint against Plaintiff under the University's sexual misconduct policy.  In response, Plaintiff hired an attorney and then filed a sexual misconduct complaint of her own two weeks later, in which she claimed the sexual encounter was consensual but that she did not consent to her fellow student calling her certain words or taking certain actions during intercourse.  After an investigation by an outside female investigator and a hearing, the University found that both Plaintiff and the fellow student had each violated the University's sexual misconduct policy and gave them an identical sanction (a suspension of one semester).

The documents attached to the Complaint by Plaintiff show that there was ample evidence to support the University's finding regarding her fellow student's level of intoxication and Plaintiff's awareness of his intoxication at the time, including a contemporaneous text from Plaintiff that the subject student was "drunk as f**k" and contemporaneous verbal statements from Plaintiff to numerous others, such as her statement to her roommate immediately prior to the sexual encounter that the student was "really drunk" and Plaintiff was "going to take care of him."  Most importantly, there is no support for the notion that the University purposefully found that Plaintiff violated its sexual misconduct policy and disciplined her because she is a woman. Consequently, Plaintiff instead claims that the alleged "erroneous outcome … can only be

explained by bias against the accused in cases involving sexual assault." Complaint, ¶ 157. But the law is clear that "bias against the accused" does not equate to bias on the basis of gender sufficient to state a Title IX claim, and the documents attached to the Complaint reinforce Plaintiff's inability to state any viable claim against the University as a matter of law. Plaintiff's Complaint should be dismissed.[1]

## BACKGROUND

Loyola is a private university located in Baltimore. Complaint, ¶ 3. Loyola's student conduct standards, policies, and processes are contained in a document titled, "Community Standards."[2] The Community Standards cover a wide variety of student conduct matters, from academic issues to the possession of fireworks to theft. The Community Standards also contain a policy regarding allegations of sexual misconduct called "Sexual and Gender Based Misconduct" (the "Sexual Misconduct Policy"). Sexual Misconduct Policy, attached as Exhibit 1.

During the 2018-19 academic year, Plaintiff, a female, and "John Doe," a male, attended Loyola as undergraduate students. *See* Complaint, ¶ 2, 29. On the evening of Saturday, January 19, 2019, Plaintiff and several of her fellow students, including John Doe, were in Plaintiff's dorm room on Loyola's campus playing cards and having alcoholic drinks. Investigative Report Summary (the "Inv. Report"), attached as Inv. Report, Part 1 (Ex. 2), at 1. According to Plaintiff, John Doe was flirting with Plaintiff's friends, but not with Plaintiff. *Id*. Plaintiff told

---

[1] Plaintiff filed an Amended Complaint, but her counsel indicated that the Amendment was being withdrawn. The Amended Complaint has neither been docketed by the Court nor served on Loyola.

[2] Plaintiff has combined numerous documents and attached them as exhibits to her Complaint. Loyola received service of the documents as four exhibits. For ease of reference and the Court's convenience, some of those documents have been separated into their own exhibits and attached to this Memorandum. All exhibits to this Memorandum are exhibits to Plaintiff's Complaint.

fellow student Zoe that night she would like to be with John Doe sexually, including texting her that John Doe was "so hot" and "gorgeous."  *Id.* at 5.

The next afternoon, Plaintiff texted Zoe to see if John Doe and she would be returning to Plaintiff's dorm room that evening again because Plaintiff was having another get together.  *Id.* Zoe said yes, and told Plaintiff that John Doe and she would bring alcohol.  *Id.*

Thus, on the evening of Sunday, January 20, 2019, Plaintiff, John Doe, and several other students were playing cards and drinking alcohol in Plaintiff's dorm room.  Complaint, ¶ 29. Plaintiff knew that John Doe had been drinking alcohol before he arrived at her room that night around 10 p.m.  Inv. Report, Part 1 (Ex. 2), at 2; Administrative Hearing Transcript, May 13, 2019 ("May 13, 2019 Tr."), attached as May 13, 2019 Tr. (Ex. 3), at 17, 21, 71.

While playing cards in Plaintiff's room, John Doe drank alcohol from a bottle, while Plaintiff also drank alcohol.  Complaint at ¶ 30; May 13, 2019 Tr. (Ex. 3) at 17.[3]  Multiple other people recalled John Doe having a full bottle of liquor to himself that he was drinking out of in Plaintiff's room that night.  Inv. Report, Part 2 (Ex. 2), at 25, 27, 29.  Plaintiff herself saw John Doe take about 4 or 5 shots of liquor in her room that night.  May 13, 2019 Tr. (Ex. 3) at 23-25. John Doe, who is 5' 8" tall and 150 pounds, surmised that he drank more than a dozen shots of liquor that night, including about three-fourths of a fifth of Malibu Black 70 proof.  May 13, 2019 Tr. (Ex. 3) at 60.

While continuing to drink alcohol in Plaintiff's dorm room that night, John Doe flirted with a close friend of Plaintiff's named Katy.  Inv. Report, Part 1 (Ex. 2), at 2; May 13, 2019 Tr. (Ex. 3) at 26.  Upon returning home after leaving Plaintiff's dorm room around midnight or

---

[3] Plaintiff claimed the night of the incident was the only time she consumed alcohol at Loyola. May 13, 2019 Tr. (Ex. 3) at 174.

shortly thereafter, Katy texted Plaintiff and advised Plaintiff that John Doe had been flirting with Katy that night.  *Id.*

Zoe left Plaintiff's room to get more cups, and when she returned Plaintiff was sitting on John Doe's lap.  Inv. Report, Part 1 (Ex. 2), at 5.  Soon thereafter, Zoe and the remaining students left the dorm room, and Plaintiff and John Doe were the only two people remaining.  *Id.* at 2.

Three students, Kayla, Anaya, and Dominic, who had been in Plaintiff's room earlier returned to the room to retrieve a fellow student's belongings but the door was closed, when it had not been earlier.  Inv. Report, Part 2 (Ex. 2), at 27.  Plaintiff answered their knock on the door and asked them to take their fellow student's belongings back to him.  *Id.*  Kayla asked Plaintiff to leave the door open for when they returned, but Plaintiff refused.  *Id.* at 27, 29.

After dropping off their fellow student's belongings, Kayla, Anaya, and Dominic returned to Plaintiff's room about ten minutes later.  *Id.* at 27.  They knocked on the door and Plaintiff answered.  *Id.*  Plaintiff told them that everyone was gone and she was calling it a night. *Id.*  While Plaintiff was closing the door on them, Dominic said he needed to retrieve his slippers from the room.  *Id.*  While Dominic got his slippers, Kayla saw John Doe on Plaintiff's bed.  *Id.* Kayla said that John Doe did not say anything, his eyes were closed, and he was dressed.  *Id.* Kayla reported that she remarked to Plaintiff, "I thought you said everyone was gone," to which Plaintiff replied, "Yeah, he's pretty drunk. I am just going to take care of him."  *Id.*  Kayla said that when she asked Plaintiff if she needed help taking care of him, Plaintiff replied no.  *Id.*

Kayla said she and Anaya stood in the hall outside Plaintiff's room for a few minutes because they felt what they had just witnessed was odd.  *Id.*  Consequently, Kayla and Anaya went back and knocked on Plaintiff's door, which she answered.  *Id.*  Kayla said at this point

4

John Doe was on the bed but with his shirt off.  *Id.*  Anaya said John Doe looked like he was asleep.  *Id.* at 29.  Kayla stated that after she gave Plaintiff a weird look, Plaintiff told her, "Oh, he just took off his shirt, I don't know."  *Id.* at 27.  Kayla reported asking Plaintiff what was wrong with John Doe, and Plaintiff told her, "That's just how drunk people are."  *Id.* at 27-28.  Anaya assumed that Plaintiff and John Doe were friends and Plaintiff was letting him sleep it off since he was drunk.  *Id.* at 29.  Kayla offered to stay with Plaintiff but Plaintiff told her it was fine, she could leave, so Kayla and Anaya left.  *Id.* at 28.

