IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JANE DOE<br>*Plaintiff*<br><br>v.<br><br>LOYOLA UNIVERSITY MARYLAND<br>*Defendant.* | Civil Action No. ELH-20-1227 |

**MEMORANDUM OPINION**

This case is rooted in competing claims of sexual misconduct lodged by a female student and a male student at Loyola University Maryland ("Loyola," the "School," or "University"), a private educational institution in Baltimore. Plaintiff, a female proceeding under the pseudonym "Jane Doe," and the male student, identified as "John Doe," were both undergraduate students at the relevant time. Plaintiff was 19 years of age. ECF 2-14 at 16.[1]

John Doe was the first to lodge accusations of sexual assault. A few weeks later, plaintiff accused John Doe of sexual misconduct. So, each was both a complainant and a respondent during the School's investigation of the allegations. Loyola adjudicated the complaints simultaneously, pursuant to its sexual misconduct policy.

Plaintiff was found to have sexually assaulted John Doe because she had sexual intercourse with him when, according to Loyola, he was too intoxicated to give consent. And, John Doe was

[1] The Complaint states that plaintiff filed a motion to proceed pseudonymously. But, the docket does not reflect that plaintiff submitted such a motion. *See* Docket. Nevertheless, given the nature of the allegations, I shall refer to both students by pseudonyms.

Curiously, the Complaint uses the full names of other students at Loyola who were involved in the case. From those names, one can easily ascertain the identity of Jane Doe and John Doe. In order to maintain the anonymity of Jane Doe and John Doe, I shall refer to other students only by their first names.

found to have committed sexual assault of plaintiff based on choking her during the sexual encounter. John Doe was also found to have committed "Sexual Verbal Abuse" based on his use of inappropriate sexual language. The students received identical sanctions of a one-semester suspension.

Unhappy with the disposition, plaintiff filed suit against Loyola, challenging the University's process and its decision. ECF 1 (the "Complaint"). The Complaint contains five counts. ECF 1. In Count I, Ms. Doe seeks declaratory relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, to the effect that Loyola's student disciplinary process, as written and applied, violated Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq*. Count II, titled "Erroneous Outcome from a Flawed Proceeding," asserts a claim of gender bias under Title IX. Plaintiff also lodges several claims under Maryland law: negligence (Count III); breach of contract (Count IV); and breach of the covenant of good faith and fair dealing (Count V).[2] The Complaint also includes 26 exhibits, some of which are quite lengthy. ECF 2-1 to ECF 2-26.

According to plaintiff, this "case arises amidst a growing national controversy stemming from the Department of Education's Office of Civil Rights ('OCR') threats to withhold federal education dollars in order to compel colleges and universities to address so-called 'sexual violence' on campuses." ECF 1, ¶ 10. She argues that the University's findings were the result "of a rigged and unfair disciplinary process." *Id.* ¶ 1. Plaintiff complains of an erroneous outcome "as a result of the sham sexual assault trial," and asserts that "nothing even resembling due process was

[2] Plaintiff asserts jurisdiction based on federal question jurisdiction, pursuant to 20 U.S.C. §§ 1681-88 and 28 U.S.C. §§ 1331, 1338, and supplemental jurisdiction under 28 U.S.C. § 1367(a). ECF 1, ¶ 4. Plaintiff also asserts jurisdiction based on diversity, pursuant to 28 U.S.C. § 1332, because she is a citizen of Virginia and Loyola is incorporated in Maryland. *Id.* ¶ 5.

provided . . . ." ECF 33 at 5. In essence, plaintiff insists that it was not physically possible for her to have committed a sexual assault of John Doe and that John Doe was not so incapacitated as to be unable to consent.

Loyola has moved to dismiss the Complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 12. The motion is supported by a memorandum of law (ECF 12-1, collectively, the "Motion") and thirteen exhibits. ECF 13 to ECF 26. Defendant's exhibits are also exhibits to the Complaint. Plaintiff opposes the Motion. ECF 33 (the "Opposition"). Defendant has replied. ECF 34 (the "Reply").

The parties have not pointed the Court to any other sexual assault cases involving a male student who accused a female student of sexual assault. In the search for similar cases, I have found only two such cases: *Doe v. California Inst. Of Tech.*, No. 2:19-cv-01005-AB (KSx), 2019 WL 8645652 (C.D. Cal. Aug. 13, 2019); *Roe v. Univ. of Cincinnati*, 1:18-cv-312, 2018 WL 9944938 (S.D. Ohio Aug. 21, 2018).

Despite the uncommon nature of the allegations here, I am satisfied that no hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion, with leave to amend.

## I. Factual Background[3]

[3] Given the posture of the case, I must assume the truth of all factual allegations in the Complaint. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). In general, and as discussed, *infra*, the Court may also consider the many documents that are attached to the Complaint as exhibits or incorporated in the Complaint by reference. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016).

### A. Loyola's Sexual Misconduct Policies

Loyola is "a private, liberal arts college" in Baltimore with a population of approximately 4,000 undergraduate students. ECF 1, ¶¶ 3, 8.[4] During the 2018-2019 academic year, plaintiff and John Doe were undergraduate students and members of Loyola's Class of 2022. *Id.* ¶¶ 2, 29; ECF 2-6 (John Doe's sexual assault complaint) at 1.

During the relevant period, Loyola received federal funding from the U.S. Department of Education. ECF 1, ¶ 9. In order to receive federal funding, Loyola, like many other colleges and universities, agreed to operate its programs and activities in accordance with Title IX and Title IX regulations. *Id.* ¶¶ 14, 15. This agreement is known as an "assurance of compliance." *Id.* ¶ 14.

Loyola's student conduct standards and policies are contained in a document titled "Community Standards." *See* ECF 2-1 (the "Handbook" or "Community Standards" for 2018-2019). The Handbook contains a detailed policy on "Sexual and Gender Based Misconduct." *Id.* at 35-43 (the "Policy" or the "Sexual Misconduct Policy").

The Policy sets forth the definitions applicable to allegations of sexual misconduct, several of which are relevant here. Consent "is defined as an affirmative indication by words and/or actions of a voluntary agreement to engage in the particular sexual act or conduct in question." *Id.* at 35, ¶ 21. The definition continues, *id.* (emphasis added):

> Consent for one sexual act or conduct does not constitute consent to all sexual acts or conduct. Consent can be withdrawn at any time, and once withdrawal of consent has been expressed, sexual activity must cease. Consent cannot be obtained through the use of force, threat, intimidation, or coercion. *Consent cannot be given by someone who is not able to effectively communicate or to understand the nature of the conduct being engaged in as a result of incapacitation due to consuming drugs or alcohol* or for any other reason (including but not limited to being unconscious, asleep, or otherwise unaware that sexual activity is occurring). . . . Silence or absence of resistance on the part of an individual does not constitute their consent.

[4] Plaintiff describes Loyola as both a college and a university. ECF 1, ¶¶ 3, 8.

"Sexual Verbal Abuse" is defined as "using language that is sexual in nature and unwanted on the part of another person." *Id.* at 35, ¶ 21(b).  It includes oral communication that is "obscene in nature."  *Id.*

"Sexual Assault" is defined to include "any sexual act or sexual contact without consent, including intercourse; oral sex; unwanted touching of an intimate body part of another person….It is the intent of this policy to provide notice that any unconsented sexual conduct, whether by a stranger or an acquaintance of the victim, is prohibited." *Id.* at 36, ¶ 21(c).

Also of relevance here, the Handbook includes a section on "Physical Conflict." *Id.* at 34, ¶ 15. According to the Handbook, physical conflict "includes acts of violence including, but not limited to, punching, kicking, scratching, spitting, biting, pushing, slapping, etc." *Id.* Further, it states: "**Standard sanction: suspension or expulsion from the University**." *Id.* (emphasis in original).

The Sexual Misconduct Policy provides comprehensive "Procedures for Adjudicating Charges of Sexual Misconduct." *Id.* at 39. The Policy indicates that the procedures "provide for prompt, fair, equitable, and impartial investigation and resolution of all reports of sexual misconduct" and all "participants will be treated with dignity, respect, and sensitivity." *Id.* Further, it provides: "Investigations and hearings will be conducted by officials who have received annual training on the issues related to domestic violence, dating violence, sexual assault, and stalking and on how to conduct an investigation and hearing process that protects the safety of participants and promotes accountability." *Id.*

In addition, the Policy describes, in detail, the process and procedures for (1) the filing of sexual misconduct complaints; (2) the notification to and response from a respondent; (3) the investigation conducted by a third party, hired by the University; (4) a hearing panel that makes

findings of fact, determinations, and decisions with regard to sanctions; and (5) the appeals process. *See id.* at 37-43.

With respect to the investigation phase, the Policy specifies that the Title IX Deputy for Students or his/her designee selects an independent investigator. *Id.* at 40. During the investigation, the complainant and respondent will "have the right to submit to the investigator evidence, witness lists, and suggested questions for witnesses." *Id.* And, at the conclusion of the investigation, the investigator is required to "prepare a written report summarizing and analyzing the evidence." *Id.* The complainant and respondent are both provided with the report and, within five days, "may submit a written response" that will be shared with the investigator, the hearing panel, and the Office of Student Conduct. *Id.*

Thereafter, based on "the investigation and the parties' responses, if any, the Office of Student Conduct may schedule a sexual misconduct hearing panel[.]" *Id.* The hearing panel consists of one faculty member, one administrator, and the Director of Student Conduct, and all "the panel members will receive special training on sexual misconduct cases." *Id.* Both the respondent and complainant "may each have an advisor [of choice] present throughout the entire process, including the hearing." *Id.* But, the "advisor is not allowed to address the investigators, address the hearing panel, or question witnesses." *Id.* In addition, the "respondent and the complainant each have the right to bring fact witnesses to the hearing to testify on their behalf." *Id.* at 41.

The Policy also sets forth the procedures for the hearing. *Id.* At the outset, the panel chair reviews student rights, responsibilities, and the charges. The respondent has the opportunity to present a brief statement to the panel and respond to questions from the panel. The complainant then has an opportunity to present a brief statement to the panel and respond to questions from the

panel. "The panel will then call witnesses and has the ability to recall the parties and any witness for clarification." *Id.*

"The panel will make findings of fact and determinations using a preponderance of evidence standard." *Id.* And, if "the panel determines that the respondent is responsible for a violation of this policy, the panel will decide the appropriate sanctions in accordance with the Student Code of Conduct." *Id.* Violations of the sexual misconduct Policy are "serious" and the range of sanctions includes the following: "written reprimand, fine, restitution,…suspension from the University, expulsion…" *Id.*

Within ten days of the hearing, the respondent and the complainant will be informed concurrently in writing of the outcome of the hearing. *Id.* at 42. The determination "must also include the rationale for the result and the sanctions." *Id.*

Within five days from the date of receipt of the panel's decision, the complainant and the respondent have the right to file an appeal to the "University Board on Discipline" (the "Board"). *Id.* However, an appeal may be founded only on the following specified grounds, *id.*:

- The party alleges that his/her rights to a fair hearing were violated.

- The party alleges that new evidence that was not available for the original hearing might impact the decision of responsibility or determination of sanction.

- The party alleges that the sanctions imposed are grossly disproportionate to the findings of responsibility.

The Dean of Students (the "Dean") or the Dean's designee "shall determine whether the student has provided sufficient support for each asserted ground" for appeal. *Id.* Failure "to follow the guidelines or to provide sufficient support for the asserted grounds will result in the Dean…determining that only certain asserted grounds should be submitted for review by [the Board] or that the appeal should be dismissed without further proceedings." *Id.*

The Board then considers the appeal based on the grounds that have been accepted by the Dean. *Id.* The appeals panel may not include anyone who participated in the original determination; it is "comprised of at least one faculty member and up to two University administrators." *Id.* at 43. The appeals panel reviews the "hearing record, the appeal letter and response, and the decision and rationale of the hearing panel." *Id.* It may also "meet with the student who is making the appeal and the original hearing officer." *Id.* Thereafter, the panel will affirm, reverse, or remand the matter. And, the Board's decision will then "be communicated concurrently in writing to both the respondent and the complainant." *Id.* Notably, the Board's "decision" is "final, and no further appeal is permitted by either party." *Id.*

**B. The Events of January 20-21, 2019**

Plaintiff and John Doe met for the first time on Saturday, January 19, 2019. ECF 2-14 (Investigation Report) at 14. They met through another student and mutual friend, Zoe. *Id.*

At about 10:00 p.m. on the evening of Sunday, January 20, 2019, plaintiff, John Doe, and about eight other students were in plaintiff's room in the Flannery O'Conner dorm on Loyola's campus. ECF 1, ¶ 29. The students were "playing cards and drinking alcohol." *Id.* According to plaintiff, John Doe was consuming "alcohol from a bottle in his backpack" during this time. *Id.* ¶ 30. John Doe claimed he consumed more than a dozen shots of liquor that night and he was "drunk to the point of incapacitation." ECF 2-8 (Hearing Tr., 5/13/19) at 61. Plaintiff was also consuming alcohol; she drank two Smirnoff Ice bottles and two shots of vodka. ECF 1, ¶ 31.

When the gathering concluded, plaintiff "ended up alone in her room with John Doe, with both parties sitting [on] the floor." *Id.* ¶ 32. When they were alone, plaintiff and John Doe "talked about and showed each other their tattoos" and, after talking for a few minutes, plaintiff "asked John Doe if she could kiss him." *Id.* ¶¶ 33, 34. According to plaintiff, John Doe said "yes" and

they "kissed for several minutes." *Id.* ¶¶ 35, 36. Thereafter, "John Doe went to the bathroom and then removed his shirt"; when he returned to plaintiff's room, "he began kissing" plaintiff again. *Id.* ¶¶ 37, 38.

While plaintiff and John Doe were kissing on plaintiff's bed, students Kayla and Dominic, who had been in plaintiff's room earlier, knocked on plaintiff's door to talk to plaintiff and to retrieve Dominic's slippers. *Id.* ¶¶ 39, 40.[5]  Kayla recalled that John Doe was on the bed with his eyes closed and fully dressed.  ECF 2-14 (Investigation Report) at 131.   According to Kayla, plaintiff reported that John Doe was "pretty drunk."  *Id.*  Plaintiff also said, *id.*: "'I am just going to take care of him.'" Kayla claimed she asked plaintiff if she needed help and plaintiff allegedly said that she did not need help and told them to leave. *Id.* Kayla said that they went back to plaintiff's room ten minutes later "because they thought the situation was kind of weird" and they saw John Doe "in the same position (on the bed) but with his shirt off." *Id.*; *see* ECF 1, ¶ 41. Kayla claimed that she asked plaintiff what was wrong with John Doe, and plaintiff allegedly said "'that's just how drunk people are.'" ECF 2-14 at 131-132.[6] Plaintiff again said "it was fine" and told them to leave. *Id.* at 132.