Plaintiff's roommate, Caitlyn, who had been at acapella practice most of the night, returned to their dorm room around 1 a.m., at which time she saw Plaintiff and John Doe in the room alone.  *Id.* at 35.  Caitlyn saw John Doe on Plaintiff's bed wearing just his boxers.  *Id.*  Caitlyn stated that Plaintiff approached her and said, "He's really drunk.  I'm going to take care of him for the night."  *Id.*  Caitlyn described John Doe as being "pretty much gone."  *Id.*  Caitlyn stated that she spoke to John Doe, and although he could say actual words, he was not making any sense.  *Id.*  Caitlyn reported that Plaintiff hurriedly ushered her back out the door and said, "I have to take care of him and no one else should be in the room."  *Id.*

Around that same time, Plaintiff sent a text to Zoe stating that John Doe was with her.  *Id.* at 25.  Zoe replied back, "Oooo that's spicy," to which Plaintiff replied, "He's drunk as f**k."  Inv. Report, Part 1 (Ex. 2), at 133 (text message).  This text exchange occurred at 1:26 a.m. on January 21.  *Id.*

Soon after Plaintiff escorted Caitlyn out of their room and texted that John Doe was "drunk as f**k," Plaintiff and John Doe engaged in sexual activity.

Right after the sexual encounter, John Doe made a FaceTime call to Zoe.  Inv. Report, Part 2 (Ex. 2), at 25.  Zoe stated that John Doe told her, "I want to get out of here."  *Id.*  Zoe

described John Doe's face on the call as looking like he was about to cry.  *Id.*  Zoe further stated that Plaintiff then entered the conversation and said, "You need to come get him – he is out of it and drunk and can't walk."  *Id.*  A fellow student named Chuck overheard this conversation and recalled Plaintiff stating, "I'm not letting him leave – he's pretty drunk – come get him … not leave unless you come get him."  *Id.* at 24.

When Zoe and Chuck arrived at Plaintiff's dorm room, Chuck described John Doe as drunk and stumbling a little.  *Id.*  He said there was a slight slur to John Doe's speech.  *Id.*  Zoe stated that John Doe could not walk on his own.  *Id.* at 25.  According to Zoe, John Doe whispered to her, "She's crazy. I need to get out of here."  *Id.*  Chuck helped John Doe out of Plaintiff's room, while Zoe stayed inside for a moment.  *Id.* at 24, 25.  Zoe stated that Plaintiff told her Plaintiff and John Doe had sex.  *Id.* at 25.

Chuck reported that once he helped John Doe out of Plaintiff's room, John Doe stated, "she raped me, oh my god, she raped me," and started crying.  *Id.* at 24.  Chuck texted Zoe to alert her to what John Doe just stated and to find out what Plaintiff said occurred.  *Id.*  Zoe reported that after receiving Chuck's text, she asked Plaintiff if the sex between Plaintiff and John Doe was consensual.  *Id.* at 25.  Zoe stated that Plaintiff told her that she was fine, it was all good, and she wanted to do it.  *Id.*  Chuck confirmed that Zoe relayed this sentiment from Plaintiff to him.  *Id.* at 24.

Chuck reported that while helping John Doe leave Plaintiff's room and walk to another dorm building, John Doe was sobbing.  *Id.*  When they entered the other dorm, Chuck said he did not trust letting John Doe walk on the stairs, so Chuck placed John Doe on a swivel chair and

6

pushed him into the building's elevator. *Id.*[4]  Chuck reported that after he got John Doe inside

the dorm room and placed him on the bed, John Doe started bawling. *Id.*  Another student,

Connor, was in the room playing a game and asked what happened. *Id.*  Chuck explained the

situation to Connor, and said after that John Doe went back forth between playing the game and

crying. *Id.*  Zoe now also was in the room, and described John Doe as being in tears one minute

and then "try[ing] to be normal" the next, like playing a video game. *Id.* at 25.  John Doe's

friend, Eddie, described John Doe at that time as heavily intoxicated with red eyes. *Id.* at 31.

And when John Doe's shirt became lifted up, Zoe and Chuck saw scratches on John Doe's back.

May 13, 2019 Tr. (Ex. 3) at 96.

Around 3 a.m., Plaintiff's roommate, Caitlyn, returned to their door room. *Id.* at 35.  At

that point, Plaintiff was there talking with two other students, Brendan and Danny. *Id.*[5]

On January 22, 2019, John Doe filed a Sexual Misconduct Incident Report with Loyola.

*Id.* at 39; John Doe's Sexual Misconduct Incident Report, attached as Exhibit 4.  John Doe

claimed that on the evening of January 20/early morning of January 21, Plaintiff engaged in

sexual activities with him when he did not want to and was too intoxicated to consent. Ex. 4.

John Doe stated that he had little recollection of the night other than Plaintiff telling him that he

should have flirted with her and then her straddling and kissing him. *Id.*; May 13, 2019 Tr. (Ex.

3) at 80, 87, 93.

---

[4] Dormitory security camera footage from that night shows Chuck supporting John Doe's weight while helping him back from Plaintiff's room.  Inv. Report, Part 2 (Ex. 2), at 138.

[5] Brendan did not hear about the incident between Plaintiff and John Doe until "a few weeks later." May 13, 2019 Tr. (Ex. 3) at 120-121.  He described that Plaintiff told him that she had been sexually assaulted by John Doe, who had "forced himself on her."  May 13, 2019 Tr. (Ex. 3) at 132, 134.

#711295

On January 23, 2019, Plaintiff received notice from Loyola of John Doe's sexual misconduct complaint against her.  Complaint, ¶ 81.  That same day, Plaintiff engaged and met with a criminal defense attorney, James Crawford, Esq.  May 13, 2019 Tr. (Ex. 3) at 56.  The day after meeting with her attorney, Plaintiff visited a physician near her home residence. Plaintiff told the physician that she had engaged in consensual intercourse with an individual, but did not consent to other sexual activities and reported feeling soreness and bruising on her body from the sexual encounter.  Inv. Report, Part 2 (Ex. 2), at 72 – 76.

Over the next several days, Plaintiff met with her attorney several times.  May 13, 2019 Tr. (Ex. 3) at 191.  Thus, on February 8, 2019, Plaintiff filed a Sexual Misconduct Incident Report of her own with Loyola.  Plaintiff's Sexual Misconduct Incident Report, attached as Exhibit 5.  Plaintiff alleged that the sexual intercourse with John Doe was consensual and that he was not drunk.  She alleged that she asked for John Doe's consent at every step of the encounter from kissing to intercourse.  She also claimed that John Doe said to her, "I want to f**k you. When can I f**k you?"

Plaintiff alleged that during the intercourse John Doe was physically rough, digitally penetrated her, and used offensive language and she did not consent to those specific things. Inv. Report, Part 1 (Ex. 2), at 1.  She alleged that her shoulders were hurt from when John Doe had his arms on them during the intercourse, and that his digital penetration of her was hard and caused bleeding.  *Id.* at 2-3.  She claimed that John Doe asked her if he could choke her during the intercourse, and after she responded, "I don't know," he gripped her neck for two or three thrusts, which hurt, before she pushed at his hands.  *Id.*  Plaintiff further alleged that John Doe called her "a little slut" during the intercourse.  *Id.*  She claimed the reason why scratches were found on John Doe's back was because he asked her to scratch his back while they were having

8

intercourse.  *Id.*  Plaintiff also complained that the day after the sexual encounter she found an open pocket knife in her room which belonged to John Doe.  *Id.*

Per the Sexual Misconduct Policy, Loyola initiated an investigation of the parties' allegations.  *See* Sexual Misconduct Policy (Ex. 1) at 38.  Stephanie P. Karn, Esq., an attorney from Richmond and not affiliated with Loyola, conducted the investigation.  Inv. Report, Part 1 (Ex. 2), at 1.  Ms. Karn interviewed Plaintiff and John Doe, as well as persons identified as being present in Plaintiff's room on the subject night (including Zoe, Chuck, Kayla, Anaya, and Caitlyn).  *Id.* at 1-10.  When Plaintiff was interviewed, she was accompanied by her attorney, Mr. Crawford.  *Id.* at 1.  Ms. Karn also obtained a diagram of Plaintiff's dorm room, text messages and phone records of the parties, and campus surveillance video footage and photos. *Id.* at 15-16.