Plaintiff claims that after Kayla and Dominic left, John Doe "removed his pants and asked Plaintiff if they could 'fuck'[.]" ECF 1, ¶ 42. Plaintiff told John Doe that they had to wait because plaintiff's roommate needed to get something from the room. *Id.* ¶ 43. While they waited for

---

[5] According to statements from the Investigation Report, Anaya, who had also been in plaintiff's room earlier, was with Kayla and Dominic when they knocked on plaintiff's door. ECF 2-14 at 131, 133.

[6] Plaintiff denies that she made this statement.  But, she does not dispute that Kayla made the statement, *i.e.*, that Kayla claimed plaintiff had made the statement. ECF 2-9 (Plaintiff's Response to the Investigation Report) at 6.  Clearly, the panel credited the statement of Caitlyn.

plaintiff's roommate, plaintiff allegedly "asked John Doe if he was sure he wanted to have sex." *Id.* ¶ 44.

Caitlyn, plaintiff's roommate, reported that she returned to the dorm room with her friend, Chris, around 1 a.m. that night, *i.e.*, the early morning of January 21, 2019.  ECF 2-14 at 139.  She saw plaintiff and John Doe in the room alone; John Doe was on plaintiff's bed "with just his boxers on." *Id.*  According to Caitlyn, plaintiff stated that John Doe was "'really drunk.'"  *Id.*  She also said:  "'I'm going to take care of him for the night.'" *Id.*  At that point, Caitlyn "talked with" John Doe "a little bit." *Id.* According to Caitlyn, John Doe "could say actual words but was not making any sense." *Id.*

The Investigation Report provides, *id.*: "Caitlyn described [John Doe] as 'pretty much gone.' Caitlyn said that when she came back into the room from their bathroom, [plaintiff] was 'trying to get me and Chris to leave.' [Plaintiff] told them, 'I have to take care of him [*i.e.*, John Doe] and no one else should be in the room.'"

At around 1:26 a.m. on the morning of January 21, 2019, plaintiff texted Zoe, who had also been in plaintiff's room earlier with the group.  Plaintiff indicated that John Doe was with plaintiff. *Id.* at 129. Zoe replied, "Oooo that's spicy," and plaintiff responded by text, stating: "He's drunk as fuck." *Id.* at 72 (screenshot of text messages); *see id.* at 129.

According to plaintiff, after her roommate left, John Doe "again asked" plaintiff "if they could 'fuck.'" ECF 1, ¶ 46.  Notably, John Doe removed his own clothes.  *Id.* ¶ 48.  He "then leaned forward and grabbed the Plaintiff by the hips and moved her into a straddling position on top of him." *Id.* ¶ 49. While plaintiff was "straddling" John Doe, "he grabbed her hips very roughly." *Id.* ¶ 50. Then, he "pushed [plaintiff] below him and then stuck his fingers roughly into [her] vagina," but had not "asked to do this action," nor had he "given" any "indication" of his

intention.  *Id.* Plaintiff began to "bleed from her vagina" and, after "several minutes," John Doe "removed his fingers." *Id.* ¶ 51. Plaintiff asserts that she "did not give her full consent" for that conduct, but "did not say anything as she was scared because [John Doe] had pinned her down forcefully and she was much smaller than he and was worried that he could hurt her." *Id.*

Plaintiff alleges that, on his own, John Doe retrieved a condom from his wallet, which was in his backpack, and he placed it "on his own erect penis" and "then assumed the dominant position putting his entire weight on top" of plaintiff and asked plaintiff if "he could choke her." *Id.* ¶¶ 52, 53. "Plaintiff said she was not sure," but "John Doe ignored this and then put his hands around Plaintiff's neck and squeezed hard choking her"; he also "inserted his penis into" her vagina and "started to thrust." *Id.* ¶¶ 54, 55. After plaintiff pushed John Doe's hands off of her neck, "John Doe placed his hands on either side of Plaintiff's head and pushed his forearms and elbows onto Plaintiff's shoulders and clavicle, causing pain in both of her shoulders and in her chest." *Id.* ¶¶ 56, 57.

According to the Complaint, John Doe then asked plaintiff to "scratch his back." *Id.* ¶ 59. She scratched lightly at first, but then John Doe asked plaintiff to scratch harder, so "she complied" because she "was afraid of his actions." *Id.* ¶¶ 59, 60. Then, John Doe called plaintiff "a little slut." *Id.* ¶ 61.  The sexual encounter ended when John Doe "ejaculated into the condom, pulled his penis from Plaintiff's vagina, and sat up on the bed." *Id.* ¶ 62. He subsequently threw the condom on the floor and started to get dressed. *Id.* ¶ 63.

Thereafter, John Doe called Zoe and asked her to come get him so he "could get into Hammerman," another dorm on Loyola's campus. *Id.* ¶ 64. John Doe also called Chuck and told Chuck that he was still in plaintiff's room and was coming to Hammerman. *Id.* ¶ 65. John Doe also texted Eddie and Zoe around that time. *Id.* ¶ 66.  When Zoe and Chuck arrived at plaintiff's dorm

room, John Doe packed his bag and left with them. *Id.* ¶ 67. John Doe was able to walk to Hammerman. *Id.* ¶ 69.

Upon leaving plaintiff's room, John Doe "broke down in the hallway" and stated that he had been raped. *Id.* ¶ 68; ECF 2-14 at 7. At Hammerman, John Doe "conversed with multiple people, including calling his ex-girlfriend, who later observed the scratches on John Doe's back." ECF 1, ¶ 70. Zoe and Chuck also reported seeing "severe" scratches on John Doe's back. *Id.* ¶ 71; ECF 2-14 at 6-7. But, plaintiff maintains that the photographs taken on January 21, 2019, do not support that contention. ECF 1, ¶ 71; *see* ECF 2-14 at 94-98 (Photographs of John Doe's chest and back, 1/21/2019).

Plaintiff remained in her room that night. ECF 1, ¶ 72. She "awoke to find a used rubber on the floor along with a hunting knife left in the open position." *Id.*

**C. The Investigation**

John Doe filed a "Sexual Misconduct Incident Report" with the University on January 22, 2019. ECF 2-6. In the report, he claimed that on the evening of January 20, 2019, and the early morning of January 21, 2019, "he believed that he had been raped by" plaintiff. *Id.* at 2.[7] John Doe recounted that a group had gathered in Jane Doe's dorm room and "consumed an excessive amount of alcohol." *Id.* at 1. Further, he stated that he "had no intention of engaging in sexual activity that night . . . ." *Id.* at 2. And, he stated, *id.*:

> After a while, some of the people left the room. Kayla [] and Anaya [] were the last students to leave the room, and they seemed concerned about [John Doe] who was lying on [plaintiff's] bed. [Plaintiff] told them that they didn't have to worry. [Plaintiff] forcibly kissed [John Doe] as he was lying on the bed and was unable to consciously get out of the bed due to his high level of intoxication. Then she said that "you should've flirted with me" rather than others. At this point, [John Doe] froze and does not have any memory of what happened next.

[7] There is no information in the record as to whether Loyola ever previously had a complaint lodged by a male student claiming that he had been raped by a female student.

> The next thing that [John Doe] remembers is when Zoe [] and [Chuck] came into the room to get him out. Standing in the hallway, [John Doe] was hysterically crying and visibly distraught to the point where Chuck had to physically support him on the way to Chuck's room in Hammerman. He continued to be inconsolable and upset because he believed he had been raped by [plaintiff]. There were visible scratches on his back and hickeys on his chest and neck which were not present prior to going to [plaintiff's] room. . . .

On January 23, 2019, plaintiff was verbally informed that John Doe had initiated charges against her. ECF 1, ¶ 81. She also received an email from the Title IX Deputy Coordinator for Students, stating that Loyola had issued a mutual no contact order for plaintiff and John Doe. *Id.* The letter also barred plaintiff from discussing the incident with "<u>any student</u> at Loyola University unless this matter has been referred for an official university action." *Id.* ¶ 82 (emphasis in ECF 1). According to plaintiff, the guidance in the letter "was in contradiction of the spirit of the university guidelines" and "undermined" her "ability to defend herself." *Id.* ¶ 83. Despite the no contact order, plaintiff claims that "John Doe was seen around and near" her dorm. *Id.* ¶ 84.

Also on January 23, 2019, plaintiff returned to her family home in Virginia. *Id.* ¶ 73. The following day, she went to the doctor for evaluation and "treatment of the injuries she suffered during the sexual encounter with John Doe." *Id.*; *see* ECF 2-3 (Plaintiff's Medical Exam Report, 1/24/2019). According to the medical records, plaintiff told the physician that she had engaged in "consensual protected intercourse with a one time partner." ECF 2-3 at 3. The notes reflect that plaintiff reported that "during the intercourse, partner got abusive and started to choke [her] as well as used a finger to aggressive [sic] penetrate vagina to the point of bleeding." *Id.* Further, she reported soreness and bruising to various parts of her body from the sexual encounter, *id.* at 3, and bilateral hip joint pain and pain in her left shoulder. *Id.* at 4.

The doctor performed a "full examination" of plaintiff, which included photographs "of the visible bruising and swelling on Plaintiff's shoulders, hips, and neck." ECF 1, ¶ 74; *see* ECF

2-3 at 6-14 (Photographs from Medical Exam). The notes from the exam include the following finding: "1cm 1st degree vaginal tear noted at the introitus on the superior aspect." ECF 2-3 at 4. In addition, plaintiff "had abnormal uterine and vaginal bleeding [and] laceration of the vagina . . . ." ECF 1, ¶ 76. Further, the physician assessed plaintiff as a "victim of sexual abuse." *Id.* The doctor ordered x-rays and recommended physical therapy for plaintiff's pain in her left shoulder.  ECF 2-3 at 4; ECF 1, ¶ 77.

Thereafter, on February 12, 2019, plaintiff began physical therapy for the pain she was experiencing in her neck, shoulder, and hips. ECF 1, ¶ 78; *see* ECF 2-4 (Physical Therapy Records). She was also placed on anxiety medication by the school psychologist and "began to have flare ups of Panic Disorder that was previously in remission." ECF 1, ¶ 79. In addition, a licensed social worker diagnosed plaintiff with Post-Traumatic Stress Disorder ("PTSD"). *Id.* ¶ 80; *see* ECF 2-5.

On February 8, 2019, more than two weeks after John Doe had filed his sexual assault complaint against plaintiff, Ms. Doe lodged a "Sexual Misconduct Incident Report" against John Doe. ECF 1, ¶ 85; *see* ECF 2-7. Plaintiff stated, in "summary," that John Doe "initiated sex with [her], but then he was immediately very rough which she never consented to. She was frightened both when he squeezed and choked her. She did not expect or consent to be chocked [sic] or squeezed to the point of injury." ECF 2-7 at 2. She also asserted that John Doe "vaginally penetrated" her "with his fingers roughly, resulting in bleeding from the vagina onto the bed sheets." *Id.*

Pursuant to the University's Sexual Misconduct Policy, Loyola initiated an investigation of the parties' allegations on February 15, 2019. *See* ECF 2-14 ("Investigation Report" or "Report") at 3. The Title IX Coordinator, Kurita Kitsura, appointed Stephanie P. Karn, Esquire, to

conduct an investigation as to both complaints. ECF 1, ¶ 87. Karn is a lawyer in Richmond, Virginia; she is not affiliated with Loyola. ECF 12-1 at 11; *see* ECF 2-14.[8]

During the investigation, which concluded on March 29, 2019 (ECF 2-14 at 3), Karn interviewed plaintiff and John Doe, as well as the individuals identified as being present in plaintiff's room on the night in question and students with whom plaintiff and John Doe interacted after the incident. *Id.* at 3-13. Plaintiff was accompanied by her attorney during her interview with Karn. *Id.* at 3.[9] Karn also collected evidence from the incident, including a diagram of plaintiff's dorm room, text messages, phone records of plaintiff and John Doe, campus surveillance video, and plaintiff's medical records. *Id.* at 13-14.

Karn issued an "Investigation Report Summary" (the "Report") on April 4, 2019. ECF 2-14 at 3-18. It is sixteen pages in length with 31 exhibits. The exhibits include all of the statements from the interviews and other evidence that Karn collected. *See id.* at 17-18.

The Report sets out "Findings" and "Conclusions." *Id.* at 14-16. It states, in relevant part, that John Doe "was present" in plaintiff's room on January 20, 2019; plaintiff and John Doe "consumed alcoholic beverages" that night; "[a]s the party wrapped up, multiple people saw [John Doe] lying down with his shirt off and his eyes closed"; at some point late Sunday or early Monday morning, plaintiff texted Caitlyn, her roommate, stating, "'Imma watch [John Doe]'"; at some point after 1:26 a.m. on Monday morning, January 21, 2019, plaintiff texted Zoe, stating that John Doe was with her and that he was "'drunk as fuck.'" *Id.* at 16. However, the Report also notes that

---

[8] The parties do not indicate whether Karn had ever previously functioned as an investigator for Loyola regarding a sexual assault complaint.

[9] Plaintiff's lawyer at the time is not her lawyer in this litigation.

plaintiff claimed she uses that phrase "drunk as fuck" to "refer to anyone who has been drinking regardless of their level of intoxication." *Id.* at 16 n.1.

The Report references video footage from campus security cameras in the dorms, which showed that at around 1:57 a.m. on January 21, 2019, John Doe was hugging Chuck outside of plaintiff's room, and Chuck had "his arm around" John Doe "as they walk away down the hall" from plaintiff's room. *Id.* at 16. Other video footage showed Chuck putting John Doe "into a chair and pushing [him] through Hammerman, after they left Flannery O'Connor early Monday, January 21." *Id.*

In a section of the Report titled "Conclusions," it states that after John Doe left plaintiff's room early on Monday, January 21, 2019, John Doe "told multiple people that he had been raped by" plaintiff. *Id.* Further, the Report indicates that two or three days after the incident, plaintiff "was photographed with bruises and marks on her neck/shoulder and hip(s)." *Id.* The Conclusions also note that John Doe brought a pocketknife with him to plaintiff's room, which plaintiff found the next morning. *Id.*

In addition, the Conclusions include a footnote outlining various contentions of Jane Doe and John Doe. *Id.* at 16 n.2. It states that John Doe "alleges he was drunk to the point of incapacitation and did not consent to sexual intercourse with [plaintiff]; [plaintiff] alleges that [John Doe] was not drunk, and he asked her to engage in sexual intercourse. [Plaintiff] alleges that, while she consented to sexual intercourse with [John Doe], he also engaged in digital penetration, choking, use of offensive language, and rough behavior during sex to which she did not consent." *Id.*

The Report does not reference the size of either John Doe or Jane Doe. In particular, there is no mention of their respective heights or weights.