Ms. Karn produced the results of her investigation in an April 4, 2019 document titled, "Investigation Report Summary."  *Id.* at 1-16.  The Report is 16 pages long.  Thirty-one exhibits are attached to the Report, including the statements of the parties and other students, the text messages and surveillance footage, and all of the materials Plaintiff submitted for inclusion (such as medical records).  *Id*. at 15-16.  After the date for submitting any further documentation, Plaintiff submitted a list of comments/corrections/clarifications to her interview statement.  Ms. Karn included Plaintiff's belatedly submitted list with the Investigation Report Summary.  *Id.* at 15; May 13, 2019 Tr. (Ex.3), at 46.

 Pursuant to Loyola's Sexual Misconduct Policy, a hearing was scheduled regarding the parties' complaints.  The hearing originally was scheduled for April 29, 2019, but was moved to May 13, 2019 at the request of Plaintiff to accommodate her attorney's schedule.

#711295

On April 18, 2019 and again on May 1, 2019, Plaintiff and John Doe were provided notice of the Sexual Misconduct Policy hearing. *See* April 18, 2019 Notice of hearing to Plaintiff, attached as Exhibit 6. The notice letters outlined the violations of the Policy that each person stood accused of committing. *Id.* The notice letters described the hearing process, the specific policies at issue, and the possibility of sanctions if either student was found responsible for any alleged violation. *Id.* A copy of Ms. Karn's Investigation Report Summary also was attached to the letters. *Id.*

The hearing panel chairperson, David Tiscione, Loyola's Director of Student Conduct, advised Plaintiff that the Sexual Misconduct Policy hearing would not include a review of her complaint that she found a pocketknife in her room the day after the sexual encounter.[6] *See* May, 2019 email correspondences between Plaintiff and David Tiscione, attached as Exhibit 7. The reason for this was elementary—Plaintiff consistently stated that she did not find the knife until the next day; thus, it plainly was not used as part of the alleged sexual misconduct. *See* Plaintiff's Appeal Hearing Tr., June 28, 2019 ("Plaintiff Appeal Tr."), attached as Exhibit 8, at 40-41.

A little after 5 a.m. on the morning of the scheduled 9:00 a.m. hearing, Plaintiff emailed the hearing panel chairperson a list of 81 suggested questions for John Doe. Plaintiff Appeal Tr. (Ex. 8) at 22. Nonetheless, the hearing panel reviewed all of Plaintiff's suggested questions before the hearing. *Id.* Many of the suggested questions submitted by Plaintiff were close-ended, leading questions, such as, "isn't it true that you pulled the condom out and showed it to

---

[6] At the time of this matter, Mr. Tiscione had eight years of experience reviewing and investigating sexual misconduct claims in the college setting, including outside training and certification. *See* John Doe's Appeal Hearing Tr., June 28, 2019 ("Appeal Tr."), attached as Exhibit 9 at 18-19.

[Plaintiff]?", rather than open-ended questions that sought to draw out more information. *Id.* at 27-28.  Some of Plaintiff's other suggested questions asked for non-relevant information, such as wanting John Doe to be asked his opinion on Plaintiff's height and weight. *Id.* at 30.  Many of Plaintiff's suggested questions asked for John Doe to explain how Plaintiff could have undressed him or moved him into sexual positions if he was "unconscious." *Id.*  But John Doe was not alleging that he was unconscious or unable to move during the incident. *See Id.*; Appeal Tr., (Ex. 9) at 60.  And yet other questions sought information which the panel already had established— such as whose condom was used—or had accepted Plaintiff's allegation as most likely true— such as her being digitally penetrated by John Doe right before sexual intercourse.  Plaintiff's Appeal Tr. (Ex. 8), at 37-39.

The hearing lasted about 4 ½ hours. *Id.* at 45.  Plaintiff provided a statement and argument, John Doe provided a statement and argument, and the panel received additional testimony from Plaintiff's two close friends—Katy and Brendan—who she called as witnesses.

Plaintiff brought her attorney, Mr. Crawford, with her to the hearing.  May 13, 2019 Tr. (Ex. 3) at 1.  In addition to the suggested questions she submitted that morning, Plaintiff was given opportunities to suggest other questions on two separate occasions during the hearing. *Id.* at 19-22, 34-35.  Plaintiff consulted with her attorney freely during the hearing, and her attorney interrupted the hearing panel's questioning of Plaintiff without limitation to speak privately with and advise her on how to respond to questions. *E.g.*, May 13, 2019 Tr. (Ex. 3), at 27-29, 32.

At the hearing, Plaintiff tried to explain away her text that John Doe "was drunk as f**k" by claiming that she uses that phrase to describe anyone who has been drinking alcohol. *Id.* at 27.  When it was noted that she had not described anyone else who had been drinking that night as being "drunk as f**k," Plaintiff stumbled through an attempted answer and then her attorney

interrupted the proceeding so that he could counsel her on how to respond. *Id.* at 27-29. When asked to explain her comments to other students that John Doe was "really drunk" or so drunk that he needed to be helped out of her room to walk to another dorm, she alleged that her comments were "manipulated" and that she uses terms like "really drunk" or "pretty drunk" loosely. *Id.* at 31-32. When asked to help the panel understand how Zoe and Chuck both heard Plaintiff describe John Doe as having such a high level of intoxication that he needed their assistance, Plaintiff's attorney interjected before she could answer and asked to consult with her privately again before she responded. *Id.* at 32.[7] Plaintiff similarly had no meaningful explanation for why her roommate, Caitlyn, reported that Plaintiff had made various statements about John Doe's level of intoxication and "tak[ing] care of" John Doe. *Id.* at 33.

The hearing panel spent about five hours deliberating the complaints. Plaintiff's Appeal Tr. (Ex. 8), at 45. The panel considered each alleged sexual misconduct policy violation separately, applying a preponderance of the evidence standard as per the Sexual Misconduct Policy. *Id.* at 42; Sexual Misconduct Policy (Ex. 1) at 39, viii. The panel laid out all of the evidence that supported or did not support each allegation. Plaintiff's Appeal Tr. (Ex. 8), at 42. The panel then weighed the significance of each piece of evidence, including whether there was corroborating evidence or any associated credibility issues. *Id.*

Regarding the allegation that Plaintiff engaged in sexual activity with a person who was unable to consent due to being incapacitated from alcohol, the panel noted that under the Sexual Misconduct Policy, "[c]onsent cannot be given by someone who is not able to effectively

---

[7] At the hearing, Plaintiff acknowledged that she said John Doe was drunk and "come get him" during the call with Zoe that Chuck overheard. May 13, 2019 Tr. (Ex. 3) at 34. She further admitted that in her statement to the investigator she omitted the fact that she said John Doe was drunk during that conversation. *Id.* at 33-34.

communicate or to understand the nature of the conduct being engaged in as a result of

incapacitation due to consuming drugs or alcohol or for any other reason."  Sexual Misconduct

Policy (Ex. 1), at 33 § 21; Plaintiff's Appeal Tr. (Ex. 8), at 42-43.  The hearing panel had before

it statements from several different people that John Doe was highly intoxicated at the time of

the sexual encounter, as well as several persons' comments about John Doe's difficulty

communicating and walking at that time.  Plaintiff's Appeal Tr. (Ex. 8), at 44.  The panel also

had Plaintiff's admissions that she saw John Doe drinking liquor, along with the reports from

various people that Plaintiff specifically commented on John Doe's level of intoxication and

stated that she was going to "take care of him."  *Id.*  In addition, the panel had Plaintiff's own

thoughts at the time in writing, including her text immediately before the encounter that John

Doe was "drunk as f**k."  May 13, 2019 Tr. (Ex. 3), at 27; Inv. Report, Part 1 (Ex. 2) at 133

(text message). The hearing panel found the statement of Plaintiff's roommate, Caitlyn, to be

particularly important and worth significant weight.  Plaintiff's Appeal Tr. (Ex. 8), at 44.