Plaintiff submitted a response to the Report on April 12, 2019. ECF 1, ¶ 94; ECF 2-9. Notably, plaintiff's response was appended to the Report. *See* ECF 2-14 at 19-25. The response includes plaintiff's "Key Observations, Clarifications, and Corrections," as well as her "Overall Comments . . . ."  ECF 2-9 at 1.  Given that the Report appended plaintiff's response, her comments and contentions were obviously made known to the hearing panel.

In plaintiff's "Overall Comments in response to the investigative report," she complained that the Report "focuses heavily on [John Doe] as a victim, both in the report organization, sequence of the testimony, evidence and the conclusions/summary." *Id.* Further, she said, *id.*: "It appears to me, as it has from the beginning, that the investigation has been biased toward [John Doe], and proving that he could not consent to sex by describing what happened before and after the sex occurred, rather than looking carefully at the statements made about the incident itself, and physical evidence associated with the incident. In fact, there were no witnesses of [sic] what happened in the room when [John Doe] initiated sex with me."

In addition, plaintiff highlighted "discrepancies" in John Doe's claim. *Id.* at 1-2.  In particular, she noted, *id.* at 1-2: "[John Doe] claims in his statement that he blacked out from alcohol literally minutes before any sexual activity occurred.  And then he conveniently wakes up and remembers things directly after the incident and directly before."  She added, *id.* at 3:  "If he can't remember anything that happened, how can he allege he was raped?"  Characterizing John Does' account of the incident as "a hoax," plaintiff maintained that his version is "completely ridiculous" and a physical impossibility.  *Id.* at 3.  She said, *id.* at 2:  "What doesn't make sense here is that [John Doe] says he was completely unconscious, yet, somehow, he was able to become erect, place a condom on his penis, have intercourse…ejaculate, and withdraw. He could not have

done this if he was unconscious."[10] Further, she stated, *id.* at 3: "Looking at the event itself, it is almost physically impossible for me to have actually raped [John Doe] the way he indicates." Plaintiff also included clarifications as to the statements of Chuck, Zoe, and Kayla. *Id.* at 5-7. And, she complained that her injuries "were minimized" in the Report. *Id.* at 6-7.

The disciplinary hearing followed issuance of the Report.

**D. The Disciplinary Hearing**

On April 18, 2019, plaintiff received a notice advising that the disciplinary hearing was to be held on April 29, 2019. ECF 2-14 at 1-2 ("Notice Letter"). However, the date of the hearing was moved to May 13, 2019, at plaintiff's request, to accommodate her attorney's schedule. ECF 12-1 at 11.

The Notice Letter outlined the violations of the Sexual Misconduct Policy of which plaintiff and John Doe were accused. ECF 2-14 at 1-2. It also described the hearing process and the possibility of sanctions if found responsible for any of the alleged violations. *Id.* at 1-2. And, a copy of the Report was attached to the Notice Letter. *Id.* at 3.

In particular, plaintiff was accused of having violated section 21C of the Policy ("Sexual Assault") and section 15 ("Physical Conflict"). *Id.* at 1. Further, the Notice Letter stated: "*It is alleged you exhibited behaviors consistent with acts of violence towards [John Doe], and you initiated sexual acts with [John Doe] without [John Doe's] consent*." *Id.* (Emphasis in original).

John Doe was also accused of violating section 21C and section 15. *Id.* And, he was accused of a violation of section 21B ("Sexual Verbal Abuse"). *Id.*

[10] As discussed, *infra*, John Doe clarified at the hearing that he was not alleging that he was unconscious or unable to move during the incident. He stated: "I was incapacitated, not unconscious." ECF 2-8 at 60-61.

Prior to the hearing, David Tiscione, Loyola's Director of Student Conduct and Chair of the hearing panel, informed plaintiff that the hearing would not include a review of plaintiff's contention concerning the knife found in her room after the incident. ECF 1, ¶ 104. By email of May 10, 2019, plaintiff asked Tiscione why the panel "decided to drop the weapons charge regarding the knife." ECF 2-19 at 3. Tiscione responded to plaintiff the same day, stating, *id.* at 2:

> In reference to your question regarding why the weapons charge was not added to the hearing- once the investigation materials are forwarded to our office, we review the materials and make a determination regarding whether what is alleged in the report would violate policies. For the weapons charge, our policy covers many things that can be considered weapons and includes knives. However, given the make up of our campus- many of our residential buildings have kitchens — we have only traditionally charged students with that policy if they were using knives as or threatening to use knives as a weapon- meaning to cause bodily harm. Because the weapon was not germane to the incident- meaning it wasn't alleged to have been used in a sexual assault and was not discovered until after the sexual assault, we decided not to add that charge. Similarly, we did not add the alcohol charges because as noted in the community standards, "Students who report sexual misconduct, or participate in an investigation as witnesses, will not be subject to disciplinary action for their own personal involvement with alcohol.

Via email, plaintiff responded the next day. She stated, *id.* at 1:

> I would like it formally noted that I disagree with this. This knife was open in my room during a sexual assault and I think it's very relevant. How did the knife get opened? I had to look it up on Google how to open and close the knife. Finding the knife, open in my room, was very frightening to me. Also, I disagree that many students have knives in residential buildings. [John Doe] is not a resident at Loyola. He is a day student. I ask you to see the attached photo and reconsider the decision not to charge [John Doe]. I refer respectfully to the Student Handbook 2018 – 2019[.]

At around 5:20 a.m. on May 13, 2019, the morning of the scheduled hearing, which was set to begin at 9:00 a.m., plaintiff emailed Tiscione a list of 81 suggested questions for the panel to ask John Doe during the hearing. ECF 2-11 (Plaintiff Appeal Hearing Tr., 6/28/2019) at 23, 58;

*see* ECF 2-20 ("Questions for Hearing Panel").[11] Plaintiff wanted the panel to ask John Doe a range of questions regarding John Doe's level of intoxication and his conduct during the incident. For example, plaintiff suggested the panel ask: "Isn't it true that you stayed in the room after most people left because you wanted to have sex with [plaintiff]?"; "Isn't it true that you were speaking plainly with people and able to carry on a conversation with others in [plaintiff's] room shortly before each of them left?" ECF 2-20 at 1-2.

Plaintiff's proposed questions were also aimed at demonstrating that John Doe could not have been incapacitated because he was able to undress himself before sex and dress himself afterwards. Ms. Doe wanted the panel to ask, *id.* at 2, 4-5: "If you contend that you took your own clothes off please describe how you did that in detail"; "[P]lease explain how you were fully dressed when others came back to the room to escort you[.]"

In addition, plaintiff's proposed questions focused on John Doe's use of a condom. Ms. Doe suggested the following inquiries: "Isn't it true that you had a condom with you and brought the condom for the specific purpose of having sex?"; "Isn't it true that [plaintiff] did not provide the condom used for intercourse?" "Did you tell [plaintiff] where your condom was, or did you pull the condom out yourself?"; "How can you explain how [plaintiff] knew that you had a condom and it was used for the sexual act?"; "Where was your condom? Did you go to your wallet and put on the condom yourself?"; "Is it your contention that . . . [plaintiff] found a condom . . . and placed it . . . on your penis?"; "Isn't it true that after having sex . . . you took the condom off your

[11] At the appeal hearing, plaintiff explained that she had submitted the 81 questions on the morning of the original hearing because she was not told of a deadline for submission. ECF 2-11 at 58. But, she knew of the hearing date, and it is self-evident that she provided her questions at the proverbial 11th hour and 59 minutes.

penis yourself?"; "Is it your contention that while you are [sic] unconscious, [plaintiff] had intercourse with you, and you ejaculated during the time you were blacked out?".

Plaintiff also proposed questions about John Doe's height and weight. *Id.* at 1. And, she sought to ask John Doe about his estimate of her height and weight. *Id.* at 2. Further, she wanted the panel to ask, *id.* at 6: "Isn't it true that you made a phone call to Zoe almost immediately after having sex with [plaintiff]?"

According to Tiscione, the hearing panel had reviewed plaintiff's suggested questions in the hours leading up to the hearing to determine how they "were going to work them into" their questioning of John Doe. ECF 2-11 at 24. The panel adopted some of the questions, but reworded them in order to make them "open-ended questions." *Id.* at 30. However, the panel determined that some of plaintiff's questions were "irrelevant based on the policies that were alleged to have been violated" and others were pointless because, as discussed, *infra*, John Doe maintained that he did not remember anything that happened during the incident. *Id.* at 30-31.

The hearing lasted about four and a half hours. *Id.* at 46. At the hearing, plaintiff was joined by her attorney. *Id.* at 2. Pursuant to the Policy, each complainant testified outside the presence of the other complainant, but the non-testifying party could listen remotely. *See, e.g.*, ECF 2-8 at 114. And, the two facts witnesses were sequestered. *See id.* The students did not take an oath before speaking to the panel, but they were advised "that the intentional providing of false information during a hearing is an additional violation of the community standards." *See, e.g.*, *id.* at 115.

Plaintiff provided the first statement during the hearing. *Id.* at 6-16. She acknowledged that John Doe "did drink a lot of alcohol," as did plaintiff. *Id.* at 14. But, she insisted that she "had absolutely no reason to believe that he could not consent to this because he is the one that asked

[plaintiff] to have intercourse twice." *Id.* She added that although John Doe "seemed somewhat inebriated," she "had no doubt in [her] mind" that "he was capable of . . . consenting to the act . . . ." *Id.* Further, she indicated that John Doe was cognizant of what was happening because he was capable of retrieving a condom. Moreover, she said, *id.* at 195: "I had no idea that he had a condom with him. I had no idea that he had a condom in his wallet. I did not know where his wallet was or where it would be if it was in his backpack or whatnot." *See also id.* at 139-140. She also noted that the brand of condom used during intercourse was different from the condoms that she had in her room. *Id.* at 8, 137.

Plaintiff recalled that John Doe got undressed and then dressed on his own. For instance, she said, *id.* at 7, 10: "After my roommate came and left, [John Doe] took off his own underwear and went into his own wallet and put on his own condom…. After sex, [John Doe] took off . . . his own condom and tied it and…threw it on the ground. He then proceeded to get dressed on his own. . . ." In addition, he "used his own phone to call Zoe…to come and get him." *Id.* at 10. But, she recalled: "He was very cold and would not talk to me." *Id.* Based on John Doe's behavior, plaintiff believed she had been "used for sex." *Id.* at 14.

With reference to plaintiff's text message describing John Doe as "drunk as fuck," plaintiff explained, *id.* at 28: "I don't have a lot of experience with people who are very intoxicated or very inebriated so in what I was saying it was more of poor word choice . . . it wasn't meant to be as specific as it comes across . . . ." *See also id.* at 29, 30, 32.

John Doe provided his own statement and then answered questions from the panel. *Id.* at 59-114. He described his alcohol consumption at the relevant time, insisting that he was incapacitated due to alcohol, but he was "not unconscious." *Id.* at 61; *see id.* at 72, 81, 94. Moreover, John Doe claimed that he "didn't want it [*i.e.*, sex] to occur." *Id.* at 81.

In response to questions from the panelists about the condom that was used during the incident, John Doe acknowledged that he "generally" carries a condom with him. *Id.* at 90. And, he "assume[d]" that his condom was used because, about two days after the incident, he noticed that it was no longer in his wallet. *Id.*

The panelists asked John Doe several questions concerning his memory of what happened during the incident. *Id.* at 86-88. He said, *id.* at 86: "I only remember laying on my back…vaguely her coming to the bed and kissing me and telling me that I should have flirted with her. But outside of that, I don't remember what the interaction contained." John Doe explained that he felt "trapped" by plaintiff because he was not able to "reliably" move or walk. *Id.* at 94-95. And, he said, *id.* at 96: "I had the thought that I wanted to leave…and I had that like tension in my chest where it was like this is a bad situation and I need to leave now. But I couldn't. Like, there was just some disconnect between that and my muscles…" Then, his "next recollection" was seeing Zoe and Chuck walk through the door of plaintiff's room. *Id.* at 97.

After several questions about whether John Doe remembered certain specific details from the encounter, one of the panelists said to John Doe, *id.* at 88: "There are 150 questions that we could ask you that don't mean anything if you have no recollection." John Doe responded by repeating, *id.*: "There is no part of the assault that I remember."

Plaintiff brought two fact witnesses to the hearing—Brendan and Katie. Brendan testified on plaintiff's behalf and Katie submitted a written statement. *Id.* at 4.[12] John Doe did not bring any fact witnesses. *Id.*

Brendan noted that during his interview with Karn he mentioned that he thought plaintiff "was, in fact, the primary victim of the assault," but he did not believe that perspective was

[12] Katie's statement is not included in the hearing transcript or any of the exhibits.

included in Karn's summary of his statement in the Report. *Id.* at 118. He then discussed his interactions with plaintiff on the night of the incident. He recalled that immediately after the incident, Brendan was in plaintiff's room to discuss issues concerning a mutual friend, Danny. *Id.* at 118-119. Brendan recounted that, during the conversation, plaintiff seemed "sad" and "distraught," but he did not know what had occurred with John Doe and plaintiff did not discuss it with him. *Id.* at 120. Brendan did not learn about the incident with John Doe until plaintiff talked to him about it "a few weeks later." *Id.* at 121.

It does not appear that the panel considered the height or weight of plaintiff or John Doe in the context of the sexual encounter between them. *See* ECF 2-11 at 31-32. According to Tiscione, the panel only asked John Doe for his weight in order to understand his level of intoxication. ECF 2-11 at 33. John Doe indicated that he is 5 feet 8 inches tall and weighed 150 pounds at the time. ECF 2-8 at 71. The medical records submitted by plaintiff reflect that she is just 4 feet 11 inches tall and weighed 122 pounds at the time. ECF 2-3 at 1.

After the hearing, the panel deliberated for about five hours. ECF 2-11 at 46-47. The panel separately considered each alleged Policy violation for plaintiff and John Doe and laid out all of the evidence that supported or contradicted each allegation. *Id.* at 43. The panel then weighed the significance of the evidence, including whether there was corroborating evidence or any associated credibility issues. *Id.*[13] The panel also considered the appropriate sanction for each student. *Id.* at 50.

On May 29, 2019, plaintiff and John Doe received a joint notice of the outcome of the hearing. ECF 2-21 ("Determination Letter"). The Determination Letter listed the panel's finding

[13] Only four people testified at the hearing – the parties and two others. So, the credibility determinations as to other witnesses were not based on personal appearances at the hearing.

for each charge, along with a rationale for each decision. Plaintiff was found responsible for violating the Sexual Misconduct Policy by committing "Sexual Assault."  In particular, the panel found "that it is more likely than not that [plaintiff] is responsible for violating 21c [*i.e.*, sexual assault] and not responsible for violating 15 [*i.e.*, acts of physical violence]." *Id.* at 3.