Indeed, Plaintiff's roommate had no relationship with John Doe whatsoever and was the last

person to see him before the sexual encounter.  *Id.*

On May 29, 2019, Plaintiff and John Doe were provided notice of the outcome of the

hearing both in writing and verbally.  May 29, 2019 Notice, attached as Exhibit 10.  The notice

letter listed the panel's finding for each charge, along with a rationale for the decision.  *Id.*

Plaintiff was found responsible for violating the Sexual Misconduct Policy because the panel

found it was more likely than not that she engaged in sexual contact with John Doe without

consent given John Doe's intoxication.  *Id.*  John Doe was found responsible for violating the

Sexual Misconduct Policy because the panel found it was more likely than not that John Doe

used the sexual language complained of because there was no evidence in conflict with

Plaintiff's allegation.  *Id.*  John Doe also was found responsible for violating the Sexual

Misconduct Policy because the panel found it was more likely than not that the choking

allegation was a separate sexual act without consent.  *Id.*  The panel noted that under the Policy,

John Doe's intoxication was not a defense to the charges against him.  *Id.*  The panel imposed

identical sanctions on the parties (a one semester suspension plus a few other items such as a no-

contact order).  *Id.*

Both Plaintiff and John Doe appealed the decision of the administrative panel.  *See*

Appeal of John Doe dated June 1, 2019, and Appeal of Plaintiff dated June 4, 2019, attached as

Exhibits 11 and 12 respectively.  Under the Sexual Misconduct Policy, appeals expressly are

limited to three specific grounds.  *See* Ex. 1, at 40.  Nonetheless, Plaintiff submitted an appeal

letter containing a hodge-podge of numerous grievances.  Ex. 12.  Per the Sexual Misconduct

Policy, Christina Spearman, Ed.D., Loyola's Dean of Students, reviewed the parties' appeal

letters.  *See* Ex. 1, at 40.  Dr. Spearman informed Plaintiff that some of her alleged grievances

were improper grounds for appeal, and advised her that her appeal had been accepted on the

following grounds: (1) her allegation that her rights to a fair hearing were violated because Mr.

Tiscione's screening of the suggested questions she submitted limited her ability to make her

case; and (2) the sanction she received was grossly disproportionate to the finding of

responsibility for violations of the student code of conduct.  *See* Dr. Spearman's letter, attached

as Exhibit 13.[8]

A hearing on the parties' appeals was held on June 28, 2019.  Appeal Tr. (Ex. 9), at 1;

Plaintiff's Appeal Tr. (Ex. 8), at 1.  Per the Sexual Misconduct Policy, the members of the appeal

---

[8] John Doe's appeal focused on the sanctions imposed on Plaintiff and him, including contending that Plaintiff should have received a more significant sanction for engaging in non-consensual sexual activity with another person.

14

panel were different than the members of the hearing panel.  *See* Plaintiff's Appeal Tr. (Ex. 8), at 1; Appeal Tr. (Ex. 9), at 29.  The appeals panel read all of the submissions regarding the matter. Appeal Tr. (Ex. 9), at 2.  At the appeal hearing, Plaintiff was accompanied by her attorney, Mr. Crawford.  Appeal Tr. (Ex. 9), at 29; Plaintiff's Appeal Tr. (Ex. 8), at 1.  The appeals panel heard statements from both parties.  John Doe's position on appeal was that he didn't feel like he should be penalized for Plaintiff attacking him.  Appeal Tr. (Ex. 9), at 3.  Plaintiff's position on appeal was that she didn't feel like she should be penalized for John Doe attacking her. Plaintiff's Appeal Tr. (Ex. 8), at 10.

After receiving the parties' oral statements, the appeals panel called Mr. Tiscione to provide testimony during the hearing, and asked him questions about the hearing panel's deliberations and decision making process.  Plaintiff's Appeal Tr. (Ex. 8) at 17-54; Appeal Tr. (Ex. 9), at 11-26.  The appeals panel allowed Plaintiff to consult freely with her attorney during the hearing and to make a follow-up statement at the close of the hearing (including asking questions posed by her attorney).  Plaintiff's Appeal Tr. (Ex. 8), at 54-56.  When asked for specific suggested questions that she did not think were covered at the hearing, Plaintiff referenced the following:  a question about her height and weight, additional questions about the condom the parties used, how John Doe got undressed, how she believed John Doe could not have been sexually aroused if he was heavily intoxicated, and her finding the pocketknife on the ground the next day.  *Id.* at 5-7.

On July 12, 2019, Plaintiff and John Doe were notified in writing that both of their appeals had been denied.  Complaint, ¶ 138.  Regarding Plaintiff's contention that her right to a fair hearing was violated, the appeals panel found that the hearing panel appropriately considered the suggested questions and exercised its judgment to determine which questions to ask or

15

modify (including considering whether questions were duplicative, whether the information sought already had been obtained from other sources, and whether the information purportedly being sought by questions was not in dispute (such as the parties' use of a condom possessed by John Doe)).

Regarding Plaintiff's contention that a one semester suspension was grossly disproportionate to a finding that she had sex with someone who was too intoxicated to provide consent, the appeals panel concluded that the sanction was appropriate given the seriousness and totality of the circumstances.  Regarding John Doe's appeal of the sanction given to Plaintiff (too little) and the sanction given to him (too much), the appeals panel concluded that the sanctions were appropriate given the seriousness and totality of the circumstances (under the Sexual Misconduct Policy, John Doe's intoxication was not a defense to the charges levied against him).

## ARGUMENT

### I.       Standard Of Review.

To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and have "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009).  The Complaint must not only allege but also "show" that the plaintiff is entitled to relief, and "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

When resolving a Rule 12(b)(6) motion, a court may consider documents that are explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits. *All Weather, Inc. v. Optical Sci., Inc.*, 443 F. Supp. 3d 656, 663 (D. Md. 2020) (citations and quotations omitted).  Furthermore, the court should credit the contents of attached documents over conflicting

16

allegations in the complaint. *See Goines v. Valley Cmty. Serv. Bd.*, 822 F.3d 159, 166–67 (4th Cir. 2016) (citations omitted); *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

## II.     Plaintiff's Complaint Should Be Dismissed.

### A.     Plaintiff's Title IX Claim (Count II) Fails As A Matter Of Law.

Plaintiff's Title IX erroneous outcome claim fails as a matter of law for numerous, independent reasons.  To sustain an erroneous outcome claim, Plaintiff "must plausibly aver (1) that [s]he was subjected to a procedurally or otherwise flawed proceeding, (2) which has led to an adverse and erroneous outcome; and (3) the particular circumstances, suggest that gender bias is the motivating factor behind the erroneous finding."  *Doe v. Loh*, No. CV PX-16-3314, 2018 WL 1535495, at *8 (D. Md. Mar. 29, 2018), *aff'd*, 767 F. App'x 489 (4th Cir. 2019) (quotation omitted).