According to the Determination Letter, the finding of sexual assault by plaintiff was based on a number of factors. *Id.* The Determination Letter provided, in relevant part: "The panel found [John Doe] could not consent to sexual activity because he was incapacitated, and [plaintiff] should have known he was incapacitated. The finding is supported by testimony that [John Doe] was unable to effectively communicate immediately prior to sexual intercourse." *Id.* The evidence included testimony from plaintiff's roommate, Caitlyn, "who was the last person to see [John Doe] immediately before" the intercourse occurred. *Id.* According to the Determination Letter, Caitlyn's "testimony was weighed more significantly than others because she is a neutral party and her interaction with [John Doe] was timely because it was immediately prior to intercourse." *Id.* Further, the panel found that plaintiff's text messages and statements from that night demonstrated that plaintiff was "aware of [John Doe's] level of intoxication and that he needed care." *Id.* at 4. In addition, the amount of alcohol John Doe reported consuming "is consistent with his reported and observed behaviors of blacking out, not being able to walk, and slurring his words." *Id.*

As to the physical conflict allegation, plaintiff was found not responsible for acts of violence.  The panel reasoned that plaintiff's "account that [John Doe] asked her to scratch him [was] credible because there was no evidence in conflict with her report, and her report was detailed and consistent throughout the times she shared it." *Id.*

In addition, the Determination Letter provided: "Given your responsibility for the above violations and the totality of the circumstances, the panel assigned the sanctions" of a one semester

suspension, a no-contact order between plaintiff and John Doe, and a substance education requirement. *Id.*

With respect to the appropriate sanction for Jane Doe, the panel looked at the "severity of the behavior, including mitigating and aggravating factors" such as "impact on individuals." ECF 2-11 at 50. Tiscione explained that suspension "is the starting point for any…penetrative sexual assault" and the "panel unanimously agreed that suspension was appropriate" for plaintiff. *Id.* The aggravating factors that the panel considered included "that sexual assault is a serious violation because [of] the impact on the individuals," and John Doe's impact statement "showed the severe impact [it had] on him." *Id.* at 51. "There were also signs that [plaintiff] isolated [John Doe], with [plaintiff] noting to multiple people that she would take care of him due to his intoxication." *Id.* In addition, the panel considered plaintiff's lack of intent to commit sexual assault as a mitigating factor. *Id.*

John Doe was found responsible for "Sexual Assault" based on choking plaintiff, and for "Sexual Verbal Abuse" based on his use of sexual language. ECF 2-21 at 1. The panel then considered mitigating and aggravating factors to determine the appropriate sanction for John Doe. ECF 2-10 (John Doe Appeal Hearing Tr., 6/28/2019) at 14. According to Tiscione, the aggravating factors were "that choking is a dangerous act and that [plaintiff] had to physically resist twice to get the act to stop." *Id.* And, the "mitigating factors were that the act happened within the context of intercourse [plaintiff] consented to and was not intended to cause harm. And [John Doe] stopped after the second request…" *Id.* at 15. Thus, the panel concluded that "suspension was an appropriate sanction for that dangerous act." *Id.*

Accordingly, the panel imposed identical sanctions on Jane Doe and John Doe: a one semester suspension as well as a no-contact order and the requirement to complete substance

education. ECF 2-21 at 2. The Determination Letter also confirmed that plaintiff and John Doe could appeal the decision within five business days. *Id.* at 7.

**E. Post-Hearing Appeal**

On June 4, 2019, plaintiff submitted an appeal with regard to the panel's determinations. ECF 2-22. She argued that her rights to a fair investigation and hearing were violated; that the findings were not consistent with the facts presented; and the sanctions imposed were "grossly disproportionate to the findings of responsibility for violations of the code." *Id.* at 1.

John Doe also filed an appeal. ECF 2-23. He argued that the sanctions imposed on plaintiff were too lenient; he maintained that plaintiff should be suspended until he graduated. *Id.* Further, he contended that his sanctions were excessive, stating: "Choking someone and actively waiting, isolating, and raping someone should, under no circumstances, have the same sanctions." *Id.*

Dr. Christina Spearman, Loyola's Dean of Students, responded to plaintiff's appeal. ECF 2-24. Spearman noted that, pursuant to the Handbook, appeals may only be filed based on three grounds; some of plaintiff's alleged grievances were improper grounds for appeal. *Id.* at 1. In particular, Spearman stated that part of plaintiff's first ground for appeal—"right to a fair investigation"—and plaintiff's entire second ground for appeal—"the findings are not consistent with the facts"—are not bases for appeal. *Id.* Thus, Spearman approved plaintiff's appeal on two grounds: (1) plaintiff's allegation that her rights to a fair hearing were violated because "Tiscione's screening" of her suggested questions limited her ability to make her case; and (2) the sanction plaintiff received "was grossly disproportionate to the findings of responsibility for violations of the code." *Id.*

By letter of June 20, 2019, plaintiff asked Spearman to reconsider her decision and allow an appeal on all the grounds presented by plaintiff. ECF 1, ¶ 127; *see* ECF 2-25. By email of June

24, 2019, Spearman said that she reviewed plaintiff's request, but was "not making any changes to the approved grounds." ECF 2-26 at 2. Spearman also provided plaintiff with "some general information about the appeal process." *Id.*

Hearings on the cross appeals were held before the Board on June 28, 2019. ECF 1, ¶ 129; *see* ECF 2-10; ECF 2-11.  John Doe's hearing occurred first and plaintiff's followed. The members of the Board were the same for both hearings and plaintiff and John Doe, accompanied by their advisors, participated in both hearings. The members of the Board were not members of the original hearing panel. ECF 2-11 at 2.

During plaintiff's hearing, the Board heard statements from plaintiff and John Doe and then Tiscione.  Plaintiff complained that the hearing panel did not ask many of her suggested questions, including questions about the parties' height and weight, John Doe's use of a condom, how John Doe got undressed, how John Doe could have been sexually aroused if he was heavily intoxicated, and the knife that she found in her dorm the next day. *Id.* at 5-8. As to the sanction, plaintiff maintained that she should not be penalized, given that John Doe assaulted her. *Id.* at 11.

The Board asked extensive questions of Tiscione regarding the hearing panel's deliberations and decision making process. *Id.* at 18-55. According to Tiscione, with respect to the allegation that plaintiff engaged in sexual activity with John Doe when he was unable to consent, the panel "honed in on" the Policy language that says "consent cannot be given by someone who is not able to effectively communicate, or…to understand the nature of the conduct being engaged in as a result of the incapacitation." *Id.* at 43-44. The panel interpreted this provision to mean that if either prong is met—either the person is not able to communicate effectively or cannot understand the nature of the conduct—"that means that…it meets" the definition of being unable to give consent. *Id.* at 44. And, after looking at a "variety of…evidence," the panel "made a

determination that [John Doe] was unable to effectively communicate, which is one prong of being incapacitated," and thus he was unable to give consent. *Id.* at 46.

At the close of the hearing, plaintiff made a follow-up statement to the Board. *Id.* at 57-73. She described the "verbal" and "physical" indicators that demonstrated that John Doe "was able to consent to sex," including that he got undressed on his own, retrieved his own condom, and put it on before having intercourse with her. *Id.* at 69-70. And, said plaintiff, it is "nonsense" to believe John Doe's "story." *Id.* at 64, 68.

On July 12, 2019, plaintiff and John Doe were notified in writing that their appeals had been denied. ECF 1, ¶ 138.

**F. Plaintiff's Allegations in the Complaint**

In her suit, plaintiff reiterates many of the claims and complaints that she made during the University's adjudicatory and appeals process. To the extent that these contentions were already set forth, I need not restate all of them.[14]

According to plaintiff, "there was obvious gender bias against" her from the beginning of the disciplinary process. ECF 1, ¶ 86. She explains that "John Doe was reported to be pansexual." *Id.* And, the school "administration took overt actions to protect John Doe from the charges against him." *Id.*

As to the investigation, plaintiff contends that it was improper for one investigator to investigate both complaints because it "introduced significant bias into the investigative process that violated Plaintiff's right to a fair and impartial hearing." *Id.* ¶ 88. According to plaintiff, the investigator "either purposefully or negligently did not completely or objectively investigate"

[14] Many of the complaints are plainly contradicted by the record. Others suggest an unfortunate misapprehension of this Court's role in the dispute.

plaintiff's complaints against John Doe, as reflected in the omission from the Report of "significant facts or analysis that would have supported the Plaintiff's statements, either as a respondent or a claimant." *Id.* ¶ 89.

Plaintiff also challenges the University's selection of Karn as the investigator. She states that Karn's "role as a litigator is to protect universities from lawsuits" and she "is known to have represented at least one accuser." *Id.* ¶¶ 91, 92.[15] Moreover, she complains that Karn did not record the witness interviews and plaintiff was not allowed to attend the interviews, "so there is no way to determine whether the questions" or the summaries of the interviews "were unbiased." *Id.* ¶¶ 93, 95.

To that end, plaintiff claims that Brendan, one of her witnesses who spoke at the hearing, "communicated that his statements to the investigator that supported the Plaintiff as the victim appeared to have been minimized." *Id.* ¶ 93. In addition, plaintiff alleges that the investigator did not contact or interview any of plaintiff's doctors or analyze any of the medical reports documenting her injuries, violating her right "to a complete and fair investigation..." *Id.* ¶ 99.

Plaintiff also challenges "the formatting and content" of the Report, asserting that it "reflected favorably on John Doe" while making plaintiff "look guilty." *Id.* ¶ 100. She complains that the Report begins with John Doe's complaint, which "effectively" made plaintiff the "respondent." *Id.* Moreover, she asserts that the "primary focus and content of the report…was to identify the inebriated state of John Doe" and "corroborate statements from witnesses that [sic] were not present during the actual assault"; the Report "did not analyze or describe multiple items of physical evidence that demonstrated that John Doe was able to communicate and initiated sex with" plaintiff, such as putting on a condom, penetrating and choking the plaintiff, and calling his

[15] In the context of this case, plaintiff was both an "accuser" and an accused.

friends after sex.  *Id.*  In addition, she points to "[d]iscrepancies" with John Doe's "account" of what occurred in the room with plaintiff, stating that these "were never analyzed by the investigator."  *Id.*  Also, the Report "emphasized how the Plaintiff consented to sex," and the investigation never considered that the "'rape' claim could be false or fabricated." *Id.*

Further, plaintiff alleges that there "were indications" in the Report that John Doe "was discussing the case with at least one of the witnesses, Zoe." *Id.* ¶ 97. During the appeals process, plaintiff reported this allegation to the Dean, who assured her that the school would investigate. *Id.* But, according to plaintiff, there was no "additional review of the investigative process to find out if Zoe [] had influenced any of the other witnesses…." *Id.*

During the investigation, plaintiff was offered counseling by the Title IX attorney and was allegedly "assured that her privacy would be protected." *Id.* ¶ 98. But, plaintiff claims that when she later met with Dina Sokal, the school's psychiatrist, Sokal allegedly told plaintiff "that it was her understanding that" plaintiff "was responsible for the assault, and not John Doe." *Id.* Although plaintiff reported this occurrence to the Dean during the appeals process, the Dean allegedly did not investigate the issue or try to determine if someone had violated plaintiff's right to privacy. *Id.*

With respect to the hearing, plaintiff contends that Tiscione "claimed to have training and experience, but this was only his second case as a Panel Lead." *Id.* ¶ 116.[16] According to plaintiff, Tiscione "perpetuated" the gender bias, "treated the Plaintiff unfairly," and "tried to protect John Doe from being found responsible for the Plaintiff's claims against him." *Id.* ¶ 117.

The Complaint sets out a number of ways that Tiscione's gender bias was allegedly "evident throughout the process," including, *id.* ¶ 118: he "removed Plaintiff's weapons charge

---

[16] Prior to his employment with Loyola, Tiscione had eight years of experience reviewing and investigating sexual misconduct claims in the college setting. ECF 2-10 at 19.

against John Doe the day prior to the hearing"; set the agenda for the panel to cover John Doe's complaint first, so plaintiff's case "did not receive the same scrutiny as John Doe's complaint"; during the hearing, Tiscione "demonstrated obvious bias in favor of John Doe throughout the line of questioning"; Tiscione "filtered many of the cross examination questions" that plaintiff had prepared for the panel; "plaintiff was not allowed to be physically present in the room or cross-examine John Doe, the investigator, or witnesses during the original hearing or Appeal Hearing"; the hearing panel did not analyze physical evidence or plaintiff's statements of her injuries; Tiscione asked "several leading and inappropriate questions after the Plaintiff stated that the digital penetration performed by John Doe was not asked for, and unwelcome"; and none of plaintiff's injuries were considered "aggravating factors in this incident" by members of the panel. And, plaintiff posits that "it is evident that the Hearing Panel either did not read her rebuttal [to the Report] or did not believe her over the investigator." *Id.* ¶ 90.

As to the knife in particular, plaintiff alleges that she was "never provided any explanation for why Defendant…was so eager to remove consideration of the weapon's [sic] violation from the investigation." *Id.* ¶ 109. Further, she maintains that the "issue of the opened knife was never addressed again, and John Doe was not held accountable for the violation." *Id.* ¶ 110. This, according to plaintiff, violated her "rights to a fair and impartial hearing, and was an overt action on the part of David Tiscione to protect John Doe from consequences of an action that could not be refuted." *Id.*

With respect to the appeals, plaintiff complains that the Board "focused solely on whether the Plaintiff's questions were considered by the Original Hearing Panel, but they did not allow the questions to be asked of John Doe, or reconsider any of the findings and sanctions of the original Hearing Panel." *Id.* ¶ 131. Further, she claims that during the appeals hearing, "new information

was introduced to show that John Doe was willing to lie to his parents about this case, and that he had serious, ongoing problems with alcohol consumption that were not identified in the original hearing." *Id.* ¶ 135.  Yet, despite "this new information," plaintiff complains that the Board "did not reconsider this case." *Id.*

## II.    Standard of Review

### A.  Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir.

2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628

F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (internal citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. In other words, the "general rule" is that "the exhibit prevails in the event of a conflict between an attached exhibit and the allegations of a complaint." *Id.* at 165. But, "in cases where the plaintiff attaches or incorporates documents for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of the document as true." *Id.* at 167.

As noted, plaintiff included 26 exhibits with the Complaint. ECF 2-1 to ECF 2-26. And, they are all referenced in the Complaint. Accordingly, at this juncture, I may consider the exhibits,

without converting the Motion to one for summary judgment. However, plaintiff does not adopt as true the content of all the exhibits.