Plaintiff fails to allege facts demonstrating a flawed procedure or that Loyola's conclusion that she violated its Sexual Misconduct Policy was erroneous.  As described above, more than enough evidence existed in support of the finding that it was more likely than not that John Doe was incapacitated because of intoxication, including Plaintiff's own repeated admissions to different people.  But even if the Court found a sufficient basis to doubt the accuracy of the outcome, Plaintiff offers no allegations supporting a claim that the decision was motivated by discrimination against Plaintiff because she is a woman.  Indeed, Plaintiff pleads only that Loyola was biased against her based on her status as a student accused of sexual assault—not as a woman—putting Plaintiff's claim squarely outside the bounds of Title IX. Plaintiff's Title IX claim should be dismissed.

1.    Plaintiff Cannot Plausibly Allege A Flawed Process Or An Erroneous
Outcome.

Casting sufficient doubt on the accuracy of the outcome of the disciplinary proceeding

requires "(1) pointing to procedural flaws in the investigatory and adjudicative process, (2)

identifying inconsistencies or errors in the findings, or (3) challenging the overall sufficiency and

reliability of the evidence." *Doe v. Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d 508, 517 (E.D. Va.

2019) (citation and quotations omitted).  Plaintiff fails to sufficiently plead that Loyola's student

disciplinary process was flawed or that Loyola's determination regarding John Doe's level of

intoxication was an error or not supported by sufficient evidence.

a.    The Process Plaintiff Received Was Not Procedurally Flawed.

Courts defer to the Title IX process put in place by universities because "[a]s a general

rule, Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or

universities.  And, Title IX should be construed to give school administrators...the flexibility they

require to initiate a reasonable disciplinary response." *Doe v. Washington Univ.*, 434 F. Supp. 3d

735, 751 (E.D. Mo. 2020) (citations and quotations omitted).

The "procedural flaws" that Plaintiff contends "affected the proof" of the matter and

resulted in an erroneous outcome are insufficient to state a Title IX claim. Complaint, ¶ 156.

First, Plaintiff's conclusory allegation that there was a, "lack of an appropriate investigation by a

properly trained and unbiased investigator," *id.,* is belied by the documents attached to the

Complaint.  Stephanie Karn, a well-respected, experienced attorney from Richmond who is not

affiliated with Loyola, conducted the investigation.  Ms. Karn interviewed Plaintiff, John Doe,

and a host of other students, and collected a wide array of other evidence.  Plaintiff's attorney

was present at Plaintiff's interview.  Ms. Karn produced a lengthy written report summarizing

and analyzing the evidence.  Plaintiff had the opportunity to submit comments to the write-up of

18

her interview and comments to the investigative report itself, both of which Ms. Karn included as exhibits to the report (despite Plaintiff belatedly submitting her comments to the write-up of her interview).  Ms. Karn also included with her report the other materials submitted by Plaintiff, such as photos and medical reports.  And Plaintiff received a copy of Ms. Karn's report and exhibits more than a month before the initial hearing.[9]

Plaintiff's second argument, that she was deprived of trial-like rights and protections via an alleged "refusal to provide Plaintiff with a hearing wherein she could actually contest the allegations against her," a "presumption of guilt applied to Plaintiff from the outset," "the inability to conduct her own investigation or to contact any witnesses," and "the impermissible shifting of the burden of proof to Plaintiff," similarly misses the mark.  Complaint, ¶ 156. Student disciplinary hearings are not trials with a presumption of guilt or a shifting burden of proof and are not required to provide the processes one would find in a courtroom.  *Loh*, 2018 WL 1535495 at *5 (reiterating that it is well settled that the accused in a college disciplinary proceeding is not entitled to "trial-like" procedures, such as rights of confrontation or cross-examination, even in the public university setting where, unlike a private university, the defendant's process must satisfy the heightened constitutional due process standard) (collecting

---

[9] Plaintiff attempts to cast Ms. Karn as biased because she investigated both claims arising out of the same incident.  Complaint, ¶87-88.  Having a single investigator examine dueling claims is, however, not prohibited by Loyola's policy or the law.  *See, e.g., Doe v. St. John's Univ.*, No. CV 17-2413 (PAM/LIB), 2017 WL 4863066, at *1-3 (D. Minn. Oct. 26, 2017), *dismissed sub nom. Doe v. St. John's Univ., Minnesota*, No. 17-3528, 2018 WL 2324285 (8th Cir. Jan. 9, 2018) (dismissing a claim for erroneous outcome in a case where the university appointed one investigator for cross claims); 34 C.F.R. § 106.45(b)(4) (a university "may consolidate formal complaints … by one party against the other party, where the allegations of sexual harassment arise out of the same facts or circumstances").

19

cases).[10]  Plaintiff received ample opportunity to contest the allegations against her, and with the assistance of counsel from the day she received notice of the charges against her through the decision of the appeal panel, Plaintiff did just that, including providing statements and testimony before and at the hearing, submitting documents for inclusion in the record, calling whatever witnesses she wanted to testify at the hearing (she chose to call just two), and directing the panel to evidence and arguments which she believed supported her position.  The documents attached to the Complaint confirm that Plaintiff cannot plausibly allege a "procedurally or otherwise flawed proceeding" as a matter of law.  *Loh*, 2018 WL 1535495, at *9.

> b.    There Were Ample Facts Supporting The Finding That It Was More Likely Than Not That John Doe Was Incapacitated By Alcohol.

In the face of the ample evidence supporting Loyola's preponderance of the evidence finding regarding John Doe's state of intoxication at the time of the sexual encounter, Plaintiff sets forth a jumbled assortment of alleged "significant evidentiary weaknesses" that she claims resulted in an erroneous outcome.  Complaint, ¶ 154.  None of these points are sufficient to allow the Court to upend Loyola's finding.

All of Plaintiff's points concern her claims of what John Doe allegedly could do, said, or did during the sexual interaction, and based on this Plaintiff contends John Doe must have consented to the sexual activities.  Complaint, ¶ 154.  But Plaintiff's after-the-fact statements about what John Doe allegedly could or could not do had to be balanced against the contemporaneous statements she made to numerous other persons verbally and in writing regarding John Doe's level of intoxication and functioning.  Thus, it was well within the panel's

---

[10] *Harwood v. Johns Hopkins University*, 130 Md. App. 476, 483-84, *cert. denied*, 360 Md. 486 (2000) (*"*Although the actions of public universities are subject to due process scrutiny, private universities are not bound to provide students with the full range of due process protections.").

purview to give less weight to Plaintiff's post-hoc statements that John Doe drank but not to the point of intoxication and John Doe alone removed his clothes, put on the condom, walked freely and the like than to Plaintiff's contemporaneous statements that John Doe was "really drunk," "drunk as f**k," needed to be "taken care of," and needed to be helped home because he "couldn't walk." This is especially so given the statements of the numerous other persons who witnessed John Doe's intoxication status immediately near the time of the sexual encounter, such as Kayla (John Doe was mute on the bed with his eyes closed, she questioned what was wrong with him, Plaintiff responded that's just how drunk people are), Anaya (John Doe looked like he was asleep, she believed Plaintiff was just letting him sleep off his drunkenness), and Caitlyn (John Doe was "pretty much gone" and incapable of forming coherent sentences immediately before the sexual encounter). Significantly, neither Kayla, Anaya, nor Caitlyn had any connection to John Doe whatsoever—they first met him the weekend of the incident. Inv. Report, Part 2 (Ex. 2) at 27, 29, 35.

"[C]redibility determinations are fully within the purview of a university discipline hearing panel conducting a de novo review." *Washington Univ.*, 434 F. Supp. 3d at 760 (citation omitted). "The [university] decisionmakers were entitled to weigh this evidence in making their determination." *St. John's Univ.*, 2017 WL 4863066 at *3. The hearing panel's finding that by a preponderance of the evidence John Doe was not able to provide consent due to his level of intoxication was not erroneous as a matter of law. *E.g., Washington Univ.*, 434 F. Supp. 3d at 759-60 (plaintiff failed to state an erroneous outcome claim where university panel found that "plaintiff had enough information from which [they] should have known that [victim] was too incapacitated to give consent to their subsequent sexual contact").