Accordingly, before accepting the content of an exhibit as true, I shall consider the nature of the document and why plaintiff submitted it. *Id.* Where the exhibit is attached for purposes other than the truthfulness of the document, I shall rely on the factual allegations in the Complaint. But, where plaintiff relies upon the exhibit to form the basis of her claim, the content of the document will prevail over plaintiff's characterization of the document. And, in other instances, even if plaintiff disagrees with the content, such as a statement of a witness, the Court may consider that the witness made the statement. In other words, the fact that the witness made such a statement may have been pertinent to the University's findings; this Court is not the factfinder.

**B. Choice of Law**

Plaintiff assumes, without discussion, that Maryland law applies to all of the claims under State law. ECF 33 at 18, 21-22. With respect to the breach of contract claim, defendant notes that, to the extent the Community Standards Policy constituted a contract, Maryland law applies. ECF 12-1 at 29 n.12. "When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *see also Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).

Regarding tort claims, Maryland applies the law of the state where the alleged harm occurred ("*lex loci delicti*"). *See, e.g.*, *Proctor v. Washington Metropolitan Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 625, 925 A.2d 636, 651 (2007); *Phillip Morris, Inc. v. Angeletti*, 358 Md. 689, 744, 752 A.2d 200, 230

(2000). Because the alleged events took place in Maryland, the substantive tort law of Maryland governs the tort claims alleged in Counts III and V. *See Hauch v. Connor*, 295 Md. 120, 123-24, 453 A.2d 1207, 1209 (1983).

As for the contract claim (Count IV), "interpretation of private contracts is ordinarily a question of state law." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989); *accord James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004). Therefore, because Maryland is the forum state, I must apply Maryland substantive law, including its choice of law rules, to determine which state's substantive law applies to the contract. *Small v. WellDyne, Inc*., 927 F.3d 169, 173 n.3 (4th Cir. 2019); *Francis v. Allstate Ins. Co*., 709 F.3d 362, 369 (4th Cir. 2013); *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co*., 566 F.3d 150, 154 (4th Cir. 2009).

Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g. Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)). The parties have not specified precisely where this last act occurred. But, Loyola is located in Maryland and plaintiff lived on Loyola's campus after the formation of the contract.

For these reasons, and because neither side suggests otherwise, I shall apply Maryland law with respect to plaintiff's contract and tort claims.

## III. Discussion

Defendant moves to dismiss all five counts of the Complaint. ECF 12-1. First, it asserts that plaintiff's Title IX claim fails as a matter of law because plaintiff did not allege facts demonstrating a flawed procedure, an inaccurate outcome, or that the decision was motivated by gender discrimination. *Id.* at 19. Second, Loyola urges dismissal of plaintiff's breach of contract claim because plaintiff does not identify any specific terms of the Policy allegedly breached by Loyola. *Id.* at 30. Third, it contends that plaintiff's negligence claim fails for the same reason that dooms plaintiff's contract claim. *Id.* at 34-35. Further, defendant maintains that plaintiff's good faith and fair dealing claim cannot be sustained as an independent cause of action under Maryland law. *Id.* at 35. Last, defendant contends that plaintiff's declaratory judgment claim fails because it rests on plaintiff's other failed claims. *Id.* at 35-36.

I shall address defendant's arguments, in turn.

### A. Title IX (Count II)

Count II is at the heart of the Complaint. In Count II, plaintiff alleges that Loyola erred in finding her responsible for committing sexual assault, and she complains that the decision was motivated by gender bias, in violation of Title IX. Specifically, plaintiff argues that Loyola's disciplinary process involved evidentiary weaknesses and procedural flaws that resulted in a wrongful finding that she was responsible, and that these defects were due to or motivated by plaintiff's gender. ECF 1, ¶¶ 149-157.

Title IX prohibits any school that receives federal funds from discriminating on the basis of sex. 20 U.S.C. § 1681. It provides that "[n]o person shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Id.* § 1681(a). Students may enforce Title IX through an implied private right of action. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 688–89 (1979).

Title IX's implementing regulations and guidance require that schools "adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited" under Title IX. 34 C.F.R. § 106.8(b). A 2017 guidance document issued by the Department of Education's Office for Civil Rights "identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the school (i) provides notice of the school's grievance procedures…; (ii) applies the grievance procedures to complaints filed by students or on their behalf alleging sexual misconduct carried out by employees, other students, or third parties; (iii) ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; (iv) designates and follows a reasonably prompt time frame for major stages of the complaint process; (v) notifies the parties of the outcome of the complaint; and (vi) provides assurance that the school will take steps to prevent recurrence of sexual misconduct and to remedy its discriminatory effects, as appropriate." Dep't of Educ., Office for Civ. Rights, Q&A on Campus Sexual Misconduct (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

In the context of a disciplinary proceeding at a public university, the accused is also entitled to procedural due process. *Goss v. Lopez*, 419 U.S. 565, 579 (1975); *see Doe v. Cummins*, 662 F. App'x 437, 445 (6th Cir. 2016); *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005); *see also* U.S. Dep't of Educ., Office for Civ. Rights, Revised Sexual Harassment Guidance:

Harassment of Students by School Employees, Other Students, or Third Parties (Jan. 19, 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html ("The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions. The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding."). Therefore, when a student faces possible suspension, the student must receive "advance notice of the charges, a fair opportunity to be heard, and an impartial decision-maker." *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 74 (4th Cir. 1983); *see also Butler v. Rector & Bd. of Visitors of Coll. of William & Mary*, 121 F. App'x. 515, 519–20 (4th Cir. 2005). But, in "the academic setting particularly, the Supreme Court has recognized that the requirements of due process may be satisfied by something less than a trial-like proceeding." *Henson*, 719 F.2d at 74 (citing *Goss*, 419 U.S. 565); *Cummins*, 662 F. App'x at 446 ("Although a university student must be afforded a meaningful opportunity to present his side, a full-scale adversarial proceeding is not required.").

As a private university, Loyola is not subject to precisely the same rigorous constitutional due process requirements as a public university. *See Streeter v. Walden Univ.*, LLC, CCB-16-3460, 2017 WL 6035253, at *4 (D. Md. Dec. 5, 2017) (dismissing due process claim because plaintiff "does not claim the defendants are state actors, nor could he, because they are private institutions"), *aff'd*, 730 F. App'x 163 (4th Cir. 2018); *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 698 (M.D. Tenn. 2018) ("Vanderbilt is a private university and [plaintiff] brings a breach of contract claim [and Title IX claim]. The Court therefore does not resolve questions of constitutional due process."); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. 2016) ("It is well-established…that a private university 'is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts.'") (internal

citation omitted); *Yu v. Vassar College*, 97. F. Supp. 3d 448, 462 (S.D.N.Y. 2015) (noting that to the extent plaintiff is claiming the college's disciplinary proceedings denied him constitutional due process, the argument fails because Vassar is a private college); *Harwood v. Johns Hopkins Univ.*, 130 Md. App. 476, 484, 747 A.2d 205, 209, *cert. denied*, 360 Md. 486, 759 A.2d 231 (2000) ("Although the actions of public universities are subject to due process scrutiny, private universities are not bound to provide students with the full range of due process protections."). "However, courts may refer to those [due process] rules in evaluating the fairness of a particular disciplinary hearing." *Brandeis Univ.*, 177 F. Supp. 3d at 602 (citing *Cloud v. Trustees of Boston Univ*., 720 F.2d 721, 724 (1st Cir. 1983)).

Because Title IX prohibits subjecting a person to discrimination on the basis of sex, it is understood to "bar[] the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). A dispute concerning a school disciplinary proceeding on the ground of gender bias "can be expected to fall generally within two categories," as outlined by the Second Circuit in *Yusuf*, *id.* First, under the "erroneous outcome" theory, a plaintiff may claim that he or she is innocent and, on the basis of gender bias, was "wrongly found to have committed an offense." *Id.* Second, under the "selective enforcement" theory, "regardless of the student's guilt or innocence," a plaintiff can argue that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.*

Plaintiff expressly bases her claim on the ground of erroneous outcome. *See* ECF 33 at 5, 6. To state a claim for erroneous outcome discrimination, a plaintiff must allege (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" *and* (2) "particular circumstances suggesting that gender bias was a motivating factor

behind the erroneous finding." *Yusuf*, 35 F.3d at 715*; see Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 132 F.3d 949, 961–62 (4th Cir. 1997), *rev'd on other grounds*, 169 F.3d 820 (4th Cir. 1999) (en banc); *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 768 (D. Md. 2015); *Doe v. Washington & Lee Univ.*, No. 6:14–CV–00052, 2015 WL 4647996, at *9–10 (W.D. Va. Aug. 5, 2015). In other words, and of significance here, an erroneous outcome alone is not sufficient to state a claim under Title IX. Rather, the erroneous outcome must be predicated on gender bias.

"The first element [of the erroneous outcome inquiry] can be satisfied by (1) pointing to procedural flaws in the investigatory and adjudicative process, (2) identifying inconsistencies or errors in the findings, or (3) challenging the overall sufficiency and reliability of the evidence." *Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 607 (E.D. Va. 2019), *aff'd*, 832 F. App'x 802 (4th Cir. 2020); *see also Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584 (E.D. Va. 2018). "The pleading burden as to the first element – articulable doubt – is 'not heavy' and can normally be met by alleging 'particular procedural flaws affecting the proof.'" *Vanderbilt Univ*., 355 F. Supp. 3d at 679 (quoting *Yusuf*, 35 F.3d at 715).

But, the second element—that gender bias was a motivating factor for the outcome—"requires significantly more." *Vanderbilt*, 355 F. Supp. 3d at 679. To satisfy this element, a plaintiff must do more than merely rely on "a conclusory allegation of gender discrimination...." *Yusuf*, 35 F.3d at 715. Sufficiently particularized allegations of gender discrimination "might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*; *see Doe v. Loh*, PX-16-3314, 2018 WL 1535495, at *8 (D. Md. Mar. 29, 2018), *aff'd*, 767 F. App'x 489 (4th Cir. 2019); *Marymount Univ.*, 297 F. Supp. 3d at 586 ("Stated differently, a Title IX plaintiff successfully alleges gender bias if he or she points to statistical evidence of gender

bias in the University's decision making, policies and procedures that are designed to reach gender-specific outcomes, and/or statements by university officials evidencing gender bias."). As the court explained in *Marymount Univ.*, 297 F. Supp. 3d at 584: "Simply put, Doe must plead sufficient facts to create an inference that [she] was wrongfully accused and that [she] was wrongfully adjudicated guilty and disciplined, in part because of [her] gender."

Loyola argues that plaintiff fails to allege facts demonstrating either of these elements. ECF 12-1 at 19. Specifically, the University contends that "plaintiff fails to sufficiently plead that Loyola's student disciplinary process was flawed or that Loyola's determination regarding John Doe's level of intoxication was an error not supported by sufficient evidence." *Id.* at 20. But, even if plaintiff alleged facts sufficient to show a flawed proceeding that led to an erroneous outcome, Loyola maintains that plaintiff does not show particularized facts "supporting a plausible inference that the proceedings were influenced by gender bias." *Id.* at 25.

Ms. Doe vigorously disputes the determination that she assaulted John Doe and insists that the school's finding is patently erroneous, if not absurd. She repeatedly points to circumstances that suggest John Doe had the capacity to consent and that his conduct was voluntary. For example, she references John Doe's ability to remove his clothes, his sexual arousal, his decision to retrieve and then use a condom, his ability to get dressed after the sexual encounter, his immediate phone call to Zoe after the sexual encounter, and the illogic of a finding that she put his condom on him, or even knew that he had one, or where he kept it, or that she put John Doe's penis inside her vagina. *See*, *e.g.*, ECF 1, ¶¶ 100, 154.

The Policy clearly bars sexual intercourse without consent. And, it expressly provides that consent "cannot be given by someone who is not able to effectively communicate or to understand the nature of the conduct . . . ." ECF 2-1 at 35, ¶ 21. As the criteria for consent are in the

disjunctive, only one had to be satisfied, as discussed, *infra*. The University's finding was grounded on the fact-based conclusions that John Doe was so intoxicated that he was "not able to effectively communicate . . ." and therefore he lacked the capacity to consent. ECF 2-11 at 43-44. The University's published definition of capacity to consent was central to its determination.

Plaintiff's frustration with that conclusion is understandable. In finding that John Doe lacked capacity to consent, based on an inability to communicate, the panel was not persuaded by the countervailing evidence of John Doe's ability to communicate. For example, John Doe appears to have had the cognitive ability to decide not to engage in unprotected sex. He evidently recalled not only that he had a condom, but that it was in his wallet, and that his wallet was inside his backpack. Moreover, he retrieved the condom and he used it. There is not a shred of evidence that plaintiff somehow happened to find John Doe's condom in his wallet, which was inside his backpack, and then put it on his penis. Moreover, John Doe had an erection. At 4 feet 11 inches, Ms. Doe probably could not have forced John Doe to penetrate her. Nor does it seem likely that she dressed John Doe immediately after the sexual encounter. And, he had the wherewithal to use his cell phone to call a friend shortly after the sexual encounter. Such evidence could be consistent with capacity to consent, not incapacity.

Yet, even assuming that the finding of John Doe's incapacitation was erroneous, that does not carry the day. It is not the province of this Court "to retry" plaintiff's disciplinary proceeding. *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009) ("This is not a lawsuit between the Complainant and the Plaintiffs…The Court therefore expresses no opinion as to whether a sexual assault occurred, whether any such acts were consensual, or who, as between John Doe and the Complainant is credible."). And, it is not for this Court to construe the disciplinary process as "requiring a particular outcome." *Anderson v. Vanderbilt Univ.*, 450 F.

App'x 500, 502 (6th Cir. 2011); *see Plummer v. Univ. of Hous.*, 860 F.3d 767, 772 (5th Cir. 2017) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion."); *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 989–90 (D. Minn. 2017) ("As a general rule, Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or universities."); *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 13 (D. Me. 2005) ("This Court's review is substantially circumscribed; the law does not allow this Court to retry the University's disciplinary proceeding.").

Plaintiff summarily alleges that a flawed proceeding led to an erroneous outcome. But, the record belies that assertion. And, plaintiff has utterly failed to set forth facts that, if proven, would establish gender bias.