#711295

Furthermore, it should go without saying that just because an individual is too drunk to provide consent does not mean that they are wholly incapable of performing any motor functions, including participating in sexual activities.  If the case were otherwise, people could take advantage of intoxicated persons sexually with impunity merely by alleging something like, "she got on top of me," "he was able to kiss me," "she took off her bra," "he was aroused," or "afterwards she walked to the bathroom."  Hence, Plaintiff's claims that Loyola's finding had to be erroneous because John Doe participated in the sexual activity and made a FaceTime call and talked about being sexually violated afterwards falls flat.  Moreover, statements from the persons who had to retrieve John Doe from Plaintiff's room afterwards described him as being unable to walk safely without assistance and/or having slurred speech (with video evidence backing up the fact that he needed assistance to walk).  These individuals and others also described John Doe as having bouts of sobbing while consistently stating that he had been sexually violated by Plaintiff. If a person making a telephone call for help after an unwanted sexual encounter, and then later being able to ambulate and tell someone what happened to them in between fits of crying and attempting to carry on "normally," means that the person must have consented to the sexual activity, then there would be no point in having or trying to enforce a sexual misconduct policy on a college campus or anywhere else for that matter.[11]

---

[11]  Plaintiff's contention that she found John Doe's pocketknife on the ground the day after the sexual encounter is a classic red herring.  Plaintiff consistently stated that the pocketknife was not used as part of the sexual encounter and, indeed, how could it have been given that it was not discovered on the floor until the next day.  The decision not to consider John Doe's possession of a pocketknife on campus as part of the Sexual Misconduct Policy hearing therefore was reasonable.  Moreover, Plaintiff's assertion that the Community Standards' section on "Weapons and Ammunition" is part of the "Procedures for Adjudicating Charges of Sexual Misconduct" is incorrect. Complaint, ¶ 28. The Community Standards covers "Sexual and Gender Based Misconduct" in Section 21, while "Weapons and Ammunition" are addressed separately in Section 29.  Pl.'s Compl., Ex. 2.  In between the two are policies on a variety of unrelated subjects, such as "Throwing Objects from Windows" (Section 25). *Id.*

2.      Plaintiff Cannot Show Unfair Treatment "On The Basis Of Sex."

To show that gender bias was the motivating factor behind an erroneous outcome,

Plaintiff must "do more than state in conclusory fashion that the flawed outcome was the result

of 'gender bias.'" *Loh*, 2018 WL 1535495 at *9.  Instead, Plaintiff must plead particularized

allegations of gender discrimination, "such as statements by members of the disciplinary

tribunal, statements by pertinent university officials, or patterns of decision-making, supporting a

plausible inference that the proceedings were influenced by gender bias."  *Loh*, 2018 WL

1535495 at *9 (quotation omitted).

"Courts have widely held that vigilance in enforcing Title IX, even when it results in bias

in favor of victims and against those accused of misconduct, is not evidence of [gender] bias."

*Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d at 519.  Indeed, "a disciplinary system that is biased in

favor of alleged victims and against those accused of misconduct...does not equate to gender bias

because sexual assault victims can be both male and female." *Z.J. v. Vanderbilt Univ.*, 355 F.

Supp. 3d 646, 682 (M.D. Tenn. 2018) (citation omitted).

Foreshadowing the weakness of her claim, instead of alleging purposeful discrimination

because of her gender, Plaintiff alleges that "errors occurred as a result of the school's <u>bias</u>

<u>against accused students</u>," Complaint, ¶155 (emphasis added), and that the alleged "erroneous

outcome of the hearing and purported appeal can only be explained by <u>bias against the accused</u>

<u>in cases involving allegations of sexual assault</u>." *Id.*, ¶157 (emphasis added).  Nowhere does

Plaintiff show particularized facts "supporting a plausible inference that the proceedings were

influenced by gender bias." *Loh*, 2018 WL 1535495 at *9.

Plaintiff's allegations that David Tiscione exhibited "bias against the Plaintiff" cannot

carry a claim of gender discrimination as a matter of law.  Complaint, ¶ 118.  As addressed

above, the decision not to include the allegation that John Doe's pocketknife was found on the

23

ground the day after the sexual encounter in the Sexual Misconduct Policy hearing was a matter

of commonsense, especially given that there was no allegation that the pocketknife was used

during the encounter.  And most importantly, there is no plausible allegation that the decision

was motivated by gender discrimination.

Plaintiff's allegation that Mr. Tiscione exhibited bias because the hearing covered John

Doe's complaint first also defies logic, given that John Doe filed his complaint first, some two

weeks before Plaintiff's.  Moreover, "arguing her complaint second" did not deprive Plaintiff the

ability to present her case (with assistance of counsel) at a proceeding that lasted more than four

hours.  *See* Appeal Tr. (Ex. 8), at 45.  And here again no particularized connection is shown

between this natural ordering of the complaints at the hearing and purposeful discrimination

against Plaintiff on the basis of her gender.

Plaintiff's general allegation that Mr. Tiscione asked her questions that she disliked also

cannot establish gender discrimination.  Complaint, ¶118(c).  Mr. Tiscione and the other

members of the panel had to determine whether the sexual intercourse was consensual but certain

activities during the intercourse were not, as alleged by Plaintiff, which necessarily involved

questions about the sexual acts themselves.  Plaintiff fails to point to any specific question from

Mr. Tiscione that shows motivation to find against her because of her gender.

The result is the same with Plaintiff's bare allegation that Mr. Tiscione exhibited bias by

"filtering many of the cross examination questions that Plaintiff had prepared for the Hearing

Panel." Complaint, ¶118(d).  Plaintiff forgets, however, that the questions submitted by a party

are "suggested," and there is no requirement under the Sexual Misconduct Policy that the hearing

panel ask any of the suggested questions or ask them precisely as the suggesting party desires.

*See Washington Univ.*, 434 F. Supp. 3d at 751 ("Title IX should be construed to give school

administrators...the flexibility they require to initiate a reasonable disciplinary response."). Furthermore, Mr. Tiscione and the rest of the hearing panel considered Plaintiff's suggested questions despite receiving the list only hours before the start of the hearing, and as conceded by Plaintiff in her Complaint did ask some of Plaintiff's suggested questions. *See* Complaint, ¶118(d) (noting only that "several questions were not asked").  There simply is no plausible, particularized connection between Mr. Tiscione's actions and purposeful discrimination against Plaintiff because of her gender. *Doe v. Cummins*, 662 F. App'x 437, 449–50 (6th Cir. 2016) (holding that in the "university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias" and, therefore, "any alleged prejudice on the part of the decisionmaker must be evident from the record and cannot be based in speculation or inference") (citations and quotations omitted).

Plaintiff's assertion of bias because the University allegedly succumbed to "growing national and federal pressure to hold accused students responsible for sexual assault" and found Plaintiff responsible to show compliance with Title IX in "unnecessary haste" also makes no particularized connection to discrimination based on her gender.  Complaint, ¶ 10-26.  Plaintiff relies heavily on a 2011 "Dear Colleague Letter" from the U.S. Department of Education's Office for Civil Rights that she claims put "pressure on schools to find students accused of sexual assault responsible." *Id.*, ¶ 24.  Plaintiff does not plausibly allege, however, that the "Dear Colleague Letter" and related "federal pressure" created any bias by Loyola against women, especially given that the Dear Colleague Letter universally only has been found to promote a "pro-female, anti-male bias." *Ruff v. Bd. of Regents of Univ. of New Mexico,* 272 F. Supp. 3d 1289, 1299 (D.N.M. 2017).  Further, Plaintiff explicitly alleges in her Complaint that based on pressure from the federal government Loyola is being more aggressive against <u>all</u>

<u>students</u> accused of sexual assault, a claim which plainly falls outside the scope of Title IX.  *Z.J.*, 355 F. Supp. 3d at 682;  *see also Loh*, 2018 WL 1535495 at *9 ("Doe's allegation of general pressure that the Dear Colleague letter supposedly exerted on <u>all</u> universities does not allow the inference that UMCP succumbed to such pressure, and that the pressure rendered a biased outcome in Doe's case.") (emphasis in original).