The Complaint identifies numerous alleged procedural flaws in the proceedings. For example, plaintiff complains that the witness statements were not recorded or obtained in the presence of another witness. ECF 1, ¶¶ 93, 95; ECF 33 at 12. She contends that Loyola failed to ask appropriate questions of the witnesses and failed to present all relevant evidence and witness statements in the Report; failed to provide her with an opportunity to question John Doe and other witnesses; did not provide an opportunity to review all the evidence, particularly exculpatory evidence; failed to investigate John Doe's "state of mind in making the allegations"; did not respond to plaintiff's "concerns about the fact that someone had told the psychiatrist, Dina Sokal, she was the responsible party before the hearing"; failed to investigate "collaboration of witnesses during the investigative process"; failed to consider plaintiff's "account of the sexual encounter or consider multiple items of physical evidence after determining that John Doe was not able to consent to sex"; did not "reexamine" on appeal whether plaintiff "had been given adequate due

process during the investigative and hearing process"; and, during the appeals process, the Board did not properly "reconsider this case." ECF 1, ¶ 155.

Despite these numerous contentions, the allegations in the Complaint and the exhibits show a well crafted Policy with which the University carefully complied.   With respect to the investigation, the Policy sets forth various requirements regarding how Loyola must conduct an appropriate substantive investigation. Notably, students "who are being disciplined are 'entitled to only those procedural safeguards which the school specifically provides.'"   *Doe v. Lake Erie College*, 1:19CV02619-JRA, 2021 WL 288559, at *4 (N.D. Ohio Jan. 27, 2021) (quoting *Kimberg v. Univ. of Scranton*, 411 F. App'x. 473, 481 (3d Cir. 2010)).

The Policy provides that, following a complaint against a student, the Title IX coordinator shall appoint an investigator and that investigator shall conduct an investigation and prepare a final report summarizing his or her findings. ECF 2-1 at 40. In addition, the complainant and respondent have the right to "submit to the investigator evidence, witness lists, and suggested questions for witnesses." *Id.* And, after the report is complete, the complainant and respondent may "submit a written response" that will be included in the materials reviewed by the hearing panel. *Id.* The Handbook does not contain any additional specific requirements regarding the investigation, the means by which an investigator must conduct interviews, or the way the report should be formatted. *See id.*

Pursuant to the Policy, Loyola designated an outside investigator, Stephanie Karn, Esquire, to investigate the matter. ECF 1, ¶ 87. Karn conducted a series of interviews with plaintiff, John Doe, and the individuals who were present on the night in question. ECF 2-14 at 3-13. Karn also gathered evidence in the form of text messages, a diagram of plaintiff's room, and security video footage. *Id.* at 13-14. Based on the interviews and evidence, Karn summarized her findings in a

Report. *See id.* Thereafter, as permitted by the Policy, plaintiff submitted a response to the Report, with comments and clarifications. ECF 1, ¶¶ 90, 94; *see* ECF 2-9.

Loyola clearly complied with these portions of the Policy, and the Policy itself is gender neutral.  Plaintiff casts aspersions on Ms. Karn, but the fact that she previously represented an accused certainly did not constitute a reason to reject her.  Moreover, plaintiff complains that the witness statements were not recorded, but she cites no authority for the proposition that witness statements must be recorded.  Nor does the Policy require such recording. In addition, plaintiff received written summaries of each of the witness statements in the Report and was free to call any of those witnesses to testify at the hearing if she wanted to refute the summaries of their statements

As to the disciplinary hearing, the Policy clearly provided for an adversarial process, including an opportunity for the parties to be heard.  "As university administrators are in the field of education, not law, university disciplinary hearings need not follow the rules of evidence." *Roe v. Univ. of Cincinnati*, 1:18-cv-312, 2018 WL 9944938, at *10 (S.D. Ohio Aug. 21, 2018).  The Policy sets out rules for the members of the panel, the right of the parties to have legal advisors, and the procedures for the hearing. *See* ECF 2-1 at 39-40. In addition, the Policy explains how the panel should make determinations: "The panel will make findings of fact and determinations using a preponderance of evidence standard." *Id.* And, if "the panel determines that the respondent is responsible for a violation of this policy, the panel will decide the appropriate sanctions in accordance with the Student Code of Conduct." *Id.* "Violations of the sexual misconduct policy are serious and the range of sanctions includes…suspension." *Id.* Within ten days of the hearing, the respondent and complainant will be informed concurrently in writing of the outcome of the hearing, along with the panel's rationale for the result and any sanctions. *Id.* at 42.

Plaintiff had the opportunity to provide a statement as well as testimony at the hearing. She was permitted to call witnesses, which she did. And, she was accompanied by her attorney. *See* ECF 2-8. The hearing panel reviewed the evidence, deliberated for several hours following the hearing, and used a preponderance of evidence standard when rendering its determination. ECF 2-11 at 49-50.

The panel carefully set forth the rationale for its decision in the Determination Letter, in which it pointed to the evidence on which it relied to make its determination that John Doe lacked capacity to consent. *See* ECF 2-21. The panel members are not lawyers, however. That another panel might have reached a different conclusion is of no moment.

In an effort to show that the process was biased and unfair, plaintiff emphasizes that the panel did not pose all 81 of her suggested questions when interrogating John Doe during the hearing. *See, e.g.*, ECF 1, ¶ 118(d). Notably, plaintiff did not submit the questions until just hours before the hearing. In any event, there is no provision in the Handbook or the law that required the panel to pose all of plaintiff's suggested questions. *See* ECF 2-1. Nevertheless, the panel reviewed those questions and, to the extent the panel believed they were relevant, tried to use them at the hearing. ECF 2-11 at 23-24; *Univ. of Cincinnati*, 2018 WL 9944938, at *10 ("The Court finds that [the University] did not provide inadequate due process to Ms. Roe by not asking every question that she wanted to be asked. The Court is unaware of any precedent finding that a plaintiff in a school disciplinary hearing is entitled to unfettered cross-examination of witnesses.") (emphasis in original).

Ms. Doe also alleges that the denial of her right to cross-examine her accuser "constituted a flawed proceeding." ECF 33 at 12; *see* ECF 1, ¶ 118(e). She relies on *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), to support her contention that disciplinary proceedings cannot be fair without

cross-examination. ECF 33 at 8. The *Baum* Court held that "if a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder." *Baum*, 903 F.3d at 578. But, the *Baum* Court also recognized that an accused student does not always have "a right to personally confront his accuser and other witnesses," because universities "have a legitimate interest in avoiding procedures that may subject an alleged victim to further harm or harassment." *Id.* at 583.

In any event, as noted, Loyola is a private university and therefore it is not subject to the same due process requirements as the public university in *Baum*. *See Doe v. Belmont Univ*., 334 F. Supp. 3d 877, 894 (M.D. Tenn. 2018) (declining to impose the *Baum* requirement for cross-examination in a case against a private university). And, even in the context of a public university, the Fourth Circuit "has not found 'a basis in the law' for 'importing' the right to cross-examination 'into the academic context.'" *Doe 2*, 384 F. Supp. 3d at 612 (quoting *Butler v. Rector & Bd. of Visitors of Coll. of William & Mary*, 121 F. App'x 515, 520 (4th Cir. 2005) (per curiam)). Indeed, it "is well settled that the accused is not entitled to 'trial-like' rights of confrontation or cross-examination at disciplinary proceedings." *Loh*, 2018 WL 1535495, at *7 (quoting *Butler*, 121 F. App'x at 519–520 & n.2); *see Henson*, 719 F.2d at 73–75; *Keerikkattil v. Hrabowski*, WMN-13-2016, 2013 WL 5368744, at *6 (D. Md. Sept. 23, 2013) ("Although students are entitled to some due process protections in a disciplinary hearing, the required protections need not mirror a full-scale adversary proceeding.")

Moreover, the cases cited by plaintiff are not to the contrary. Most of the cases involve procedural due process claims against public universities, rather than claims against private universities. *See, e.g.*, *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400 (6th Cir. 2017); *Powell v.*

*Montana State Univ.*, CV 17-15-BU-SHE, 2018 WL 6728061 (D. Mont. Dec. 21, 2018); *Doe v. Penn. State Univ.*, 276 F. Supp. 3d 300 (M.D. Pa. 2017); *Nokes v. Miami Univ*., 2017 WL 3674910, at *9 (S.D. Ohio Aug. 25, 2017). And, the cases that involve private universities, applying California state law, concluded that a right to cross-examination does not necessarily entitle the accused to question the complainant directly. *See Doe v. Westmont Coll*., 34 Cal. App. 5th 622, 638-39, 246 Cal. Rptr. 3d 369, 382 (2019) (noting that a "student [at a private college] accused of sexual misconduct is not entitled to directly cross-examine the alleged victim or other witnesses who testify at a sexual misconduct hearing"); *Doe v. Allee*, 30 Cal. App. 5th 1036, 1068, 242 Cal. Rptr. 3d 109, 136 (2019) (explaining that "where credibility is central to a university's determination, a student accused of sexual misconduct has a right to cross-examine his accuser, directly or indirectly, so the fact finder can assess the accuser's credibility"); *Doe v. Claremont McKenna Coll*., 25 Cal. App. 5th 1055, 1073, 236 Cal. Rptr. 3d 655, 668 (2018) (explaining that a private college "generally is not subject to the constitutional requirements of procedural due process" and all that is required under California law is that the accused student be afforded the opportunity to question the complainant "indirectly," including by allowing the accused to submit questions and "granting the fact finder discretion to exclude or rephrase questions as appropriate and ask its own questions").

In fact, even in the circuits where a right to cross-examination is required in certain public school disciplinary proceedings, the accused is not necessarily entitled to direct cross-examination. Courts have "generally avoided issuing broad rulings, tacitly recognizing that each university follows different disciplinary procedures and each student's path through the university disciplinary process is likewise different." *Nokes v. Miami Univ*., 1:17-cv-482, 2017 WL 3674910, at *9 (S.D. Ohio Aug. 25, 2017); *see Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) (noting

that "if the credibility of an alleged victim is at issue, the university must provide a way for the adjudicative body to evaluate the victim's credibility….But the protections afforded to an accused… 'need not reach the same level…that would be present in a criminal prosecution.'") (internal citation omitted); *see also Haidak v. University of Mass.-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019) ("If we were to insist on a right to party-conducted cross-examination, it would be a short slide to insist on the participation of counsel able to conduct such examination, and at that point the mandated mimicry of a jury-waived trial would be near complete.").

Notably, in *Penn. State Univ.*, 276 F. Supp. 3d at 310, the court observed: "Penn State's policy allowing for the submission of questions for review and use by the hearing panel may satisfy an accused's rights to confront and cross-examine adverse witnesses…." That is precisely what occurred here. Plaintiff submitted 81 questions to the panel on the day of the hearing. And, as mentioned, the panel sought to pose the questions it found relevant, despite the belated submission.

That Ms. Doe was not entitled to cross-examine John Doe at the hearing is not tantamount to a flawed proceeding. *See Doe v. Princeton Univ*., 3:20-cv-4352, 2021 WL 194806, at *10 (D. N.J. Jan. 20, 2021) ("As this Court has specified, 'a cross-examination at a live hearing is not required to satisfy due process in a Title IX context involving a *private* university such as Princeton.'") (internal citation omitted); *Gendia v. Drexel Univ*., No. 20-1104, 2020 WL 5258315, at *5 (E.D. Pa. Sept. 2, 2020) (finding Drexel "fulfilled the requirements for fundamental fairness" when it allowed the parties to submit cross-examination questions to the adjudicator); *Vanderbilt Univ.*, 355 F. Supp. 3d at 698 (finding claims based on failure to allow for cross-examination insufficient to state a claim against a private university).

In addition, plaintiff complains that the school should have conducted separate investigations and adjudications for each complainant. She also contends that the format of the

Report and hearing made her "look guilty." ECF 1, ¶ 100(a); *see id.* ¶ 155. But, there was no obligation for the school to conduct separate investigations, especially when faced with competing complaints regarding the same incident. *See Princeton Univ.*, 2021 WL 194806, at *10 (finding plaintiff failed to state a claim that proceedings were fundamentally unfair because they employed a single investigator for competing claims regarding the same relationship). And, it is obvious that the University listed John Doe first because he filed his complaint seventeen days before plaintiff filed hers.

Further, plaintiff contends that the fact that the disciplinary proceedings ignored that John Doe left a knife in her room shows that John Doe was "treated differently than her." ECF 33 at 14. But, plaintiff does not allege that the panel's decision in this regard was motivated by gender. *See Doe v. Western New England University*, 228 F. Supp. 3d 154, 188 (D. Mass. 2017) ("These bare averments of motive are not sufficient to survive a motion to dismiss even when the standard of review, which favors Plaintiff, is stretched to its limits.").

Tiscione explained that the panel decided not to consider the knife because plaintiff did not even find the knife until well after the incident. *See* ECF 2-19 at 2. That was a completely sound rationale. The presence of a knife could not have affected plaintiff at the relevant time if she did not even know about it. In any event, the failure to consider the knife does not suggest gender bias.

With respect to the appeals process, the Sexual Misconduct Policy expressly limits appeals to only three grounds. ECF 2-1 at 42. And, as outlined in the Policy, it is the Dean's responsibility to review an appeal and determine whether it is based on approved grounds. *Id.* Then, the Board, composed of individuals who did not participate in the hearing panel, reviews the relevant

documentary material and may meet with the student who noted the appeal and the original hearing officer. *Id.* at 43. Thereafter, the Board issues a written statement with its findings. *Id.*

In this case, and pursuant to the Policy, the Dean reviewed plaintiff's appeal letter and approved for appeal the grounds that complied with the three recognized bases for appeal. *See* ECF 2-24. Thereafter, the Board heard statements from plaintiff and John Doe, questioned Tiscione, the hearing officer, regarding the points plaintiff had raised on appeal, and reviewed all the documentary materials. *See* ECF 2-11. On July 12, 2019, plaintiff received a letter informing her that the Board found that plaintiff and John Doe had "received a fair hearing and sanctions proportionate to the offenses." ECF 1, ¶ 138.

Plaintiff has also failed woefully to plead the second element of the erroneous outcome claim—gender bias.  Plaintiff summarily alleges that the "errors occurred as a result of the school's bias against accused students" and that the alleged "erroneous outcome of the hearing and purported appeal can only be explained by bias against the accused in cases involving allegations of sexual assault." ECF 1, ¶¶ 155, 157. But, she has not alleged facts that constitute actual or implied gender bias.

For example, Ms. Doe offers no statements by any of the relevant decisionmakers exhibiting anti-female bias or any other evidence of bias. *See Yusuf*, 35 F.3d at 715; *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778-80 (S.D. Ohio 2015) (dismissing plaintiff's Title IX claim because the complaint failed to allege any statements of members of the disciplinary body or university officials or any patterns of conduct that permitted the court to infer bias against male students). Nor has she identified any statistics, patterns, or anecdotal evidence tending to show gender bias in the investigation, hearing, or sanctions under Loyola's Sexual Misconduct Policy. *Cf. Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016) (finding allegations that Columbia University

punished men more severely in order to address concerns in the student body and media that it did not take sexual assault complaints seriously sufficient to imply discrimination); *Salisbury Univ*., 123 F. Supp. 3d at 768 (finding that plaintiff stated a plausible claim where he alleged that the university wished to show the Department of Education and general public that it aggressively disciplined males accused of sexual assault); *Washington & Lee*, 2015 WL 4647996, at *10 (denying motion to dismiss based on alleged flaws in the proceedings and specific biased statements of a university official, who wielded "considerable influence" over the outcome of the disciplinary process).