Finally, Plaintiff's assertion that a mishmash of the alleged "procedural flaws" addressed above shows bias also fails to show purposeful gender discrimination. Complaint, ¶ 155.  Once again, Plaintiff focuses on alleged bias against an "accused" student and does not connect any of the generalized alleged "flaws" to gender bias against her.  Thus, Plaintiff's complaints about things like a single investigator reviewing the claims arising out of the same incident, a lack of trial-like processes, and her disagreement with what pieces of evidence were given greater weight than others are incapable of demonstrating intentional discrimination based on her gender.  And any claim of gender discrimination here is further undermined by the panel making findings in favor of Plaintiff and against John Doe.

In short, Plaintiff cannot plausibly allege that Loyola's determination that it was more likely than not that John Doe was too intoxicated to provide consent was motivated by discrimination against her because she is a woman.  Plaintiff's Title IX claim fails as a matter of law and should be dismissed.  *E.g., St. John's Univ.*, 2017 WL 4863066, at *3–4 (dismissing the plaintiff student's Title IX erroneous outcome claim and holding that the plaintiff student's allegation that the accuser was lying and gave conflicting statements, the plaintiff's disagreement with the defendant university about removing the investigator because she represented the defendant in another Title IX proceeding, and the defendant's refusal to allow the plaintiff to

conduct his own independent investigation or have an adversarial hearing (when the defendant's policy did not provide for either) failed to establish gender bias).

### B.   Plaintiff's Breach Of Contract Claim (Count IV) Fails As A Matter Of Law.

In Count IV, Plaintiff attempts to rehash her Title IX claim through an allegation that Loyola's Community Standards constituted a contract and Loyola breached that contract by failing act in accordance with the Sexual Misconduct Policy.  Even if, assuming *arguendo*, such a contract could exist, Loyola more than adequately followed the Sexual Misconduct Policy. Plaintiff's breach of contract claim should be dismissed.[12]

To state a claim for breach of contract, a plaintiff must show that the defendant owed her a contractual obligation and that the defendant breached that obligation. *RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658 (2010).  A breach of contract claim must be dismissed when the plaintiff fails "to plead with certainty and definiteness" a contract term allegedly breached by the defendant.  *Id.*

Where private universities are concerned, "it is not the court's function to decide whether student misbehavior should be punished or to select the appropriate punishment for transgressions of an educational institution's ethical or academic standards." *Holert v. University of Chicago*, 751 F.Supp. 1294, 1301 (N.D. Ill. 1990).  Indeed, "[c]ourts must enter the realm of school discipline with caution and allow schools flexibility in establishing and enforcing disciplinary procedures" because "[s]chool discipline is not an area in which courts lay claim to any expertise."  *Harwood*, 130 Md. App. at 483-84 (citation and quotation omitted).  Thus, a court should only intercede when a private university's disciplinary decision is malicious or

---

[12] Plaintiff contends that Loyola's receipt of her tuition and her compliance with Loyola's enrollment procedures formed the alleged contract.  Complaint, ¶ 166.  To the extent the Community Standards constituted a contract, Maryland law applies.  *Baker DC, LLC v. Baggette Constr., Inc.*, 378 F. Supp. 3d 399, 406–07 (D. Md. 2019).

arbitrary and capricious.  *Id.* at 484.  An arbitrary and capricious decision is one that "shocks the conscience." *Butler v. Rector and Bd. of Visitors of College of William and Mary*, 121 Fed. Appx. 515, 519 (4th Cir. 2005) (citations omitted).

Plaintiff does not identify any specific term of the Sexual Misconduct Policy allegedly breached by Loyola.  Complaint, ¶¶ 162-168.  Instead, she lists eleven general grievances (labeled (a)-(k)), the sum and substance of which is her belief that the conclusion of the hearing panel was wrong.  *Id.*, ¶ 167(a)-(k).  But Plaintiff's dissatisfaction with the outcome of Loyola's disciplinary process "is an insufficient basis for a breach of contract claim."  *Z.J.*, 355 F. Supp. 3d at 692–93.  Plaintiff's general grievances also are insufficient to state any claim for the additional reasons below.

> (a)  "Discriminating against Plaintiff on the basis of gender" and (k) "Failing to provide Plaintiff with an impartial process."

As discussed above, Plaintiff's Complaint and exhibits to the Complaint contain no facts from which this Court could reasonably infer that Loyola engaged in gender-based discrimination. *Supra* § II.A.1.c.  Moreover, the Sexual Misconduct Policy is written in a facially neutral manner and applies to all students accused of sexual misconduct without regard to gender.  *See Loh*, 2018 WL 1535495, at *10 (rejecting the plaintiff student's claim that the university's policy created an "unreasonable risk of an erroneous outcome for male students that were the subject of sexual misconduct complaints" where the policy was written in a facially neutral manner and applied to all students accused of sexual misconduct without regard to gender, and noting that "sexual-assault victims can be both male and female") (citation and quotation omitted).  At bottom, Plaintiff's conclusory allegations that the Sexual Misconduct Policy process somehow was biased against her are insufficient to state a claim (especially in the

face of the evidence to the contrary found in the exhibits attached to the Complaint).  *See*

*Cummins*, 662 F. App'x at 449–50.

> (b) "Failing to provide adequate policies and procedures for investigation and adjudication of complaints of alleged sexual misconduct"; (c) "Operating from a presumption that Plaintiff committed sexual assault"; (d) "Conducting a cursory, superficial, biased, and fundamentally unfair investigation, hearing and appeal process"; (e) "Preventing Plaintiff from contacting witnesses"; and (f) "Failing to allow Plaintiff to present a complete a defense."

The investigation and review of the complaint against Plaintiff more than satisfied the

requirements of the Sexual Misconduct Policy.  There are no provisions of the Policy that

required the investigator, the hearing panel, or the appeals panel to consider evidence in a way

that Plaintiff alleges they did not, or to refrain from considering evidence in a way that Plaintiff

alleges they did.  Loyola conducted a timely investigation, which included Plaintiff receiving

notice of John Doe's complaint against her the day after Loyola received it and receiving notice

of the initial hearing and appeals hearing well in advance of the scheduled dates.  Loyola even

rescheduled the initial hearing at Plaintiff's request to accommodate the schedule of her attorney.

Plaintiff further received timely notice of the decisions of the initial hearing panel and appeals

panel, with a rationale for each.

Per the Policy, and as outlined above, Loyola designated an investigator to review the

matter and the investigation involved numerous interviews and fact gathering.  Plaintiff, with her

attorney by her side, had the opportunity to engage the investigator, including submitting

comments to the report and documents for consideration (all of which were included in the final

report).

A hearing was held regarding the complaints per the Policy.  Plaintiff had the opportunity

to review the panel members in advance and to request to remove any panel member who she

believed could not be objective towards her.  May 13, 2019 Tr. (Ex. 3) at 4.  Plaintiff had the

opportunity to bring as many fact witnesses as she wanted to the hearing.  *Id.* at 3.  Plaintiff

affirmatively stated that she did not have any questions about the Policy, the hearing process, or

the Policy violations with which she was charged.  *Id.* at 3-4.

Plaintiff was able to provide a statement and testimony at the hearing, including directing

the panel to evidence and arguments which she believed supported her position.  Plaintiff's

attorney accompanied her to the hearing, and Plaintiff freely consulted with him throughout.  Just

hours before the hearing, Plaintiff submitted suggested questions for the Panel to ask John Doe,

yet the panel still took the time to review the suggested questions before starting the hearing.