Moreover, "general allegations that a school's Title IX policies favor one gender over another are insufficient to support a plausible inference of discrimination." *Drexel Univ.,* 2020 WL 5258315, at *3; *cf. Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 84 (1st Cir. 2018) ("[A]lleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences."); *Atria v. Vanderbilt*, 142 F. App'x 246, 256 (6th Cir. 2005) (noting that in "the university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias"); *Nash v. Auburn Univ.*, 812 F.2d 655, 665 (11th Cir. 1987) ("Any alleged prejudice on the part of the board must be evident from the record and cannot be based in speculation or inference."); *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 254 (8th Cir. 1985) ("[W]e observe that the committee members are entitled to a presumption of honesty and integrity unless actual bias, such as personal animosity, illegal prejudice, or a personal or financial stake in the outcome can be proven."). Stated differently, a "mere belief that [university officials] acted with ... ulterior motives" during the course of the investigation "is insufficient to state a claim for relief." *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016).

And, courts have repeatedly found that alleged bias in favor of victims and against those accused of misconduct is not evidence of gender bias. *See, e.g.*, *Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*, 832 F. App'x 802, 805 (4th Cir. 2020) (holding that a school's "desire to believe all accusers, male or female," does not establish a claim for improper gender discrimination under Title IX); *Doe v. Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d 508, 519 (E.D. Va. 2019) ("Courts have widely held that vigilance in enforcing Title IX, even when it results in bias in favor of victims and against those accused of misconduct, is not evidence of anti-[female] bias."); *Sahm*, 110 F. Supp. 3d at 778-80 ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students."); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) (stating that "a bias against people accused of sexual harassment and in favor of victims ... indicate[s] nothing about gender discrimination").

The two cases on which plaintiff relies to support her claim of gender bias are readily distinguishable. *See* ECF 33 at 14 (citing *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746 (S.D. Ohio 2014); *Salisbury Univ.*, 123 F. Supp. 3d 748). In *Salisbury*, 123 F. Supp. 3d, the court allowed the plaintiff's gender bias claim to proceed based on the plaintiff's allegation that the defendant "possess[ed] communications evidencing its intent to favor female students alleging sexual assault over male students like plaintiffs who are accused of sexual assault," so as "to demonstrate to the United States Department of Education and/or the general public that Defendants are aggressively disciplining male students accused of sexual assault." *Id.* at 768.

Similarly, in *Wells*, 7 F. Supp. 3d, the plaintiff alleged that the charges against him and the disciplinary hearing arose in a context of an investigation conducted by the Department of Education's Office of Civil Rights ("OCR") regarding how Xavier handled previous sexual assault

allegations. *Id.* at 747. He claimed that Xavier "made him into a scapegoat" to demonstrate to the OCR that it would respond better to sexual assault allegations. *Id.* And, the district court agreed with the plaintiff's argument that his allegations were sufficient to state an erroneous outcome claim insofar as he alleged that Xavier had "react[ed] against him, as a male, to demonstrate to the OCR that [Xavier] would take action, as [it] had failed to in the past, against males accused of sexual assault." *Id.* at 751.

However, the Complaint in this case does not contain any allegations that Loyola has issued communications evidencing its intent to favor male students alleging sexual assault over female students who are accused. Nor does it contend that Loyola was under investigation by the Department of Education, or that it was discriminating against her to demonstrate that it was aggressively disciplining female students accused of sexual assault. And, the Court may not "indulge in unreasonable inferences" concerning alleged bias. *Cummins*, 662 F. App'x at 454.

Plaintiff's remaining arguments are similarly unavailing. She contends that John Doe's "classification" as pansexual put her "at a significant disadvantage" because she is a female. ECF 33 at 13. But, plaintiff fails to explain the nature of this disadvantage. Moreover, she does not allege any statements or patterns indicating that Loyola is prejudiced against women, or biased in favor of people who identify as pansexual.

In sum, viewing Loyola's disciplinary process in the light most favorable to plaintiff, she does not assert facts that give rise to a reasonable inference of gender bias. Therefore, plaintiff's allegations are insufficient to state a claim under Title IX. *See Yusuf*, 35 F.3d at 715 ("[A]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss."); *see also Cummins*, 662 F. App'x at 452 ("Alleged procedural deficiencies,

without alleging additional facts linking the procedural defects to gender bias, do not create a plausible inference of gender discrimination.”).

Accordingly, I shall dismiss Count II, without prejudice.

**B. Breach of Contract (Count IV)**

In Count IV, plaintiff alleges that she had a contractual relationship with Loyola by virtue of paying tuition and complying with Loyola’s enrollment procedures. ECF 1, ¶ 166. She claims that the relevant terms of the parties’ contract are set forth in the Community Standards Handbook, which includes its Sexual Misconduct Policy. *Id.* ¶ 163. And, she alleges that Loyola breached the terms of that contract in its investigation and adjudication of her sexual misconduct case. *Id.* ¶ 164.

In Maryland, the elements of a claim for breach of contract are “‘contractual obligation, breach, and damages.’” *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda,* 198 Md. App. 337, 344, 17 A.3d 744, 749 (2011)). In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals said: “Maryland law requires that a plaintiff alleging a breach of contract ‘must of necessity allege with certainty and definiteness facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.’” (citation omitted) (emphasis in *Polek*); *see also Robinson v. GEO Licensing Co., L.L.C.*, 173 F.Supp.2d 419, 423 (D. Md. 2001). Thus, “[t]o prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation.” *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *see RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010). In other words, “[i]t is the parties’ agreement that ultimately determines whether there has been a breach.” *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005).

Under Maryland law, the interpretation of a contract is “ordinarily a question of law for the

court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). And, the "'cardinal rule…is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intention, courts look first to the written language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).

Maryland courts "adhere[] to the principle of the objective interpretation of contracts….If the language of a contract is unambiguous, [the courts] give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700, 709 (2007); *see Dumbarton*, 434 Md. at 51, 73 A.3d at 232 (recognizing that a court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean); *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014); *see also Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029,

1032 (2001); *see, e.g.*, *Scarlett Harbor,* 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

Moreover, "'[t]he words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). And, the court "must consider the contract 'in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.'" S*print Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113, 126 (4th Cir. 2019) (quoting *Dumbarton*, 434 Md. at 126, 73 A.3d at 233).

Courts applying Maryland law have recognized breach of contract claims between students and private universities. *See Walden Univ.,* 2017 WL 6035253, at *2; *Showell v. Capella University Inc*., GLR-16-3761, 2017 WL 11451382, at *3 (D. Md. Sept. 29, 2017). Indeed, "[t]he relationship between a student and a private university is largely contractual in nature." *Harwood*, 130 Md. App. at 483, 747 A.2d at 209. "When a student is duly admitted by a private university there is an implied contract between the student and the university that, if the student complies with the terms prescribed by the university, the student will obtain a degree." *Sirpal v. Wang*, WDQ-12-0365, 2013 WL 5234256, at *3 n.9 (D. Md. Sept. 16, 2013) (quoting *Harwood*, 130 Md. at 483, 747 A.2d at 209). The "terms of the contract are contained in the brochures, course offering bulletins, and other official statements, policies and publications of a university, and the university is required to conduct its hearings and enforce its policies consistent with the terms." *Harwood*, 130 Md. App. at 483, 747 A.2d at 209 (internal citations omitted).

But, "mindful of [the court's] lack of competence in assessing academic judgments, 'courts will not generally interfere in the operations of colleges and universities.'" *Onawola v. Johns Hopkins University*, 412 F. Supp. 2d 529, 532 (D. Md. 2006) (quoting *Harwood*, 130 Md. App. at 483, 747 A.2d at 209). To that end, courts must "enter the realm of school discipline with caution" and allow schools flexibility in establishing and enforcing disciplinary procedures. *Woodis v. Westark Community College*, 160 F.3d 435, 438 (8th Cir. 1998); *see Valente v. Univ. of Dayton*, 438 F. App'x 381, 384 (6th Cir. 2011) ("Contracts for private education have unique qualities and must be construed to allow the institution's governing body to meet its educational and doctrinal responsibilities."); *Huang v. Bd. of Governors of the Univ. of N.C.*, 902 F.2d 1134, 1142 (4th Cir. 1990) ("When judges are asked to review the substance of a genuinely academic decision ... they should show great respect for the faculty's professional judgment.") (applying North Carolina law).

Notably "a student asserting a breach of contract claim must identify the specific terms of the implied contract that were allegedly violated by the college (such as an internal rule, regulation, or code), and failure to do so is fatal to the claim." *Rolph v. Hobart and William Smith Colleges*, 271 F. Supp. 3d 386, 405-6 (W.D.N.Y. 2017) (citing *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 207 (W.D.N.Y. 2013)). In addition, "[n]ot all terms in a student handbook are enforceable contractual obligations…and courts will only enforce terms that are 'specific and concrete.'" *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 709 (D. Vt. 2012) (citation omitted), *aff'd*, 570 F. App'x 66 (2d Cir. 2014). Thus, "[l]anguage in a college handbook or other official statement that is merely aspirational in nature, or that articulates a general statement of a school's 'ideals,' 'goals,' or 'mission,' is not enforceable." *Id.* (quoting *Ullmo ex rel. Ullmo v. Gilmour Acad.*, 273 F.3d 671, 676–77 (6th Cir. 2001) (holding "a breach of contract claim will not arise from the failure to fulfill a statement of goals or ideals")).

To be sure, "a college 'may not act maliciously or in bad faith by arbitrarily and capriciously refusing to award a degree to a student who fulfills its degree requirement[s].'" *Harwood*, 130 Md. App. at 484, 747 A.2d at 209 (internal citations omitted). In that circumstance, "a court will step in and require it to live up to the conditions of the agreement it made with a student." *Id.* (citing *Woods v. Simpson*, 146 Md. 547, 551, 126 A. 882 (1924) ("When it is made clear that an action with respect to a student has been, not an honest exercise of discretion ... but beyond the limits of that discretion ... the courts may be called upon for relief.")).  But, plaintiff does not allege such a breach.

Rather, plaintiff alleges that Loyola breached a contractual relationship arising from its Sexual Misconduct Policy. ECF 1, ¶ 167. Specifically, she alleges that Loyola: (a) discriminated against her on the basis of her gender; (b) failed to provide adequate policies and procedures for investigation and adjudication of complaints of alleged sexual misconduct; (c) operated from a presumption that plaintiff committed sexual assault; (d) conducted a cursory, superficial, biased, and fundamentally unfair investigation, hearing, and appeal process; (e) prevented plaintiff from contacting witnesses; (f) failed to allow plaintiff to present a complete defense; (g) rendered an adverse decision against plaintiff without sufficient evidence to support it; (h) failed to impose a proportionate and reasonable sanction; (i) issued an arbitrary and capricious determination; (j) misapplied its own consent standard as elaborated in its Community Standards; and (k) failed to provide plaintiff with an impartial process.  *Id.*

Loyola seems to concede that the parties had a contractual relationship, but it urges dismissal of plaintiff's contract claim because she does not identify any specific terms of the Sexual Misconduct Policy that Loyola breached. ECF 12-1 at 29-30.  In its view, the allegations

in paragraph 167 of the Complaint are merely "eleven general grievances" that are insufficient to state a claim for relief based on breach of contract. *Id.* at 30.

Indeed, with the exception of the allegation about the consent standard, ECF 1, ¶ 167(f), the Complaint does not identify any specific contract terms that Loyola allegedly violated. In her Opposition, plaintiff contends that Loyola breached its contract with plaintiff because it "failed to provide the fair and impartial resolution it promised" in the Handbook. ECF 33 at 22. In particular, she says that the Handbook provides: "The University's procedures provide for prompt, fair, equitable, and impartial investigation and resolution of all reports of sexual misconduct." *Id.* However, a party may not supplement the facts of a complaint with an opposition to a motion to dismiss. *See, e.g.*, *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (noting that "'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss'") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)).

In any event, to determine the viability of this argument, the Court must construe this provision so as to give effect to the parties' intent in promising a "fair" and "impartial" process. The terms cannot be considered in isolation. *See DIRECTV, Inc.*, 376 Md. at 313, 829 A.2d at 632-33; *Nova Research, Inc. v. Penske Truck Leasing, Co.*, 405 Md. 435, 952 A.2d 275, 283 (2008) ("In interpreting a contract provision, we look to the entire language of the agreement, not merely a portion thereof."). Rather, the Court must consider the words in the context of the Sexual Misconduct Policy as a whole.

In the Policy, the contractual promise for a "prompt, fair, equitable, and impartial investigation and resolution" is immediately followed by a description of the precise procedures that the investigator and then the hearing panel must follow in resolving the matter. Thus, in this

context, it is plain that the "fair" investigation that the parties' contemplated is that which is set forth in the paragraphs of the Policy immediately following the promise of fairness. Indeed, in the absence of any other indication as to what would be required of a "fair" process, it is apparent that Loyola promised the requirements specifically set forth in the Policy. *See Walton*, 391 Md. at 660, 894 A.2d at 594; *see also Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 713 (S.D. Ohio 2015) (The "proper focus in analyzing whether a private university provided fundamental fairness is whether the University adhered to its misconduct procedure.") (citation omitted).

And, as discussed, *supra*, based on the allegations in the Complaint, and the exhibits submitted by plaintiff, Loyola complied with all of the requirements set out in its Sexual Misconduct Policy. *See Schaumleffel v. Muskingum Univ.*, No. 2:17-cv-463, 2018 WL 1173043, at *11 (S.D. Ohio Mar. 6, 2018) ("[The university] conducted an investigation into the allegations and prepared a report. Those actions are sufficient under the Student Handbook."); *Doe v. Columbia Coll. Chicago*, Case No. 17-CV-00748, 2018 WL 497284, at *7 (N.D. Ill. Jan. 22, 2018) (breach of contract claim regarding inadequate investigation failed where school met with and communicated with both complainant and respondent throughout the investigation, gathered facts and witnesses, considered the evidence provided and the credibility of the parties, and created an investigation report); *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 892 (N.D. Ohio 2017) (student's breach of contract claim failed where complaint allegations demonstrated that investigation was conducted in accordance with the student handbook); *Yu v. Vassar Coll.*, 97 F. Supp. 3d at 481 ("Because the Court has already found that Vassar did not violate any of its own procedures, Yu's contract claims based on the same purported violations fail for the same reasons."); *Dempsey v. Bucknell Univ.*, No. 4:11–CV–1679, 2012 WL 1569826, at *18 (M.D. Pa.