Plaintiff also had opportunities during the hearing to suggest other questions.  And although

Plaintiff complains that all of her suggested questions should have been asked by the panel, and

asked precisely as they were written or how she otherwise wanted them asked, the Policy does

not contain any such requirement.

Finally, the appeal process Plaintiff received complied with the Policy.  Although the

Policy expressly limits appeals to only three grounds (with the burden on the appealing party to

provide support for the asserted grounds), Plaintiff sought to base some of her appeal on

prohibited grounds.  As outlined in the Policy, the Dean of Students reviewed Plaintiff's appeal,

and approved the parts of her appeal based on recognized grounds.  Plaintiff received a hearing

on her appeal before a different panel.  Plaintiff was accompanied by her attorney and had the

opportunity to make statements to the appeals panel.  Plaintiff's nebulous claims that the

investigation and process she received somehow constituted a breach of the Sexual Misconduct

Policy fail as a matter of law.  *See, e.g., Z.J.*, 355 F. Supp. 3d at 692–93 (dismissing the plaintiff

student's breach of contract claim alleging a failure to conduct an appropriate investigation

where the defendant university substantially complied with the process set forth in its sexual

#711295

misconduct policy; the law does not require anything more of a private university) (collecting cases, including *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 891–92 (N.D. Ohio 2017) (dismissing the plaintiff student's breach of contract claim alleging a failure to conduct a "full and fair investigation" of the sexual misconduct claims against him where the corresponding student policy simply required that an investigator be appointed and an investigation be conducted, and the college did just that; the plaintiff's complaints about the investigator's credentials, what the investigator should or should not have done, or how the investigation otherwise should have been conducted were immaterial because they were not required under the terms of the policy)).

> (g) "Rendering an adverse decision against Plaintiff without sufficient evidence to support it"; (h) "Failing to impose a proportionate and reasonable sanction"; (i) "Issuing an arbitrary and capricious determination"; and (j) "Misapplying Defendant's own consent standard as elaborated in its Community Standards."

Plaintiff's conclusory allegations that Loyola breached the Sexual Misconduct Policy by issuing an arbitrary and capricious decision against her and imposing an unreasonable sanction similarly fail to state a claim. The hearing panel reviewed the evidence, deliberated the matter for five hours and, as provided for in the Policy, used a preponderance of the evidence standard when rendering its determinations. There was more than ample evidence to support the finding that it was more likely than not that John Doe was incapable of giving consent at the time of the sexual encounter due to alcohol intoxication, especially given that the Policy expressly states that consent "cannot be given by someone who is not able to effectively communicate" due to consuming alcohol. Sexual Misconduct Policy, Ex. 1, at 33 § 21. Multiple persons reported John Doe having difficulty communicating at the time of the sexual encounter due to intoxication, including Plaintiff's roommate, Caitlyn, who saw John Doe immediately prior to the sexual activity and stated that he was incoherent and "pretty much gone." And Plaintiff's

31

statement to the hearing panel that she describes everyone who drinks as being "drunk as f**k" was so preposterous that any reasonable person would have questioned her credibility on the issue. *Coll. of Wooster*, 243 F. Supp. 3d at 894 ("As for assessing the credibility of hearing witnesses, such a determination is well within the discretion of the disciplinary board, and is not for the courts to second guess.") (citations omitted).

The hearing panel also properly discharged its obligation to impose sanctions under the Policy. As the Policy states, "[v]iolations of the sexual misconduct policy are serious" and the possible range of sanctions includes suspension from the University. Sexual Misconduct Policy, Ex. 1, at 39-40, section viii. Imposing a one semester suspension on a student who engaged in nonconsensual sexual activity with a person who the student contemporaneously described to others as being "out of it and drunk and can't walk," "really drunk" and in need of care, and "drunk as f**k" hardly "shocks the conscience."

The appeals panel similarly followed the Policy when reviewing Plaintiff's appeal. The panel heard from Plaintiff and John Doe, questioned Mr. Tiscione regarding the points Plaintiff raised on appeal, and reviewed all of the documentary materials. There is no support for any contention that the panel's affirmance of the hearing panel's decision was arbitrary and capricious.

### C.   Plaintiff's Negligence Claim (Count III) Fails As A Matter Of Law.

Plaintiff's negligence claim fails because it is premised on the same allegations as Plaintiff's breach of contract claim—the process set forth in Sexual Misconduct Policy. "[W]here the essence of a relationship is contractual and the essence of the claimed dereliction by a defendant is failure to perform the contract, a cause of action arising from such dereliction is not available in tort but is available only in contract." *Parks v. CAI Wireless Sys., Inc.*, 85 F. Supp. 2d 549, 556 (D. Md. 2000) (applying Maryland law) (citation omitted). *See also Valente*

32

*v. Univ. of Dayton*, 438 F. App'x 381, 387 (6th Cir. 2011) ("Because the duties [plaintiff]

identifies all arise from his contractual relationship with [the university], he proffers no grounds

upon which to base a negligence action.");  *Z.J.*, 355 F. Supp. 3d at 705 ("Because [plaintiff] has

not identified a source of duty outside the relationship established by the Handbook and Sexual

Misconduct Policy, his negligence and gross negligence claims are an impermissible attempt to

recast his contractual claims in the language of tort. These claims will therefore be dismissed.").

      Even if such a tort duty could exist, Plaintiff's negligence claims would fail for the same

reasons her breach of contract fail as a matter of law.  *Supra*, § II.B.  Plaintiff's negligence claim

should be dismissed.

      **D.**    **Plaintiff's Breach Of Covenant Of Good Faith And Fair Dealing (Count V) Fails As A Matter of Law.**

      Count V of Plaintiff's Complaint must be dismissed because Maryland does not

recognize an independent cause of action for breach of a duty of good faith and fair dealing.

*Thaler v. Donald J. Trump for President, Inc.*, 304 F. Supp. 3d 473, 478 (D. Md.), *aff'd*, 730 F.

App'x 177 (4th Cir. 2018) (citation omitted); *Maryland Physician's Edge, LLC v. Behram*, No.

CV DKC 17-2756, 2019 WL 4573417, at *8 (D. Md. Sept. 20, 2019) (collecting cases); *see also*

*Magnetti v. Univ. of Md.*, 171 Md. App. 279 n.3 (Md. Ct. Spec. App. 2006), *aff'd*, 402 Md. 548

(2007).

      **E.**    **Plaintiff's Claim For Declaratory Judgment–Title IX (Count I) Fails As A Matter Of Law.**

      Count V of the Complaint—"Declaratory Judgment-Title IX"—must be dismissed

because the Declaratory Judgment Act "provides a remedy in cases otherwise in the Court's

jurisdiction; it does not create an independent cause of action." *Profiles, Inc. v. Bank of Am.*

*Corp.*, --- F. Supp. 3d ---, 2020 WL 1849710, at *7 n.6 (D. Md. Apr. 13, 2020) (citation omitted).

Regardless, there also "is no private right of action to enforce grievance procedures and other

regulations under Title IX" as Plaintiff seeks to do in Count I.  *See St. John's Univ.*, 2017 WL

4863066, at *3 (holding that "a university's failure to promulgate a grievance procedure that

complies with Title IX does not itself constitute discrimination under Title IX" and dismissing

the plaintiff's declaratory judgment claim alleging that the defendant violated Title IX's

regulations regarding grievance procedures) (quotation omitted).

## **CONCLUSION**

For the foregoing reasons, Plaintiff's Complaint should be dismissed.


Respectfully submitted,

 _/s/_ Collin J. Wojciechowski
Brian T. Tucker (Bar # 27485)
Collin J. Wojciechowski (Bar # 21112)
218 North Charles Street, Suite 400
Baltimore, MD 21201
t: (410) 727-7702
f: (410) 468-2786
btucker@gejlaw.com
cwojciechowski@gejlaw.com
*Attorneys for Defendant*


Date:  August 31, 2020