May 3, 2012) (breach of contract claim failed where allegations demonstrated that investigation into assault complaint was conducted).

Moreover, it is not the Court's role to conduct "a sufficiency-of-the-evidence" review of the school's findings. *Doe v. American Univ.*, 19-cv-03097(APM), 2020 WL 5593909, at *16 (D.D.C. Sept. 18, 2020) ("As framed, Doe's theory of breach amounts to a demand that the court conduct a sufficiency-of-the-evidence, appellate-style review of [the school's] findings, which it cannot do."); *see Univ. of the South*, 687 F. Supp. 2d at 755 (stating that it is not for the courts to review "whether a sexual assault occurred, whether any such acts were consensual, or who, as between John Doe and the Complainant is credible").

Accordingly, "the Complaint cannot—and does not—state a breach of contract claim upon which relief can be granted insofar as it alleges that Defendant failed to provide a 'fair' investigation or 'fair' hearing without identifying some other, specific provision in the [Sexual Misconduct Policy] that was allegedly breached." *Doe v. Trs. of the Univ. of Pa*., 270 F. Supp. 3d 799, 812 (E.D. Pa. 2017); *see Prasad v. Cornell Univ.*, No. 5:15-cv-322, 2016 WL 3212079, at *20 (N.D.N.Y. Feb. 24, 2016) ("The Amended Complaint appears to indicate that Cornell breached a general agreement to provide Plaintiff an impartial and timely disciplinary hearing, but it is not the Court's function to speculate what Plaintiff intended. Because Plaintiff does not specify what agreement Defendant violated, and how it was violated, Plaintiff's breach of contract claim must be dismissed."); *see also Jaksa v. Regents of Univ. of Mich*., 597 F. Supp. 1245, 1250 (E.D. Mich. 1984) ("While a university cannot ignore its duty to treat its students fairly, neither is it required to transform its classroom into courtrooms.").

As noted, plaintiff alleges that Loyola misapplied its consent standard as set forth in the Policy. ECF 1, ¶ 167. The Policy defines consent as "affirmative indication by words and/or

actions of a voluntary agreement to engage in the particular sexual act or conduct in question." ECF 2-1 at 35. But, the Policy also expressly states that consent "cannot be given by someone who is not able to effectively communicate *or* to understand the nature of the conduct being engaged in as a result of incapacitation due to consuming drugs or alcohol or for any other reason…." *Id.* (emphasis added). The provision is in the disjunctive. *See Plank v. Cherneski*, 469 Md. 548, 620, 231 A.3d 436, 478 (2020) ("Maryland courts generally interpret 'or' in the disjunctive sense when they construe statutes.") (citing *SVF Riva Annapolis, LLC v. Gilroy*, 459 Md. 632, 642, 187 A.3d 686 (2018) (noting that "or" is a conjunction "[u]sed to indicate an alternative....")). This means that the panel had to find one criterion, not both.

According to Tiscione, the panel "honed in on" the Policy language that says "consent cannot be given by someone who is not able to effectively communicate, or…to understand the nature of the conduct being engaged in as a result of the incapacitation." ECF 2-11 at 43-44. The panel correctly interpreted this provision to mean that if either prong is met—a person is not able to communicate effectively or cannot understand the nature of the conduct being engaged in—that meets the definition of a person who cannot give consent. *Id.* at 44. Pursuant to that interpretation, the panel determined that John Doe met the prong involving communication. In the view of the panel, John Doe was unable to communicate effectively at the time of the sexual encounter because he was intoxicated. Thus, the panel found that he was incapacitated and unable to give consent. *Id.* at 46.

Plaintiff does not suggest that the panel was incorrect to interpret the consent standard in this manner. And, there are no factual allegations in the Complaint that support a plausible inference that Loyola breached the terms of the contract as set out in the Sexual Misconduct Policy, merely because plaintiff disagrees with the decision. Plaintiff's "disappointment" with the

outcome "is an insufficient basis for a breach of contract claim." *Vanderbilt Univ.*, 355 F. Supp. 3d at 692. Accordingly, the Motion is granted as to Count IV, without prejudice.

**C. Negligence (Count III)**

In Count III, plaintiff claims that, as a result of its student disciplinary process, Loyola owed a duty of care to plaintiff to conduct the process "in a non-negligent manner and with due care to avoid arbitrarily dismissing students." ECF 1, ¶ 159. According to plaintiff, Loyola breached that duty by "implementing its Policy in a manner that is biased against the accused, failing to proceed with a presumption of innocence, and failing to implement the policy in a manner that would result in a fair process, tilted to favor a particular outcome by not having a fair and neutral fact finder and panel member." *Id.* ¶ 160.

In the Motion, defendant argues that plaintiff's negligence claim fails because it is predicated on Loyola's Sexual Misconduct Policy. In Loyola's view, the claim "is an improper attempt to backdoor her deficient breach of contract claim under a different title." ECF 34 at 15; *see* ECF 12-1 at 34-35.

To establish a negligence claim in Maryland, the plaintiff must prove the following: "(1) the defendant owes the plaintiff a duty of care; (2) the defendant breached that duty; (3) the plaintiff sustained an injury or loss; and (4) the defendant's breach of the duty was the proximate cause of the plaintiff's injury." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 611, 155 A.3d 445, 451 (2017) (citing *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212-13, 60 A.3d 1, 10 (2013)); *see Schultz v. Bank of Am., N.A.*, 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010) ("In a negligence case, there are four elements that the plaintiff must prove to prevail: 'a duty owed to him [or her] (or to a class of which he [or she] is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the

harm suffered, and damages.'" (alterations in *Schultz*) (quoting *Jacques v. First Nat. Bank of Md.*, 307 Md. 527, 531, 515 A.2d 756, 758 (1986))).

It is well settled that "'[t]he mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort.'" *Blondell v. Littlepage*, 413 Md. 96, 120-21, 991 A.2d 80, 94 (2010) (quoting *Jacques*, 307 Md. at 534, 515 A.2d at 759 (1986)); *see also Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 252, 725 A.2d 1053, 1058 (1999) ("A contractual obligation, by itself, does not create a tort duty. Instead, the duty giving rise to a tort action must have some independent basis.").

Thus, "when the dispute is over the existence of any valid contractual obligation covering a particular matter, or where the defendant has failed to recognize or undertake any contractual obligation whatsoever, the plaintiff is ordinarily limited to a breach of contract remedy." *Mesmer*, 353 Md. at 254, 725 A.2d at 1059. In contrast, "when the defendant has proceeded on the basis that a contractual obligation exists, has undertaken that obligation, and has undertaken it in violation of the appropriate standard of care, ... the plaintiff may, in some circumstances, maintain a tort action." *Id.*

The Court of Appeals of Maryland has explained that "[t]here is no set formula for the determination of whether a duty exists." *Doe v. Pharmacia & Upjohn Co*., 388 Md. 407, 879 A.2d 1088, 1092 (2005). Duty may be defined as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Patton v. U.S. Rugby Football*, 381 Md. 627, 851 A.2d 566, 571 (2004) (quoting W. Page Keeton, et al., Prosser and Keeton on The Law of Torts § 53 (5th ed.1984)). "At its core, the determination of whether a duty

exists represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant." *Gourdine v. Crews*, 405 Md. 722, 955 A.2d 769, 783 (2008).

Courts consider a variety of factors to determine whether a duty exists, *Pendleton v. State*, 398 Md. 447, 461-62, 921 A.2d 196, 205 (2007) (quoting *Ashburn v. Anne Arundel Cnty.*, 306 Md. 617, 510 A.2d 1078, 1083 (1986)):

> The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

The Complaint does not allege that Loyola had any duties in addition to the obligations set forth in the Handbook.  To the contrary, plaintiff only alleges that Loyola assumed and breached the duties set forth therein. ECF 1, ¶ 159. Because plaintiff has not identified a source of duty outside the relationship established by the Handbook, her negligence claim is an impermissible attempt to recast her contractual claim in the language of tort.

Plaintiff contends that she can bring a separate negligence claim against Loyola outside of the duty created by the contract because "there is a duty on [a] school, rooted in principles of due process and fundamental fairness, that gives rise to a negligence claim." ECF 33 at 18.  In support of her argument, plaintiff relies on district court decisions from Massachusetts and Tennessee, both of which supposedly recognized a special relationship between a university and its students, giving rise to certain duties. ECF 33 at 19-20 (citing *Brandeis Univ.*, 177 F. Supp. 3d 561; *Univ. of the South*, 687 F. Supp. 2d 744).

However, neither case turns on Maryland law. And, to my knowledge, there is no Maryland law establishing the duty plaintiff claims Loyola breached. Moreover, I decline to recognize a new

common law tort that has not been previously recognized by the Maryland Court of Appeals. *See Marymount Univ.*, 297 F. Supp. 3d at 589–90 (dismissing as a matter of law a plaintiff student's attempt to create a similar unrecognized negligence duty under Virginia law) (citing *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998) ("As a federal court exercising concurrent jurisdiction over this important question of state law we are most unwilling to extend North Carolina tort law farther than any North Carolina court has been willing to go.")).

Thus, plaintiff's negligence claim fails as a matter of law. *See Vanderbilt*, 355 F. Supp. 3d at 705; *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 962 (N.D. Ill. 2017) (rejecting plaintiff's negligence claim because the school did not "owe a duty to its students relating to the implementation of student disciplinary proceedings") (internal citations omitted), *aff'd*, 933 F.3d 849 (7th Cir. 2019); *Coll. of Wooster*, 243 F. Supp. 3d at 895 (dismissing student's negligence claim against the college regarding discipline imposed on the plaintiff through the college's disciplinary policy and holding that the existence of the college's disciplinary policy governed the relationship between the parties and dictated that the student had no cause of action in negligence but rather only in contract); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 228 (D. Mass. 2017) (rejecting plaintiff's negligence claim because college did not find that a legal duty was owed directly to students, relating to the implementation of student disciplinary proceedings); *Doe v. Trs. of Boston Coll.*, No. 15-CV-10790, 2016 WL 5799297, at *28 (D. Mass. Oct. 4, 2016) (rejecting negligence claim for unfair disciplinary proceedings relating to sexual assault because university does not owe duty of care to students in relation to disciplinary proceedings), *aff'd*, 892 F.3d 67, 84 (1st Cir. 2018).

**D. Covenant of Good Faith and Fair Dealing (Count V)**

Plaintiff alleges that Loyola breached its implied duty of good faith and fair dealing. ECF 1, ¶¶ 169-172. Loyola urges dismissal of this claim because it contends that Maryland does not

recognize an independent cause of action for breach of a duty of good faith and fair dealing. ECF 12-1 at 35.

Maryland recognizes that every contract imposes a duty of good faith and fair dealing in its performance. *See Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 534, 200 A.2d 166, 174 (1964). However, Maryland courts have not explicitly recognized a separate cause of action for breach of this duty. *Maryland Physician's Edge, LLC v. Behram*, DKC-17-2756, 2019 WL 4573417, at *8 (D. Md. Sept. 20, 2019) (citing *Abt Associates, Inc. v. JHPIEGO Corp.*, 104 F. Supp. 2d 523, 534 (D. Md. 2000); *see Baker v. Sun Co.*, 985 F. Supp. 609, 610 (D. Md. 1997) ("Maryland does not recognize an independent cause of action for breach of the implied contractual duty of good faith and fair dealing.")); *cf. Alig v. Quicken Loans*, __ F.3d __, 2021 WL 899305, at *11 (4th Cir. Mar. 10, 2021) (noting that West Virginia law does not allow an independent claim for breach of the implied covenant, and "plaintiffs cannot pursue a claim for breach of the implied covenant where they failed to allege breach of contract").

Because plaintiff has failed to state a claim for breach of contract, she cannot succeed in asserting a separate claim for breach of a duty of good faith and fair dealing. *See Coll. of Wooster*, 243 F. Supp. 3d at 894 (dismissing plaintiff's good faith and fair dealing claim because plaintiff failed to statement a claim for breach of contract); *Yu v. Vassar Coll.*, 97 F. Supp. 3d at 482 (student's breach of "good faith" contract claim under similar NY law dismissed).

In addition, plaintiff does not address Loyola's argument as to Count V in her Opposition or oppose its dismissal. *See* ECF 33. Therefore, she has waived any opposition to the defendant's argument. *See Stenlund v. Marriot Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016) ("In failing to respond to [defendant's] argument, Plaintiff concedes the point."); *Ferdinand-Davenport v.*

*Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (same). Accordingly, I shall grant the Motion as to Count V.

**E. Declaratory Judgment (Count I)**

In Count I, plaintiff seeks a declaratory judgment related to alleged violations of Title IX regulations and guidance. ECF 1, ¶¶ 140-148. In particular, she seeks a declaration that Loyola's disciplinary process in 2018-2019 as written, implemented, and applied, violated Title IX. *Id.* ¶ 148.

The Declaratory Judgment Act "is remedial only and neither extends federal courts' jurisdiction nor creates any substantive rights." *CGM, LLC v. BellSouth Telcoms., Inc.*, 664 F.3d 46, 55 (4th Cir. 2011) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950)); *see also Profiles, Inc. v. Bank of America Corp.*, 453 F. Supp. 3d 742, 752 (D. Md. 2020) ("The Declaratory Judgment Act 'provides a remedy in cases otherwise in the Court's jurisdiction; it does not create an independent cause of action.'") (quoting *Elec. Motor and Contracting Co., Inc. v. Travelers Indemnity Co. of Am.*, 235 F. Supp. 3d 781, 793 (E.D. Va. 2017)). In other words, a plaintiff's claim for declaratory relief is concomitant to and coterminous with her substantive claims. Consequently, "'[a] request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred.'" *CGM, LLC*, 664 F.3d at 55-56 (alteration in original) (citation omitted).

Because plaintiff has failed to establish a claim for violation of Title IX, and the request for declaratory relief rests on this claim, the claim for declaratory judgment also fails. *See Vassar Coll.*, 97 F. Supp. 3d at 484 ("Given that [plaintiff] has failed to establish his other claims, and the declaratory relief sought rests on those claims, his claim for declaratory judgment also fails."); *Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 WL 7254213, at *13 (S.D. Ohio Nov. 17, 2015)

(dismissing declaratory judgment claim because "[w]ithout an actionable [Title IX] claim, there is no controversy to be settled").

## IV. Conclusion

For the foregoing reasons, the Motion (ECF 12) is granted, without prejudice. I shall grant plaintiff leave to amend the Complaint as to her Title IX (Count II) and breach of contract (Count IV) claims.

An Order follows, consistent with this Memorandum Opinion.

Date: March 29, 2021

/s/
Ellen L. Hollander
United States District Judge